# ORIGINAL

FILED
HARRISBURG

MAR 1 4 2002

MARY E. D'ANDREA, CLERK
Per _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CLEARY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 1:CV-00-2125 |
| v. | : | |
| | : | (Judge Caldwell) |
| KENNETH KYLER, et al., | : | |
| | : | |
| Defendants | : | |

### DEFENDANTS' BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

## I.   STATEMENT OF THE CASE

This civil rights action was initiated by John Cleary ("Plaintiff"), an inmate
presently confined at the State Correctional Institution at Pittsburgh ("SCI-
Pittsburgh") and formerly confined in the Special Management Unit ("SMU") at
the State Correctional Institution at Camp Hill ("SCI-Camp Hill").  The
Defendants include former Superintendent Kenneth Kyler, former SMU Unit
Manager William S. Ward, and former Mailroom Supervisor Howard Imschweiler.

In his Complaint, the Plaintiff states that he was housed in the SMU at SCI-Camp Hill between October 10, 1997 and July 7, 1999. Complaint at ¶7. He was also confined for a brief period in the Mental Health Unit ("MHU") at SCI-Camp Hill between August 27, 1999 and August 30, 1999. Complaint at ¶¶8-9.

The Plaintiff contends that the Defendants wrongly withheld legal and other mail from him while he was confined in the SMU at SCI-Camp Hill. Specifically, he contends that he did not receive a piece of legal mail, which was postmarked December 5, 1997, until November 12, 1999. Complaint at ¶¶12-16. This delay allegedly caused him to be unprepared for the trial of the matter and he lost the case. Complaint at ¶18. He indicates he had court-appointed counsel for this civil case. Complaint at ¶13.

He further states that he did not receive religious books, which were postmarked June 4, 1998, until November 16, 1999. Complaint at ¶¶32-34. Finally, he contends that he did not receive additional religious books postmarked November 20, 1998, until November 23, 1999. Complaint at ¶¶41-43. The Plaintiff contends that the delayed delivery of the religious books resulted in a denial of his religious freedom. Complaint at ¶¶39, 47.

The Plaintiff initiated this action by filing his Complaint on December 7, 2000. The Defendants have waived service of summons. On August 31, 2001, the Court granted in part and denied in part the Defendants' Motion to Dismiss

Plaintiff's Complaint.  The Court dismissed the Plaintiff's Eighth Amendment claim relating to his personal correspondence, but refused to dismiss the Plaintiff's access to courts and religious freedom claims.

On October 23, 2001, the deposition of Plaintiff John Cleary was taken.  At that time, he testified that he never had any face-to-face meetings with Superintendent Kyler.  He only knew Superintendent Kyler through grievance appeals.  Deposition at 7-8.  He never discussed with Kyler the two-year delay in the receipt of his legal and religious mail.  He cannot say if Kyler had any role in the delay of his mail.  He also cannot say whether or not Unit Manager Ward had any role in delaying his mail.  Deposition at 58.

Plaintiff also testified that he had filed an excessive use of force claim arising out of an incident at SCI-Graterford in 1995.  That matter was entitled *Cleary v. Vaughn* and filed in the Eastern District of Pennsylvania.  His court-appointed attorney in that case was Christopher Culleton, Esquire of Philadelphia.  Deposition at 13-14.  See also Deposition Exhibit 1.  Plaintiff felt that Attorney Culleton provided the best representation he could, given the circumstances.  The jury trial lasted about a week in April of 1998 and resulted in a verdict against the Plaintiff.  Deposition at 15-16.  Prior to the trial, he met with Attorney Culleton to prepare for trial.  He also communicated with Culleton concerning the lawsuit both

3

while he was at SCI-Graterford and later when he was at SCI-Camp Hill.

Deposition at 17-20.

Plaintiff's letter from Attorney Culleton was postmarked December 1998, but was not received by the Plaintiff until 1999.  The letter contained a copy of Plaintiff's deposition taken in *Cleary v. Vaughn*, as well as a trial sentencing order in the same case.  Deposition at 22-23; see also Deposition Exhibit 2.  Plaintiff cannot say if his trial would have been different if he had received the package earlier.  He stated it was up to the jury.  He testified to the best of his ability.  Deposition at 31-32.  He felt that Attorney Culleton provided him the best representation he could under the circumstances.  Deposition at 15.

Plaintiff testified that he is of the "Nazarite" religious faith, which is a type of Hebrew faith.  Deposition at 34.  Those of the Nazarite faith do not pray together.  They pray individually.  They also read the Torah and fast.  Deposition at 38-39.

Two envelopes containing Nazarite religious material were delayed and not delivered until 1999.  The first was from the House of Yahweh in Abilene, Texas.  That envelope contained several religious tracts.  Deposition at 41-42.  Plaintiff maintained 20-25 religious tracts in his cell and more in storage.  Deposition at 43; see also Deposition Exhibit 3.  The other envelope was from New Covenant Assembly in Kingdom City, Missouri.  That also contained several small religious

tracts, amounting to one to five pages each.  Deposition at 50-53.  (A third envelope, which was also delayed, did not contain material on the Nazarite faith. Rather, it contained Muslim books.  Deposition at 54-55; Deposition Exhibit 4.)

Plaintiff conceded that he was still able to practice his religious faith, even without the religious tracts, which he did not receive until 1999.  Deposition at 59. He continues to pray and observe the Sabbath.  Deposition at 55-56.

This brief is filed in support of the Defendants' Motion for Summary Judgment.

## II.    STATEMENT OF ISSUES PRESENTED

1.    ARE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S ACCESS TO THE COURTS CLAIM, SINCE THE DELAY IN THE RECEIPT OF HIS LEGAL MAIL DID NOT RESULT IN AN ACTUAL INJURY TO HIS EXCESSIVE USE OF FORCE CASE?

Suggested Answer:        YES.

2.    ARE THE DEFENDANTS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S RELIGIOUS FREEDOM CLAIM, SINCE HE WAS STILL ABLE TO PRACTICE HIS RELIGIOUS FAITH WITHOUT THE DELAYED RELIGIOUS MAIL?

Suggested Answer:        YES.

## III.   ARGUMENT

1.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S ACCESS TO THE COURTS CLAIM, SINCE THE DELAY IN THE RECEIPT OF HIS LEGAL MAIL DID NOT RESULT IN AN ACTUAL INJURY TO HIS EXCESSIVE USE OF FORCE CASE.

The Plaintiff is unable to establish that he suffered an actual injury to his legal claim in this matter, which is an essential element of his denial of access to the courts claim.  Therefore, the Defendants are entitled to summary judgment in their favor.

Before a litigant can claim denial of access to the courts, he must first demonstrate that his right to access was infringed upon, and that some actual injury occurred, that is, that his pending meritorious litigation was affected in some way. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Oliver v. Fauver*, 118 F.3d 175, 177 (3d Cir. 1997).  An actual injury includes the loss or rejection of a non-frivolous legal claim regarding his sentence or conditions of confinement.  *Lewis*, 518 U.S. at 351-5; *Robinson v. Ridge*, 996 F. Supp. 447, 449 (E.D. Pa. 1997), *aff'd*, 175 F.3d 1011 (3d Cir. 1999).

Plaintiff has testified that his prior excessive use of force case went to trial in April of 1998.  This resulted in a jury verdict against him.  He concedes at his deposition regarding the outcome of the trial: "That was up to the jury." Deposition at 51.  He also stated: "I could have been more prepared I believe, you

6

know, than I actually was. I mean, then I could have been more prepared than anything and still could have lost, you know." Deposition at 31-32.

Plaintiff is unable to say whether or not the delay in the receipt of his legal mail from Attorney Culleton affected the outcome of the trial. Deposition at 31. In fact, the evidence seems to indicate that the delayed letter from his attorney had absolutely no effect on the outcome of the trial. The Plaintiff was still able to communicate with Attorney Culleton, while Plaintiff was at SCI-Graterford and while he was at SCI-Camp Hill. Deposition at 18-20. He was able to meet with Attorney Culleton to prepare for trial. Plaintiff has testified that he reviewed his deposition with Attorney Culleton prior to the trial. He also felt that Attorney Culleton provided the best representation he could, given the circumstances. Deposition at 15, 33.

The weight of the evidence indicates that the two-year delay in receipt of the letter from Attorney Culleton had no effect on the outcome of the jury trial in the use of force case. Plaintiff was still able to contact and correspond with his attorney before the trial. In fact, he was able to meet with the attorney prior to the trial and prepare for the trial. The bottom line is that the matter came down to a credibility determination and the jury did not believe the Plaintiff. It also strains one's credibility to believe that the delay of a single letter somehow sabotaged his trial.

This case is analogous to the case of *Williams v. Frame*, 821 F. Supp. 1093 (E.D. Pa. 1993). In *Williams*, an inmate claimed that prison officials delayed the delivery of his legal and personal mail. The Court dismissed the matter as frivolous, since the prisoner failed to show that the interference resulted in any injury to him.

In addition, where a plaintiff has court-appointed counsel, he cannot assert a denial of access to the courts claim. *Peterkin v. Jeffes*, 855 F.2d 1021, 1046 (3d Cir. 1988); *Morrow v. Harwell*, 640 F. Supp. 225, 227 (W.D. Tex. 1986); *Urbano v. McCorkle*, 334 F. Supp. 161, 164 (D.N.J. 1971), *aff'd*, 481 F.2d 1400 (3d Cir. 1973). Plaintiff has testified that Attorney Culleton was his court-appointed counsel for the use of force claim. (This is confirmed in the dockets to the Eastern District case.) Therefore, he cannot assert a denial of access to the courts claim with regard to the outcome of *Cleary v. Vaughn*.

Furthermore, even assuming that the Plaintiff suffered some injury as a result of the delay in his legal correspondence, the evidence does not show any personal involvement on the part of Defendants Kyler and Ward. Liability in a case brought under the Civil Rights Act may only be based upon a defendant's personal involvement in the conduct amounting to a constitutional violation. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3 Cir. 1988); *Egan v. Concini*, 585 F.Supp. 801, 804 (M.D. Pa. 1984). In other words, liability cannot be premised on a theory

of *respondeat superior*. *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976).

In their declarations, Defendants Kyler and Ward both indicate that they had no involvement in the delay of the Plaintiff's legal mail. See Ward declaration at ¶3; Kyler declaration at ¶6. Kyler declares that he never discussed the delay of the Plaintiff's legal mail with the Plaintiff and had no knowledge about the delay until after the fact. Plaintiff confirmed this in his deposition. Superintendent Kyler cannot be liable, based merely on his title and position at SCI-Camp Hill. Absent any personal involvement on their part, they are entitled to summary judgment in their favor and against the Plaintiff.

2.  THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S RELIGIOUS FREEDOM CLAIM, SINCE HE WAS STILL ABLE TO PRACTICE HIS RELIGIOUS FAITH WITHOUT THE DELAYED RELIGIOUS MAIL.

The Defendants are also entitled to summary judgment on the Plaintiff's religious freedom claim. Plaintiff is unable to establish that the delay in receipt of some religious tracts interfered with or prohibited him from practicing his religious faith.

At his deposition, Plaintiff testified he is of the Nazarite faith. He testified that as part of his faith, he prayed almost everyday and read the Torah. He also fasted as part of his faith. Deposition at 38-39. The delay in receipt of the

religious tracts did not affect his ability to pray. At his deposition, he stated that he did not need the religious tracts to pray. Deposition at 52.

Furthermore, Plaintiff stated that he was still able to practice his faith, without the religious tracts, which he eventually received in 1999. Deposition at 59. He also maintained 20-25 religious tracts in his cell and more in storage at the prison. Deposition at 43. It is clear that the temporary loss of the religious tracts had no effect on his ability to practice his religious faith. Therefore, it cannot be said that the Defendants interfered with the Plaintiff's right to practice his religion under the First Amendment.

Many prison policies and practices have been found not to interfere with an inmate's right to practice his religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987)(restrictions on inmate movement did not violate Muslim inmates' rights); *The Holy Name Society v. Horn*, 2001 WL 959408 (E.D. Pa. August 21, 2001)(denial of fellowship meal to Catholic inmates did not violate their rights)(copy attached); *Robinson v. Horn*, 2001 WL 1101351 (E.D. Pa. August 7, 2000)(Native American inmate not entitled to "smudge" in his cell)(copy attached). In deciding if there is a constitutional violation, the courts often look to whether the prisoner maintained the ability to practice his or her religion, despite the prison regulation. *O'Lone*, 482 U.S. at 352; *The Holy Name Society*, 2001 WL 959408 at *10; *DeHart v. Horn*, 227 F.3d 47, 55 (3d Cir. 2000).

While there is no prison regulation at issue here, it is clear that the Plaintiff maintained the ability to practice the Nazarite faith, despite the lack of the delayed tracts. He could still pray, fast, read the Torah and read his other religious tracts. By his own admission, the lack of the religious mail did not affect his ability to be a good Nazarite.

In addition, the law states that isolated instances cannot rise to the level of a constitutional violation. *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988)(single incident of food poisoning was not violation of inmate's rights); *Roach v. Kligman*, 412 F. Supp. 521, 527 (E.D. Pa. 1976)(isolated incidents of uncomfortable conditions not cruel and unusual punishment). Since the delay of the Plaintiff's mail was an isolated incident, it cannot rise to the level of a constitutional violation.

The same lack of personal involvement on the part of Defendants Ward and Kyler applies to the Plaintiff's religious claim. *Rode*, 845 F.2d at 1207; *Egan*, 585 F.Supp. at 804. *See also Williams*, 821 F. Supp. at 1098 (claim dismissed where inmate failed to show how mail to religious group was lost). Since neither Ward nor Kyler had any role in the delay of the religious mail to the Plaintiff, they cannot be liable under the Civil Rights Act to the Plaintiff. Neither of them worked in the mailroom at SCI-Camp Hill. Therefore, they are entitled to summary judgment in their favor and against the Plaintiff.

With respect to Defendant Imschweiler, the most that the Plaintiff may be able to establish at time of trial is that he was negligent in the delivery of the Plaintiff's mail.  However, mere negligence does not establish a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 330 (1986).  In addition, with respect to any state law negligence claim against Imschweiler, Imschweiler would be protected under the Sovereign Immunity Act, 42 Pa.C.S. §8522(a).  *See also Frazier v. SEPTA*, 868 F. Supp. 757, 761 (E.D. Pa. 1994).

## IV.   CONCLUSION

For all of the above reasons, it is respectfully requested that the Court grant

the Defendants' Motion for Summary Judgment and enter summary judgment in

favor of the Defendants and against the Plaintiff.

Respectfully submitted,

Raymond W. Dorian
Assistant Counsel
Attorney I.D. No. 48148

PA Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:        March 14, 2001

2000 WL 1101351
(Cite as: 2000 WL 1101351 (E.D.Pa.))
**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

James Four Deer Walking **ROBINSON**,
v.
Martin **HORN**, et al.

No. CIV. A. 97-3657.

Aug. 7, 2000.

FINDINGS OF FACT, CONCLUSIONS OF
LAW AND FINAL JUDGMENT

HUTTON

*1 Presently before the Court are Defendants
Corrections Officials' ("Defendants") Motion for
Summary Judgment (Docket No. 121), pro se
Plaintiff James Four Deer Walking Robinson's
("Plaintiff") response thereto (Docket No. 122),
Defendants' Reply Brief (Docket No. 125),
Plaintiff's Response Motion in Opposition to
Defendants' Reply Brief (Docket No. 130),
Defendants' Post-Oral Argument Supplement to
Motion for Summary Judgment (Docket No. 134),
and Plaintiff's Supplemental Statements and
Averments Continued from Hearing of 5/18/2000
(Docket No. 135). The Court held a hearing on
May 18, 2000. The Court now enters the
following findings of fact and conclusions of law.
See Federal Rule of Civil Procedure 52(a).

I. FINDINGS OF FACT

1. Plaintiff, who is currently an inmate at SCI-
Graterford, and James Hunt Warcloud
("Warcloud"), a former inmate at SCI-Graterford,
[FN1] filed suit against Defendants on or about
May 27, 1997.

> FN1. Warcloud is no longer an inmate in the
> Pennsylvania correctional system.

2. Each Defendant is an official of the
Pennsylvania Department of Corrections
("DOC").

3. As Warcloud is no longer a party to this
lawsuit, [FN2] and a number of Plaintiff and

Warcloud's claims were previously dismissed,
only Plaintiff's First Amendment free exercise
claims and Fourteenth Amendment equal
protection claims remain for adjudication.

> FN2. As the DOC released Warcloud, the Court
> thereafter granted Defendants' Motion to
> Dismiss Warcloud's claims.

4. Plaintiff's claims relate to the exercise of his
religion, Native American Spirituality.

5. Plaintiff is one-sixteenth Cherokee, (see Trans.
at 5), and converted from Christianity to Native
American Spirituality while incarcerated.

6. Plaintiff is a member of the American
Cherokee Confederacy. (See Trans. at 6).

7. At SCI-Graterford, group prayer and group
activities are available to those inmates who
practice Native American Spirituality. (See Defs.'
Mot. for Summ. J., Declaration of Rev. E.
Neiderhiser at 2-3). Defendant Reverend
Neiderhiser coordinates the religious activities for
all accommodated religious activities at SCI-
Graterford, including the recruitment and
oversight of a volunteer to lead Native American
group worship. (See Defs.' Mot. for Summ. J.,
Declaration of Rev. E. Neiderhiser at 2-3).

8. Prior to the Court's hearing of May 18, 2000,
Plaintiff attended only two group prayer sessions
and attempted to attend a third session which was
cancelled due to the Native American volunteer's
unavailability. (See Trans. at 52).

9. The Native American volunteer at SCI-
Graterford leads weekly one and one- half hour
prayer and education sessions. (See Trans. at
21-22). He brings to the sessions tapes, literature,
photographs, a ceremonial pipe, a red pipe stone,
etc. (See Trans. at 52-53). At SCI-Graterford,
there is also a chest which holds sacred herbs,
tobacco, a smudging shell, feathers, burning
rights, and other items used in group worship.
(See Trans. at 52-53).

10. Plaintiff claims that his rights are being
violated because he is denied "[r]easonable access
to his religious culture, spirituality, and to practice

same respectively." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 2) (hereinafter, "Claim I").

*2 11. Plaintiff claims that his rights are being violated because he is denied "[r]easonable access to make traditional prayer with the required herbs, and to burn for same accordingly, privately, and/or within a group setting." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 2) (hereinafter, "Claim II").

12. Plaintiff wishes to burn herbs in his cell so that he may "smudge" in accordance with his religious beliefs. Among Native Americans, smudging is a universally-accepted means of cleansing religious objects and sending prayer to the creator. (See Trans. at 7, 28, & 30). It is the act of burning herbs in a "smudge pot" (i.e., a shell or a piece of bark), allowing the burning herbs flame to smother, and using the resultant smoke to cleanse objects or send prayer. (See Trans. at 7).

13. Plaintiff is allowed to smudge during group prayer sessions. (See Trans. at 51-52). Prison regulations indirectly prohibit Plaintiff smudging in his cell. (See Trans. at 6-7 & 51-52).

14. Plaintiff claims that his rights are being violated because he is denied "[r]easonable access to perform spiritual ceremonies, smudging, and including and adhering to cyclic religious feasts." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 2) (hereinafter, "Claim III").

15. SCI-Graterford regulations permit practitioners of Native American Spirituality to hold religious feasts. (See Trans. at 64). The Native American Spirituality practitioners at SCI-Graterford elected to not observe this year's Green Corn Ceremony. (See Trans. at 64). When the practitioners of Native American Spirituality elected to not observe this year's Green Corn Ceremony, Plaintiff was not participating in the group prayer and education sessions and therefore had no input regarding observance of this feast. (See Trans. at 64).

16. Plaintiff claims that his rights are being violated because he is denied
   [r]easonable access to and the possession of

religious sacred spiritual objects/items, materials (including cassette tapes, visual tapes/VCR/VHS; craftwork), and various accouterments which are needed for prayer, and ceremonies for which to practice their belief in their tribal traditions; individually and as a group; throughout SCI[-Graterford] including the Restricted Housing Unit (RHU) and visiting room.
(Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim IV").

17. Religious items such as those described above are available to Plaintiff when he elects to participate in Native American Spirituality group prayer and education sessions. (See Trans. at 52-53). Other items (i.e., books and tapes on his religion) are available to him individually. (See Defs.' Post-Oral Arg. Supp. to their Mot. for Summ. J. at 4-5).

18. Plaintiff claims that his rights are being violated because he is denied "[r]easonable inspections and/or searches (visually) upon sacred spiritual objects/items, accouterments, in a traditional manner by not touching, disturbing, and/or handling same in a respectful manner." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim V").

*3 19. Plaintiff does not claim that his "sacred spiritual objects/items, [and] accouterments" have been anything other than visually inspected. (See Trans. at 29, 54, & 69).

20. Plaintiff claims that his rights are being violated because he is denied "[t]he traditional custom of 'gifting' and/or giving sacred spiritual objects/items, accouterments to others out of respect amongst Native Americans of such spiritual practice." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim VI").

21. While the prisoners of SCI-Graterford are not allowed to give gifts to each other, Plaintiff may gift with non-prisoners. (See Trans. at 71).

22. Plaintiff claims that his rights are being violated because he is denied "[r]easonable access to a spiritual sweat lodge." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter,

2000 WL 1101351
(Cite as: 2000 WL 1101351, *3 (E.D.Pa.))

Page 3

"Claim VII").

23. The record indicates that use of a sweat lodge is not a "spiritual" activity of the Cherokee people. (See Trans. at 15)

24. Plaintiff claims that his rights are being violated because he is denied  "[a] designated room for Native American use only, as is provided to others within SCI[-Graterford], and per DOC policy." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim VIII").

25. No religious group at SCI-Graterford has its own exclusive worship space.  (See Trans. at 53).

26. Plaintiff claims that his rights are being violated because he is denied
[r]easonable access to Medicine and/or Spiritual person(s), Shaman, which are needed for deaths, and/or other tragedies, to spiritually console the Native Americans whom encounter lost love ones, family crises, etc., other than an Outside volunteer Coordinator and/or non-native Chaplain.
(Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim IX").

27. Plaintiff never specifically claims that he was denied reasonable access to "Medicine and/or Spiritual person(s), Shaman." Per SCI-Graterford policy, Plaintiff has access to an outside spiritual advisor other than an Outside Volunteer Coordinator or non-native Chaplain. (See Trans. at 55).

28. Plaintiff claims that his rights are being violated because he is denied "[t]he respect, knowledge, and self determination of inmate Councilman and their abilities/credibility within their respective positions whom have proven worthy to oversee and act rightly according to their traditional tribal societies and cultural belief." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim X").

29. Prisoners are not allowed to exclude other prisoners from group worship activities, are not allowed to have the clergyperson of their choice, and are disallowed from determining whom shall be the volunteer allowed to lead group worship

and education activities. (See Trans. at 72-76).

30. Plaintiff claims that his rights are being violated because Defendants failed "[t]o establish an appropriate Religious Activities Policy to fulfill the Spiritual needs of the Native Americans and/or Practitioner of same throughout the DOC." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim XI").

*4 31. The record contains numerous SCI-Graterford and/or DOC policies regarding Native American religious issues. (See, e.g., Defs.' Mot. for Summ. J., "Numbered Exhibits").

32. Plaintiff claims that his rights are being violated because Defendants failed "[t]o advise and/or train Correctional Officers and/or personnel as to Native American religious policies and/or adequate training on how to handle a Native American issue(s), i.e. the searching of sacred spiritual object, and the like." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim XII").

33. Guards at SCI-Graterford are advised as to the proper protocol regarding Native American spiritual objects-that is, guards may only visually inspect the religious items of practitioners of Native American Spirituality. (See Trans. at 69). Moreover, SCI-Graterford and/or the DOC have policies regarding myriad issues concerning Native Americans. (See, e.g., Defs.' Mot for Summ. J ., "Numbered Exhibits").

34. Plaintiff claims that his rights are being violated because the Defendants failed "[t]o provide equal training, programs, and rehabilitative services to Native Americans as is provided to other races and/or religions throughout the DOC." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3) (hereinafter, "Claim XIII").

35. At SCI-Graterford, there are no therapeutic rehabilitative programs specific to a single religion. (See Trans. at 55). Although traditional twelve- step programs require a belief in a higher power, non-religious alternatives also exist within the DOC. (See Defs.' Post-Oral Argument Supp. to their Mot. for Summ. J. at 3).

2000 WL 1101351
(Cite as: 2000 WL 1101351, *4 (E.D.Pa.))

Page 4

36. Plaintiff claims that his rights are being violated because he is denied "[r]easonable access to non-sacred spiritual objects/items within the SCI [-Graterford] commissary as is provided to other races and or religions throughout the DOC." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 3-4) (hereinafter, "Claim XIV").

37. Plaintiff is unaware whether there exists a manufacturer or manufacturers from whom the commissary may purchase said items for resale to those incarcerated at SCI-Graterford.

38. Plaintiff claims that his rights are being violated because Defendants failed

[t]o provide federally recognized tribal Medicine and/or Spiritual persons who may best guide the defendants accordingly to tribal, religious, and cultural traditions and to establish a Native American Board and/or Review Committee to oversee all Native American activities throughout the DOC, other than non-native persons whom are not knowledgeable of same. (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XV"). Plaintiff continues that

[t]he above includes the RHU Native American and/or Practitioners on Disciplinary status (DC) or Administrative Custody (AC) accordingly, and with exceptions ..., which said person(s) would be limited but not denied to possess certain sacred objects, i .e. medicine bag, head band, and possibly other items that such person(s) must have access to in order for his/her continued religious practice; plus said person(s) would not have a need nor is it provided to others....

*5 (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4).

39. Plaintiff does not claim that he was denied access to tribal medicine or spiritual persons. While in the RHU, Plaintiff never availed himself to an outside spiritual advisor. (See Trans. at 55).

40. Plaintiff claims that his rights are being violated because Defendants "[h]ave repeatedly abused the 'Hair Length Exemption['] Policy." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XVI").

41. Plaintiff does not claim that the Hair Length

Exemption policy has been violated as to him. (See Trans. at 83; see also Defs.' Mot. for Summ. J., "Numbered Exhibits" at D-6 & D-32 (policy re: Haircut Exemptions)).

42. Plaintiff claims that his rights are being violated because Defendants failed "[t]o approve and/or address said Native American Proposal[,] Exhibit 'P-11'." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XVII").

43. Plaintiff claims that his rights are being violated because Defendants have not provided "[r]easonable access to a small controlled outdoor fire which required for various Native American ceremonies." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XVIII").

44. Plaintiff claims that his rights are being violated because Defendants have failed "[t]o allocate and/or provide received funds for Native American Spiritual/Religious purposes, programs, activities, etc." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XIX").

45. Plaintiff claims that his rights are being violated because Defendants have failed "[t]o permit Native American religious groups to raise funds for their spiritual operating needs." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XX").

46. No religious groups at SCI-Graterford are allowed to raise their own funds. (See Trans. at 77-78).

47. Plaintiff claims that his rights are being violated because Defendants have failed "[t]o provide proper recognition of the Native American as a race, not based on the color of an individuals skin color alone." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4) (hereinafter, "Claim XXI").

48. Plaintiff claims that his rights are being violated because Defendants have failed

[t]o post current and/or standard DOC and/or individual SCI[-Graterford] (DC- ADM's), approved policies, directives, bulletins, and

2000 WL 1101351
(Cite as: 2000 WL 1101351, *5 (E.D.Pa.))

procedures governing Native American issues, and making questioned Native American individual prove and/or produce on the spot identification as to his/her belief and/or to what is being challenged by a Correctional Officer; if same is not proved and/or produced then said person may be sanctioned, and falsely accused and disciplined, contrary as to said rules, arbitrarily and without affording any procedural due process of law. All because said rules were not posted in designated areas of the institution and/or not made known to Correctional Officers and/or staff personnel.
*6 (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4-5) (hereinafter, "Claim XXII").

49. Plaintiff claims that his rights are being violated because Defendants have failed "[t]o provide Native American meals on their religious observances and on special days in which is provided to non-native religious within SCI [-Graterford] and throughout the DOC." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 5) (hereinafter, "Claim XXIII").

50. Plaintiff claims that his rights are being violated because Defendants have failed to "[p]rovide reasonable access to their religious culture, spirituality, and to practice same respectively, without an Outside Volunteer Coordinator, and/or the like." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 5) (hereinafter, "Claim XXIV").

51. Plaintiff claims that his rights are being violated because Defendants have failed to make "[u]se of birth or institutional committed name with genuine religious name when such name is made known and acknowledged by Institutional officials." (Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 5) (hereinafter, "Claim XXV").

52. Plaintiff has the following available to him as part of the group of Native American Spirituality practitioners: (1) ecumenical worship and education for various Native American tribal beliefs including group use of sacred objects such as feathers, pipes and other ritual items that the Native American volunteer provides for the weekly worship circle, smudging via the burning of sacred herbs and other burning rites, and access to educational materials (e.g., tapes, literature,

photos); (2) a chest to hold the objects left for group use at SCI-Graterford; (3) special meals and rituals; (4) a meeting area; (5) purification; and (6) the opportunity to seek personal spiritual advice from the Native American volunteer. (See Defs.' Post-Oral Arg. Supp. to their Mot. for Summ. J. at 4).

53. In addition to what is available to Plaintiff when he chooses to participate in SCI-Graterford's weekly one and one-half hour Native American Spirituality group worship and education sessions, the following items are also available to Plaintiff individually: (1) prayer feathers and other feathers; (2) a headband; (3) a medicine bag containing various small objects and which Plaintiff wears around his neck; (4) permission to grow and maintain long hair pursuant to SCI-Graterford policy; (5) access to books and tapes on his religion; (6) ability to seek personal spiritual advice from an approved outside spiritual advisor; (7) ability to seek spiritual advice through the mail from various outside spiritual advisors; (8) access to approved religious items via the custom of gifting; (9) a prayer cloth; (10) sage found on prison grounds; and (11) the practice of ethical principles. (See Defs.' Post-Oral Arg. Supp. to their Mot. for Summ. J. at 4).

54. In addition to an injunction, Plaintiff seeks the following relief:
*7 removal of all current Native American Coordinators and/or Committee/Board in which Reverend Menei and/or those defendants rely on for advice regarding Native Americans .... and those whom are not bonafide with an official affiliation from a federally recognized Tribal Nation; and those who are in possession of fraudulent tribal documentation (other than from said "Nations"), supported by unrecognized "alleged" Native American Groups in which they belong to.
(Pl.'s Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 5).

55. Defendants argue that summary judgment is appropriate on each of Plaintiff's claims.

II. DISCUSSION [FN3]

FN3. To the extent that the "Discussion" portion of this decision contains findings of fact and/or

2000 WL 1101351
**(Cite as: 2000 WL 1101351, \*7 (E.D.Pa.))**

conclusions of law in addition to those set forth under such headings, these determinations are deemed to be part of the respective sections even if not expressly stated.

A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Ultimately, the moving party bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. See id. at 324. A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under applicable rule of law. See id.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. See id. Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. See Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir.1992).

The court's inquiry at the summary judgment

stage is the threshold inquiry of determining whether there is need for a trial-that is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. See Anderson, 477 U.S. at 250-52. If there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of plaintiff, that is enough to thwart imposition of summary judgment. See id. at 248-51.

B. Injunctive Relief

\*8 In order to obtain injunctive relief, the moving party must demonstrate the following: (1) the likelihood of success on the merits; (2) a threat of irreparable harm; (3) the lack of harm to the nonmovant; and (4) that the public interest requires the relief requested. See Hoxworth v. Blinder Robinson & Co., 903 F.2d 186, 197 (3d Cir.1990). If either of the fundamental requirements--the likelihood of success on the merits and the probability of irreparable harm if relief is not granted-is absent, a district court may not grant the requested injunctive relief. See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 523 (1994); Hoxworth, 903 F.2d at 197.

When a prisoner requests injunctive relief, said request "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with complex and intractable problems of prison administration.' " Goff v. Harper, 60 F.3d 518, 520 (8th Cir.195 (citations omitted); Forrest v. Nedab, No. CIV.A. 97-4442, 1999 WL 552546, at \*3 (E.D.Pa. June 29, 1999); Riley v. Snyder, 72 F.Supp.2d 456, 460 (D.Del.1999). Where a prisoner requests an injunction that would require the Court to intervene with the management of a state prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." Rizzo v. Goode, 423 U.S. 362, 379 (1976); see Meachum v. Fano, 427 U.S. 215, 229, 96 S.Ct. 598, 608 (1976) ("The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States.").

C. 42 U.S.C. § 1983

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Plaintiff's claims are actionable pursuant to 42 U.S.C. § 1983. To prevail on a § 1983 claim, Plaintiff must demonstrate that the challenged conduct was committed by a person acting under the color of state law and that the conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or federal law. See Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908 (1981).

1. Free Exercise of Religion

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. Convicted prisoners do not forfeit all constitutional protections by reason of their incarceration. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); Bell v. Wolfish, 441 U.S. 520, 545-99 S.Ct. 1861, 1877 (1979). Nevertheless, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations .... The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." Id. at 545-46, 99 S.Ct. at 1877-78.

"[A] prison regulation impinging on inmates' constitutional rights is valid if reasonably related to legitimate penological interests." Cooper, 855 F.2d at 128. The Supreme Court noted that this inquiry necessarily involves the balance of two competing principles: (1) an individual does not surrender the protections which the Constitution provides him when he passes through the prison gate; and (2) prison officials must be given substantial deference in the administration of their institutions. See Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254 (1987). In light of these considerations, the Court set forth four relevant factors for evaluating the validity of prison regulations, which the Third Circuit Court of Appeals summarized as follows: (1) whether there is a rational connection between the regulation and the penological interest asserted; (2) whether inmates have alternative means of exercising their rights; (3) what impact accommodation of the right will have on guards, other inmates and the allocation of prison resources generally; and (4) whether alternative methods for accommodation

exist at de minimis cost to the penological interest asserted. See Cooper, 855 F.2d at 129 (citing Turner, 482 U.S. at 89-90, 107 S.Ct. 2254). When considering a free exercise claim, "the Court need not perform this analysis with respect to every interference alleged...." Madison v. Horn, No. CIV.A. 97-3143, 1998 WL 531830, at *7 (E.D.Pa. Aug. 21, 1998).

2. Equal Protection

*9 The Fourteenth Amendment provides in relevant part as follows:
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law nor deny any person within its jurisdiction the equal protection of the laws.
U.S. Const. amend. XIV, § 1.

To sustain an equal protection claim "with any significance independent of his or her free exercise claim, the prisoner must also allege and prove that he or she received different treatment from other similarly situated prisoners. See Johnson v. Horn, 150 F.3d 276, 384 (3d Cir.1998); Brown v. Borough of Malley, 35 F.3d 846, 850 (3d Cir.1994). When a prisoner claims a violation of the Equal Protection Clause of the Fourteenth Amendment, the reasonableness of the challenged prison rules and policies must be examined to determine whether distinctions made among religious groups in the prison are reasonably related to legitimate penological interests. See Madison, 1998 WL 531830, at *19; Benjamin v. Coughlin, 905 F.2d 571, 575 (2d Cir.1990). Moreover, unless the regulations are "arbitrary," the prisoner's claims must fail because religious discrimination "is governed by the religious clauses of the First Amendment, leaving for the equal protection clause only a claim of arbitrariness unrelated to the character of the activity allegedly discriminated against." Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir.1988).

III. CONCLUSIONS OF LAW

2000 WL 1101351                                                                    **Page 8**
(Cite as: 2000 WL 1101351, *9 (E.D.Pa.))

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

2. Claim I is claim brought pursuant to the Free Exercise Clause of the First Amendment. Plaintiff clearly has access to his religion and spirituality within the confines of SCI-Graterford. (See, e.g., Defs.' Mot. for Summ. J., "Numbered Exhibits" at D 16; Defs.' Post-Oral Arg. Supp. to their Mot. for Summ. J. at 4- 5). Moreover, this broadly-worded claim is subsumed within other more factually specific claims and is therefore better addressed in the context of those claims. Accordingly, summary judgment will be granted as to Claim I.

3. Claim II is brought pursuant to the Free Exercise Clause of the First Amendment and must be analyzed pursuant to the framework set forth in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254 (1987). Plaintiff is not prohibited from participating in group prayer sessions wherein herbs are burned for smudging. Plaintiff is prohibited from smudging in the privacy of his cell. Defendants cite various reasons for the DOC's prohibition of smudging in cells: (1) Defendants' interest in the care and control of inmates is compromised when a prisoner lights a fire, however small, in his cell; (2) the fragrance or aroma produced by the fire can hide other aromas, such as those produced when illicit drugs are consumed; and (3) if smudging were allowed in cells, the DOC would incur oversight would strain personnel and budgetary resources. (See Trans. at 56 & 69; See also, Defs.' Mot. for Summ. J., "Numbered Exhibits" at D-28;). There is clearly a rational connection between the DOC's prohibition of in-cell smudging and the penological interests asserted. Summary judgment will be granted as to Plaintiff's Claim II.

*10 4. Claim III is a free exercise claim. Plaintiff may perform spiritual ceremonies, smudge, and observe religious feasts. (See Trans. at 52-53 & 64). Therefore, summary judgment will be granted as to Claim III.

5. Claim IV is a free exercise claim. Plaintiff is not denied reasonable access to "sacred spiritual objects/items, materials, ... and various accoutrements which are needed for prayer and ceremonies...." (Pl.'s Resp. Mot. in Opp. to

Defs.' Summ. J. Mot. at 3). He has access to these items at group prayer sessions. (See Trans. at 52-53). Plaintiff also has access to numerous sacred items in his cell. Plaintiff is allowed to possess his medicine bundle and the items contained therein. (See Trans. at 53). He is allowed to possess his headband. (See Trans. at 53). He is allowed to possess a prayer cloth, a feather, and the sage he finds on the grounds of SCI-Graterford. (See Trans. at 55). He is neither allowed to smudge nor to possess the materials required for smudging; the Court previously discussed why the DOC's smudging prohibition is not violative of the First Amendment. As to Plaintiff's claim regarding religious observance while in the RHU (i .e., the ability to make private prayer (see Trans. at 36)), the limitations placed on Plaintiff's religious observance while in the RHU are also reasonably related to legitimate penological interests. Again, the DOC's prohibition of private smudging is just as valid in the inherently restrictive environment of the RHU as it is in the prison's general population. See, e.g., Acosta v. McGrady, No. CIV.A. 96-2874, 1999 WL 158471, at *6 (E.D.Pa. March 22, 1999 (stating that "regulations barring certain personal religious property in the RHU are inherently reasonable where ... the prisoner is afforded alternate means of expressing and observing his faith). Finally, Plaintiff never availed himself to an outside spiritual advisor while he was in the RHU although SCI-Graterford allows inmates in the RHU to consult such an advisor. (See Trans. at 55). Summary judgment will be granted as to Claim IV.

6. Claim V is a free exercise claim. Plaintiff does not claim that his sacred objects have been unreasonably searched or inspected. Plaintiff therefore sets forth no cognizable claim for this Court's consideration as the policy and practice in question do not burden Plaintiff's free exercise of religion. Summary judgment will be granted as to Count V.

7. Claim VI is a free exercise claim. The DOC prohibits prisoners from giving gifts to each other as it might create a situation where one prisoner uses a gift to coerce another prisoner. (See Trans. at 71). In deference to this policy, the Court finds that this prohibition is reasonably related to legitimate penological concerns. It must be noted

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

that SCI-Graterford's policy does not foreclose Plaintiff from gifting with non-prisoners. (See Trans. at 71). Plaintiff thus has alternative means available to him regarding the custom of gifting. Therefore, summary judgment will be granted as to this claim because there is no evidence that Plaintiff's inability to gift with fellow inmates is an unreasonable denial of the rights guaranteed to him by the Constitution.

*11 8. Claim VII is a free exercise claim. Plaintiff produced evidence that sweat lodge activities are not spiritual activities for Cherokees. (See Trans. at 15). Therefore, SCI-Graterford's denial of a sweat lodge cannot be a denial of Plaintiff's First Amendment rights as any activity that takes place therein is not "spiritual" and mandated by his religion. Summary judgment is granted as to this claim.

9. Claim VIII is brought under the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court stated that "[a] special ... place of worship need not be provided for every faith regardless of size...." Cruz v. Beto, 405 U.S. 319, 322, n. 2, 92 S.Ct. 1079, 1081 n. 2 (1972). As no religious group has its own designated worship space within SCI-Graterford (see Trans. at 53), the practitioners of Native American Spirituality are not treated less favorably than practitioners of other religions. Moreover, SCI-Graterford's policy regarding worship space cannot be arbitrary as it applies equally to all religious groups in the prison. Therefore, this claim must fail.

10. Claim IX is free exercise claim. Plaintiff does not allege that he has been denied reasonable access to medicine and/or spiritual persons or a shaman. He therefore lacks standing to bring this claim. Summary judgment will be entered against Plaintiff as to Claim IX.

11. Claim X is a free exercise claim. As a prisoner, Plaintiff does not possess the authority to choose an inmate councilman because this places him in a position of control relative to his fellow inmates. (See Trans. at 73-74). As the state prison system does not wish to create a hierarchy among prisoners within its facilities (especially one that bears the imprimatur of state- sanctioned action as may be the case where prison officials allow a

prisoner to select the volunteer who will lead services for all Native Americans in that correctional institution), the Plaintiff's inability to select a Native American volunteer to run group worship and education is reasonably related to penological interests and therefore is not violative of Plaintiff's First Amendment rights. Moreover, Plaintiff does not have the right to the clergyperson of his choice. See Madison v. Horn, No. CIV.A. 97-3143, 1998 WL 531830, at *8 n. 13 (E.D.Pa. Aug. 21, 1998) (citation omitted). Summary judgment will be entered on Claim X.

12. Claim XI is a free exercise claim. Plaintiff fails to establish that the absence of "Religious Activities Policy" is violative of his First Amendment Rights. He also fails to establish that his Fourteenth Amendment rights are violated because SCI-Graterford lacks such a policy for practitioners of Native American Spirituality, has such a policy for other religions, and that this difference is detrimental to him. Accordingly, Claim XI must fail.

13. Claim XII is a free exercise claim. At SCI-Graterford, there is a policy regarding the visual inspection of the sacred items of Native Americans. (See Trans. at 54; see also Defs.' Mot. for Summ. J., "Numbered Exhibits" at D-5). Plaintiff does not allege, however, that this policy has been violated as to him. (See Trans. at 54). Therefore, he lacks standing to bring this claim. To the extent that Plaintiff seeks any other relief at to the training of SCI- Graterford's personnel, he fails to establish that he suffered a harm which may be remedied under the First or Fourteenth amendments. Therefore, summary judgment will be granted on Claim XII.

*12 14. Claim XIII is a Fourteenth Amendment claim. As Graterford does not provide training and/or rehabilitation programs specific to any one race or religion, Plaintiff fails to state a Fourteenth Amendment claim. (See Defs.' Post Oral Argument Supp. to their Mot. for Summ. J. at 3). Moreover, as there are non-religious-based alternatives available to Plaintiff, there exist alternative means for Plaintiff to receive training and/or rehabilitative services that do not impinge on his religious beliefs or violate his First Amendment rights. Finally, the courts have consistently held that prisoners do not have a

constitutional right to any rehabilitation program whatsoever. See Moody v. Daggett, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9 (1976). Therefore, summary judgment will be granted as to Claim XIII.

15. Claim XIV is an equal protection claim. It is not clear that SCI- Graterford's commissary's failure to have non-sacred items which relate to the interests of Native Americans is arbitrary. Indeed, Plaintiff is uncertain whether such items are available to the commissary. Therefore, this claim must fail to the extent it is brought pursuant to the Fourteenth Amendment. Under the First Amendment, "non-sacred spiritual items" do not enjoy constitutional protection because they are, by definition, unnecessary to the practice of Native American Spirituality. Therefore, Claim XIII must fail.

16. Claim XV is a free exercise claim. Plaintiff first claims that his rights are violated because Defendants fail to provide "federally recognized tribal Medicine and/or Spiritual persons who may best guide the defendants accordingly to tribal, religious, and cultural traditions...." (Pl.s' Resp. Mot. in Opp. to Defs.' Summ. J. Mot. at 4). First, there is no constitutional guarantee to cultural and tribal traditions while incarcerated. Second, as Plaintiff complains that these things are being denied to the Defendants and not to him, the claim is not cognizable. To the extent that Plaintiff claims his First Amendment rights are violated because the Defendants have not established a Native American Board and/or Review Committee, Plaintiff does not demonstrate that his constitutional rights are violated due to this failure. Moreover, the Defendant's alleged failure to have a Native American Board does not contravene Plaintiff's sincere religious beliefs as he presents no evidence that such a Board is necessary to the practice of Native American Spirituality. Finally, to the extent that this claim is brought under the Fourteenth Amendment, no similar board exists for any religion. Therefore, Plaintiff cannot claim unequal treatment under the law on the basis of his religion. Therefore, summary judgment will be entered on this claim.

17. Claim XVI is a free exercise claim. As Plaintiff has not alleged that he was injured due to the enforcement of the "Hair Length" exemption, he lacks standing to bring this claim. (See, e.g., Pl.'s Rebuttal Decl. at ¶ 13). Summary judgment will be entered in Claim XVI.

*13 18. Claim XVII is brought as a free exercise claim. The Defendants' failure to respond to Plaintiff's proposal hardly rises to a Constitutional violation, regardless of the proposal's subject matter. The Court therefore perceives no basis under which Plaintiff can recover on the instant claim under the First or Fourteenth amendments. This claim must fail.

19. Claim XVIII is free exercise claim. A small, controlled, outdoor fire raises multiple, obvious security and safety concerns. Most evidently, fire not only presents a danger to the prisoners under SCI-Graterford's control and care but to the prison personnel that must supervise the prisoners who use the fire for religious purposes. Prohibiting the religious use of a small, controlled, outdoor fire is reasonably related to legitimate penological interests. Therefore, this claim must fail.

20. Claim XIX is an equal protection claim. Plaintiff's only cognizable argument regarding this claim is that other religious groups within SCI-Graterford have full time personnel available to them for spiritual and religious needs. Plaintiff presents no evidence to demonstrate that these religious groups are similarly situated to SCI-Graterford's Native Americans. Prisons are not required to provide identical resources to different religious groups. See Cruz v. Beto, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1082, n. 2 (1972). Plaintiff's instant claim must be dismissed.

21. Claim XX is an equal protection claim. As no religious groups are allowed to raise money at SCI-Graterford, Plaintiff cannot set forth a claim under the Fourteenth Amendment. Therefore, this claim must fail.

22. Claim XXI is a free exercise claim. Plaintiff wishes that the DOC use "Native American" as a racial classification. Plaintiff does not allege that SCI-Graterford's racial classification of him interferes with the practice of his religion. Moreover, SCI-Graterford's records now reflect that Plaintiff is Native American for both the classification of his race and his religion. (See Defs.' Post-Oral Arg. Supp. to their Mot. for

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Summ. J. at 2). Therefore, Claim XXI must fail.

23. Claim XXII is a free exercise claim. Plaintiff's allegations do not concern the substance of DOC or SCI-Graterford policies on Native American issues, instead his allegations concern whether such policies are posted within the prison itself. (See Trans. at 32-33). As Plaintiff does not present an issue which impacts the practice of his religion, Claim XXII must fail.

24. Claim XXIII is a free exercise claim. DOC policy allows religious groups to observe feasts that are part of their religious practice. (See Trans. at 64). Nevertheless, it is simply not administratively efficient for the prison to provide each Native American with each meal he needs for particular religious reasons each time a religious day must be observed. To the extent that this claim is brought pursuant to the Fourteenth Amendment, Native Americans at SCI-Graterford recently chose to forego observance of a religious feast. (See Trans. at 64). Therefore, while available to them, SCI-Graterford's Native Americans elected to forego a recent religious feast. Therefore, the difference in treatment among practitioners of Native American Spirituality and other religions is non-existent; any perceived difference in the opportunity to observe religious feasts was self-imposed by SCI-Graterford's practitioners of Native American Spirituality with whom Plaintiff did not associate. Therefore, Plaintiff's claim is not actionable under the First Amendment or the Fourteenth Amendment.

*14 25. Claim XXIV is subsumed within prior claims and therefore must fail for the reasons stated heretofore.

26. Claim XV is a free exercise claim. Plaintiff does not demonstrate that the use of his birth name interferes with his religion. Moreover, SCI-

Graterford's records now reflect that plaintiff is Native American for both the classification of his race and his religion. (See Defs.' Post-Oral Arg. Supp. to their Mot. for Summ. J. at 2). Therefore, Claim XXV must fail.

27. In light of the foregoing, Plaintiff fails to demonstrate that he is likely to succeed on the merits of his claims. Where the movant for injunctive relief fails to show that he or she will succeed on the merits of his or her claims, injunctive relief may not be granted. See McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 523 (1994). Therefore, Plaintiff's prayer for injunctive relief must be denied and Defendants' Motion for Summary Judgment on the merits is GRANTED.

This Court's Final Judgment follows.

FINAL JUDGMENT

AND NOW, this 7th day of August, 2000, upon consideration of Defendants Corrections Officials' ("Defendants") Motion for Summary Judgment (Docket No. 121), pro se Plaintiff James Four Deer Walking Robinson's ("Plaintiff") response thereto (Docket No. 122), Defendants' Reply Brief (Docket No. 125), Plaintiff's Response Motion in Opposition to Defendants' Reply Brief (Docket No. 130), Defendants' Post-Oral Argument Supplement to Motion for Summary Judgment (Docket No. 134), and Plaintiff's Supplemental Statements and Averments Continued from Hearing of 5/18/2000 (Docket No. 135), IT IS HEREBY ORDERED that said Motion is GRANTED.

IT IS FURTHER ORDERED that judgment is entered in favor of all Defendants and against the Plaintiff on all claims.

END OF DOCUMENT

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408 (E.D.Pa.))

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

THE HOLY NAME SOCIETY, Joseph Hennessey,
Robert Rigler, Roberto Montanez, and
Jerry Ganter, Plaintiffs,
v.
Martin Horn and Donald Vaughn, Defendants.

No. 97-804.

Aug. 21, 2001.

*MEMORANDUM*

DUBOIS, J.

I. INTRODUCTION

*1 This action brought by plaintiffs, The Holy Name Society, Graterford Chapter ("HNS"), and four inmates at the State Correctional Institution at Graterford ("SCI-Graterford"), Joseph Hennessey, Robert Rigler, Roberto Montanez and Jerry Ganter, raises issues under the Free Exercise Clause of the First and Fourteenth Amendments and the Equal Protection Clause of Fourteenth Amendment. In their complaint, plaintiffs make two allegations: (1) that they were denied their right to freely exercise their religion because defendants have barred them from partaking in a fellowship meal following certain Catholic holy days; and (2) that they were denied their right to Equal Protection because defendants did not allow them to engage in activities in which other organizations or religious groups were permitted to engage--fundraising and an annual banquet. Plaintiffs seek declaratory and injunctive relief requiring defendants to allow them to have fellowship meals, fundraising events and an annual banquet. Defendants assert that the regulations on plaintiffs' conduct are not unconstitutional and are reasonably related to legitimate penological interests.

The case was tried non-jury for three days beginning October 10, 2000. Based on the following Findings of Fact and Conclusions of Law, the Court finds in favor of defendants and against plaintiffs on all claims and will enter judgment in favor of defendants on all claims. The Court's Findings of Fact are set forth in Section II, *infra*. The Court's Conclusions of Law are set forth in Section III, *infra*.

Page 1

II. FINDINGS OF FACT

A. Background

1. Plaintiffs are four Roman Catholic prisoners currently incarcerated at SCI- Graterford and HNS. HNS is an unincorporated Roman Catholic religious group, formed in 1987, and sanctioned by the Vatican. Ex. D-10, D-11. The individual plaintiff inmates are all former members of the HNS board. Hennessey, Rigler and Ganter are all currently members of HNS. Montanez is no longer a member of HNS. Tr. of Oct. 11, 2000 ("Tr.2") at 78.

2. Defendants are two officials of the Pennsylvania Department of Corrections ("DOC"): Secretary of Corrections Martin Horn [FN1] and SCI-Graterford Superintendent Donald T. Vaughn, in their official capacities.

> FN1. On December 30, 2000, Secretary Horn left his position as Secretary of Corrections to assume another position within the state government. On that same date, Executive Deputy Secretary Jeffrey A. Beard, who appeared as a witness in this case, was named Acting Secretary of Corrections by Governor Tom Ridge. He was confirmed as Secretary of Corrections by the Pennsylvania Senate on February 15, 2001. *See* http:// www.cor.state.pa.us/history.htm.

3. SCI-Graterford is one of 24 state correctional institutions within the DOC system subject to DOC policies and regulation. SCI-Graterford has approximately 3,065 inmates. More than 700 inmates are serving life sentences and about 700 or 800 are serving sentences with a minimum in excess of eight years. SCI- Graterford contains all levels of inmate classifications, from minimum to maximum security. Tr. of Oct. 12, 2000 ("Tr.3") at 10-12. It is considered to be a maximum security institution. Ex. P-19, ¶ 1.

4. HNS adopted a Constitution and By-Laws on December 14, 1987. Until March 1999, only practicing Catholics could be members of HNS. Tr. of Oct. 10, 2000 ("Tr.1") at 61-63. Beginning at that time, non-Catholics were permitted to become associate members, but could not hold office or have voting privileges. Tr. 1 at 49. At every meeting, HNS members say a pledge in which they proclaim their belief in Jesus, love for the Pope, including the lines "I believe all the sacred truths--which the Holy

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Catholic Church--believes and teaches" and "I believe O Jesus--that Thou art the Christ--the Son of the Living God." Ex. D- 12; Tr. 1 at 64.

5. As of October 2000, HNS had approximately 26 members, down from a maximum of 115 to 120 members. Tr. 2 at 185. HNS meets monthly; the HNS board meets twice a month. Tr. 1 at 35-36, 37. HNS has also had retreats. Tr. 2 at 45.

*2 6. SCI-Graterford has a full-time ordained Catholic chaplain, Father Michael Rzonca, who is employed by the DOC, and Catholic volunteers. Father Rzonca is the HNS spiritual advisor and attends all HNS meetings in this capacity. Tr. 2 at 180-82. Catholic Mass, which meets the Sunday obligation of the Roman Catholic Church, is held weekly at the prison on Saturday evenings. In addition, there are Masses held for major Holy Days of Obligation, frequent Bible study, confession, and rosary groups. Inmates may also pray and meditate individually, say grace before meals, and make charitable contributions. [FN2] HNS is allowed to solicit inmates attending Mass to donate to charitable causes. Inmates are permitted to correspond with religious advisors, seek advice from Father Rzonca, and read the available Catholic books. Tr. 2 at 74-75.

> FN2. Charitable contributions differ from the fundraisers which plaintiffs seek in that charity involves asking a person to contribute something without receiving anything tangible in return, whereas the fundraising activities at issue involve selling something to make money. Tr. 2 at 190.

7. The DOC Activities Manual delineates a class of inmate organizations as approved inmate organizations. Approved inmate organizations can generally be described as generic inmate betterment groups, or alternatively as civic groups. They "are prohibited from any discriminatory practice that prohibits membership based on race, color, creed national origin, religion or sex." Ex. D-7, DOC Activities Manual, IX-07(A); Tr. 2 at 42. Approved inmate organizations must have the recommendation of the prison's superintendent and the approval of the Secretary of Corrections. [FN3] Tr. 2 at 55. These organizations may request permission to conduct annual banquets and fundraising events to raise money for general inmate welfare, charity and the organization itself. Non-approved inmate organizations are permitted by the DOC, but they

are not allowed all of the privileges afforded to approved inmate organizations. For example, under DOC policy, only approved inmate organizations are allowed to hold banquets and conduct fundraising projects. Ex. P-41 (DC-ADM 822).

> FN3. It appears that the term Secretary of Corrections and Commissioner are used interchangeably. The head of the Pennsylvania Department of Corrections is correctly called the Secretary of Corrections. See 71 Pa.C.S.A. § 66. The position was previously called Commissioner. Ex. P-18, ¶ 1.

8. There are four inmate organizations at SCI-Graterford which are approved, the most at any DOC facility--LACEO (Latin American Cultural Exchange Organization), Brotherhood Jaycees, LIFERS (Long Incarcerated Fraternity Engaging Release Studies) and the NAACP (National Association for the Advancement of Colored People). Ex. P-19, ¶ 22. All of these organizations are open to all members of the prison population. [FN4] There are also therapeutic and intramural groups at SCI-Graterford, such as Vietnam Veterans of America, Paraprofessional Law Clinic, Montgomery County Task Force, the Step Program, a chess club, as well as various religious groups. Tr. 3 at 13-15.

> FN4. LIFERS was originally open only to inmates serving life sentences, or sentences longer than 15 years. Ex. P-19, 24. In approximately 1995, all inmates were permitted to join LIFERS. Tr. Oct. 11, 2000 at 68.

9. Approved inmate organizations are required to submit a yearly plan of action--a form of content review which is not deemed appropriate for HNS or other religious groups. Approved organizations present agendas, subject to DOC approval, for all meetings, including meetings where banquet and fundraising planning and discussion may occur. Such organizations have a more diverse membership than does HNS, which is essentially Catholic and holds Catholic beliefs as part of its central tenets.

10. In 1995, after Martin Horn [FN5] was appointed Secretary of Corrections, DOC undertook a systemwide reorganization of the prisons. On October 23, 1995, there was a state police raid at SCI-Graterford, and a state of emergency was declared. A thorough search of the entire prison facility, including the sewage system, was conducted

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *2 (E.D.Pa.))

by the Pennsylvania State Police and correctional officials from outside SCI-Graterford. Many different types of contraband were seized, such as drugs, weapons, money, tools, and photographs of nude women taken in the basement of the prison chapel. As a result, the DOC suspended "virtually all" organizational and volunteer activities at SCI-Graterford, and made dramatic staff changes. Tr. 3 at 65-72.

> FN5. Secretary Horn's appointment was effective March 1, 1995. *See* http://www.cor.state.pa.us/ history.

**\*3** 11. Following the October 1995 state police raid, escapes from other state correctional institutions, such as Pittsburgh, Huntingdon and Dallas, further heightened security concerns at SCI-Graterford. Tr. 3 at 25-27.

12. As part of the reorganization, policies that were more strict were instituted to promote security and control at SCI-Graterford and all other DOC institutions. The reorganization resulted in better control over inmate movements. To further the goal of better control within the prisons, the DOC sought to reduce the number of approved inmate organizations and promote one or two civic-type groups to serve the entire population at each institution. Tr. 2 at 48-49. For instance, Executive Deputy Secretary Beard testified that should one of the approved inmate organizations "fold," it would most likely not be restarted. At SCI-Graterford the goal is to reduce the number of groups to one or two. *Id.*

13. Before 1995, SCI-Graterford was treated differently than other facilities in the DOC system, in part because of its size. There was an unwritten understanding that it could apply its own rules and selectively enforce system- wide regulations, as it saw fit. However, as a result of the October 1995 state police raid, and Secretary Horn's reorganization effort, that practice was discontinued and the DOC required SCI-Graterford to follow all DOC regulations.

14. After the October 1995 state police raid HNS and all other prison groups were temporarily placed under suspension pending review. Ex. P-19, ¶ 7. During this period, in addition to weekly Mass, Mass was approved on the six Holy Days of Obligation, but no special group meals were

permitted.

15. As part of the reorganization, the DOC established a practice of providing meals for religious groups only when they were religiously mandated. To accomplish this end, the DOC chaplaincy coordinator, Father Francis Menei, solicited advice from the relevant religious leaders, then formulated a recommendation as to which meals were religiously required. Tr. 2 at 58. No inmate group of any kind--civic, religious, therapeutic or other--was allowed to have any banquet, fellowship meal or organized meal of any nature, with the exception of the Jewish and Moslem inmates, whose religions command them to have a Passover Seder and an Eid Feast, respectively, as a required part of their religious ritual. Ex. P-19, ¶ 13.

16. As a result of the internal changes at SCI-Graterford and the system wide reorganization, SCI-Graterford has become a more safe facility, for both the inmates and the public at large. Tr. 3 at 65-72. There is better control of inmates, better security, and punishment that is more strict for inmates who test positive for drugs. *Id.*

**\*4** 17. As part of the reorganization, the ability of prisoners to congregate in large groups was limited. For example, the number of inmates allowed into the exercise yard at any given time was curtailed. That has resulted in a more calm prison atmosphere. Tr. 3 at 67-70.

18. Prior to the reorganization, HNS was treated like an approved inmate organization by SCI-Graterford, although it was never recognized as such by the DOC. Tr. 2 at 49-50, 52-57; Ex. P-20, ¶ 3. This was also true of a Muslim group and a Jewish group. As a result of the system-wide changes, including DOC enforcement of its statewide policies at SCI-Graterford, beginning in 1998, HNS was no longer treated as an approved inmate organization. Until 1998, HNS was listed as an approved inmate organization in SCI-Graterford local policy. In 1998, the written policy was "clarified" to reflect the correct status of HNS. Ex P-19, ¶ 30.

19. DOC exercises less control over HNS than it exercises over approved inmate organizations. Although HNS meetings are supervised by a DOC chaplain, the chaplain does not control what is discussed at the meetings, control inherent in pre-

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

approved agendas for approved inmate organizations. HNS does not have to submit a yearly plan of action--a form of content review which is not appropriate for religious groups. Ex. P-20, ¶ 12.

B. Fellowship Meals

20. Plaintiffs seek to participate in fellowship meals following the Holy Days of Obligation, [FN6] on which there is a special Mass. In the late 1980s, when HNS requested "full recognition" from the DOC, they proposed to observe the following as Days of Obligation: (1) Solemnity of Mary, January 1; (2) Easter Sunday; (3) St. Patrick's Day, March 17; (4) Ascension Thursday, forty days after Easter; (5) The Assumption of the Blessed Virgin Mary, August 15; (6) The Solemnity of All Saints, November 1; (7) The Immaculate Conception, December 8; (8) Christmas Day, December 25. Ex. D-10. Since St. Patrick's Day is not an obligatory holy day and Easter always falls on a Sunday, there are only six official Days of Obligation [FN7] on which Mass is held in addition to the weekly Mass. Tr. 2 at 208-09.

> FN6. The term "Days of Obligation" are days on which adherents to the Roman Catholic faith are expected to attend Mass. *See DiPasquile v. Board of Educ. of Williamsville Cent. Sch. Dist.*, 626 F.Supp. 457 (W.D.N.Y.1985). *See also Pielech v. Massasoit Greyhound, Inc.*, 1994 WL 879559, *2 (Mass.Super. Ct. June 30, 1994) ("The Code of Cannon Law states: 'On Sundays and other days of obligation the faith are bound to participate in the Mass; they are also to abstain from those labors and business concerns which impede the worship to be rendered to God, the joy which is proper to the Lord's day, or the proper relaxation of mind and body.' 1983 Codex Iuris Cannici, Cannon 1247.").

> FN7. The Court takes judicial notice that the Archdiocese of Washington recognizes those same six days as Days of Obligation. *See* http://www.adw.org/parishes/obligation.html. The Court notes, however, that the Supreme Court of Canada recognized a somewhat different list of Days of Obligation. *See Henry Birks & Sons (Montreal) Ltd. v. Montreal and Attorney-General of Quebec*, 113 C.C.C. 135, 143, [1955] S.C.R. 799 ("[I]t may first be observed that the days which are dealt with are, like Sundays, all made feast days 'of obligation' by canons 1247 and 1248 of the 'Codex Juris Canonicus' of the Roman Catholic Church, namely, the day of the circumcision of Our Lord, January 1st; Epiphany,

January 6th; Ascension Day (forty days after Easter Sunday); All Saints Day, November 1st; Conception Day, December 8th; and Christmas Day, December 25th. These days are the only feasts of obligation, other than Sundays, required by the canons to be celebrated on the actual days on which they fall and they are dealt with on exactly the same footing as Sundays.").

21. The Court heard testimony about the fellowship meals from two Catholic priests, Father Rzonca [FN8] and Father Richard Appicci. [FN9] The Court accepted both priests as experts in Catholicism. Fellowship meals take place after Mass and are not part of the Mass. They are a coming together after a Mass where people can discuss their experiences, problems and faith. Tr. Oct. 10, 2000 at 102. The fellowship meals may consist of an ordinary meal or coffee and donuts after Mass. Tr. 1 at 112.

> FN8. Father Rzonca was ordained as a Catholic Priest in 1973. He has worked for the Department of Corrections as a chaplain at SCI-Graterford since 1991. Tr. 2 at 180-82.

> FN9. Father Appicci was ordained as an Augustinian Priest in 1960. He was a professor of religion at Villanova University from 1960 to 1967. He was a volunteer in prison ministries at Graterford from 1992 to 1997. Ex. P-24.

22. Father Appicci, plaintiffs' expert, testified that fellowship meals are religious in nature. Father Rzonca, defendants' expert, testified that the meals are not religious in nature. Both priests agreed that the meals are not required by the Catholic religion. The four individual plaintiffs testified that they viewed fellowship meals as religious in nature. The Court finds that the fellowship meals are religious in nature, part of the individual plaintiffs' sincerely held religious beliefs, but not a requirement of the Catholic religion.

*5 23. From 1987 until 1992, HNS members were allowed to order catered food from outside the prison for fellowship meals. Fellowship meals did not take place in the main dining facilities; rather food was brought to remote locations within the prison, such as the chapel or auditorium. Tr. 2 at 190. They would pay for the special meals from their inmate accounts using cash slips. Some fellowship expenses, such as coffee, were paid for by HNS. Tr. 2 at 13.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *5 (E.D.Pa.))

Page 5

24. Fellowship meals require considerable additional work by inmates and staff. They require groups of inmates to set up prior to, and clean up after, the meal. The meals require extra supervision and staff time from the inmate accounting staff, the food services staff, the activities staff, the Catholic chaplain, and correctional officers to provide security. Planning and approval of the fellowship meals involves the time of the chaplaincy supervisor, the deputy supervisor of centralized services, the executive staff of the prison, the culinary department staff, the activities department staff, and the inmate accounting department staff. Father Rzonca devoted about 20 hours of his time to planning and attending each fellowship meal. Tr. 2 at 189-90.

25. In 1992, the number of fellowship meals were reduced to two per year. Ex. P-19, ¶ 3. Between 1992 and 1995, the post-Mass fellowship meals took the form of a group meal with inmates sitting around multiple tables, with the priest present. Sometimes music and a religious or non-religious video were provided. Discussions were not limited to religious themes. Tr. 1 at 39-41.

26. On December 8, 1994, HNS was permitted to hold a three-hour fellowship meal in the field house after Mass in conjunction with the Feast of the Immaculate Conception and Advent. Ex. P-31; Tr. 2 at 202-03. In February 1995, HNS received permission to hold Easter and Christmas fellowship meals with no outside guests. Ex. D-20.

27. In January, 1996, HNS requested an Easter fellowship meal following Easter Mass. SCI-Graterford disapproved the meal in February, 1996 on the ground that having such a meal following Easter Mass was not obligatory for Catholics. HNS has not requested a fellowship meal since 1996. Tr. 1 at 77.

28. Providing the requested fellowship meals would result in extra expenses for the prison. Even if the regular prison food was provided for the special meals, there are additional security costs involved in transporting the food to another location. There are also added costs of maintaining the temperature of the food. Tr. 3 at 22.

29. Providing the requested fellowship meals would likely result in the other Christian groups, totaling about 1800 inmates, requesting fellowship meals, and in inmate resentment towards those inmates who receive the special meals. Doing so would likely result in inmate jealousy.

*6 30. It is not feasible to provide fellowship meals at minimal cost to the Commonwealth.

C. Fundraisers and Banquets

31. Prior to 1995, DOC policy allowed approved inmate organizations to hold fundraisers and annual banquets. Ex. P-18, ¶ 4. Fundraisers have been curtailed at SCI-Graterford since 1995. There have been no fundraisers since 1998, but prison officials anticipate approving projects for approved inmate organizations within reduced guidelines. Tr. 3 at 39-49.

32. The four approved inmate organizations at SCI-Graterford have the right to apply for permission to have an annual banquet. As of October 2000, there were three pending banquet requests. As of October 2000, no group had received permission to have an annual banquet at SCI-Graterford since the end of 1995. Tr. 3 at 56.

33. Prior to September 1993, HNS was permitted to hold an annual catered banquet to which each member was permitted to invite two outside guests.

34. An HNS banquet, approved for September 1993 after Mass and catered by an outside caterer, was canceled when contraband liquor was discovered. Tr. 2 at 24; Tr. 3 at 52-53. As a result of this security breach, sanctions were imposed on HNS including forfeiture of the annual banquets for 1994 and 1995, forfeiture of Christmas and Easter fellowship meals for the remainder of 1993 and 1994, and forfeiture of the right to purchase Christmas gifts for its membership in 1993. Ex. D-17. The 1993 incident prompted a statewide change in policy whereby all fellowship and banquet meals and all other meals were required to be prepared inside the individual correctional institutions. Outside catering was no longer permitted. Tr. 2 at 38.

35. In February 1995, the sanctions against HNS were modified, and HNS was granted permission to hold one banquet with two guests per inmate that year. That banquet was held on October 7, 1995. Ex. D-20; Tr. 2 at 120. HNS has not been permitted to hold an annual banquet since that date.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *6 (E.D.Pa.))

36. The individual plaintiffs may participate in fundraisers and banquets for the approved inmate organizations of which they are members, although inmates are permitted to attend only one annual banquet per year, regardless of the number of organizations to which they might belong. Tr. 2 at 51-52; Ex. P-41 (DC-ADM 822). All of the individual plaintiffs are, or have been, members of some of the approved inmate organizations.

## III.  CONCLUSIONS OF LAW AND DISCUSSION

### A. *Introduction*

Plaintiffs have made two constitutional claims: (1) that defendants' barring of plaintiffs from partaking in fellowship meals following the six Days of Obligation violates the free exercise clause of the First Amendment, and (2) that they were denied the right to participate in fundraisers and have annual banquets, unlike other inmate organizations, violated their right to equal protection.

It should be stated at the outset that prisoners do not retain all the rights of free citizens, *see e.g. Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Castle v. Clymer,* 15 F.Supp.2d 640, 660 (E.D.Pa.1998), however, convicts "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). "Inmates clearly retain protections afforded by the First Amendment, ... including its directive that no law shall prohibit the free exercise of religion." *DeHart v. Horn,* 227 F.3d 47, 50 (3d Cir.2000) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). However, incarceration, and "the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." *Id.* at 50-51 (citing *Pell,* 417 U.S. at 822-23). Prisoners only retain those rights which "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 51 (quoting *Pell,* 417 U.S. at 822).

### B. *Free Exercise Claim*

**\*7** Plaintiffs claim that defendants have acted to bar HNS and the individual plaintiffs from partaking in

fellowship meals following the celebration of six Holy Days of Obligation, in violation of their right to freely exercise their religious beliefs, guaranteed by the First Amendment to the United States Constitution. It is well established that the Fourteenth Amendment incorporates the First Amendment, and is applicable to the states. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *DeHart,* 227 F.3d at 50.

In *Turner v. Safley,* the Supreme Court set forth a standard for reviewing prison regulations challenged on constitutional bases: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This test is a balance between the principle that "federal courts must take cognizance of the valid constitutional claims of prison inmates" and the principle that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration' and [that] separation of powers concerns counsel a policy of judicial restraint." *DeHart,* 227 F.3d at 51 (quoting *Turner,* 107 U.S. at 84-85 (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974))) (alterations in original). In other words,

> this standard of review requires a court to respect the security, rehabilitation and administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns, it also requires a court to give weight, in assessing the overall reasonableness of regulations, to the inmate's interest in engaging in constitutionally protected activity.

**\*8** *Id.*

*Turner* goes on to articulate a four pronged test to determine whether a prison regulation is reasonable. The Third Circuit explained the *Turner* test as follows:

> [*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *8 (E.D.Pa.))

circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

*DeHart,* 227 F.3d at 51 (citing *Waterman v. Farmer,* 183 F.3d 208, 213 (3d Cir.1999) (internal citations omitted)) (alterations in original).

As a predicate, plaintiffs have the burden of demonstrating that a constitutionally protected interest is at stake. *Id.* at 51. A simple assertion of a religious belief does not automatically trigger First Amendment protections. "[O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *Id.* (citing *Africa v. Pennsylvania,* 662 F.2d 1025, 1029-30 (3d Cir.1981).

The fellowship meals at issue in this case are religious in nature and part of plaintiffs' sincerely held religious beliefs. Facts, ¶ 22. It therefore follows that plaintiffs have a constitutionally protected interest upon which defendants may not unreasonably infringe. *See DeHart,* 227 F.3d at 52. Since plaintiffs have met their initial burden, the Court will address the issue of whether a legitimate and reasonably exercised state interest outweighs the proffered First Amendment Claim. *Id.* at 52.

The Court will analyze the asserted infringement on plaintiffs' constitutionally protected interest using the reasonable relationship test. Previously, this Court held that the reasonable relationship test supplies the proper burden of proof when applying *Turner* in a retaliatory transfer setting. *See Castle v. Clymer,* 15 F.Supp.2d 640, 662 (E.D.Pa.1998). This test, which mirrors *Turner,* is a balancing test which places the final burden on the defendant, who must show that the action complained of is reasonably related to legitimate penological interests. *Id.* at 661; *see also Madison v. Horn,* 1998 WL 531830, *16 (E.D.Pa. August 21, 1998) (adopting reasonable relationship test). The reasonable relationship test requires a causal relationship between the action and the "inmate's exercise of a constitutional right and then balances any infringement of a constitutional right with the prison's need to achieve penological objectives." *Id.* This test is consistent with the recent decision in

*Rauser v. Horn,* 241 F.3d 330 (3d Cir.2001), in which the Third Circuit held, in a retaliation claim, that "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protect conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334.

Accordingly, the Court will apply a reasonable relationship test when applying *Turner* in the free exercise context--the final burden falls on defendants to show that denying plaintiffs the ability to partake in a fellowship meal is reasonably related to legitimate penological interests.

1. *Rational Connection to Legitimate Penological Interests*

*9 The first prong of *Turner* addresses the question of whether the prison regulation at issue--barring plaintiffs from partaking in fellowship meals--has a rational connection to legitimate penological interests. Defendants must demonstrate the existence of a legitimate penological interest in creating the restriction.

Specifically, plaintiffs complain about the DOC's decision to restrict special group meals to those religious groups where the meal is religiously mandated. Currently, the prison system only allows Jews and Moslems special group meals, the Passover Seder and the Feast of Eid, respectively. Facts, ¶ 15.

The Third Circuit has held that a "prison's interest in an efficient food system and in avoiding inmate jealousy are legitimate penological concerns under *Turner.*" *DeHart,* 227 F.3d at 53. Moreover, defendants' policy of allowing group meals only when they are a commandment of the religion is rationally related to legitimate penological interests. Organized group meals burden prison resources in the amount of administrative time and security resources that the group meals take up. These factors weigh on the prisons legitimate penological interest of efficient administration and general safety in the facility.

Further, restricting meals to only those religious groups where such meals are religiously mandated serves the legitimate penological interest of keeping morale high among the entire prison population.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *9 (E.D.Pa.))

Having group meals is likely to cause resentment and jealousy from other inmates who would perceive the meals as disparate treatment. Facts, ¶ 29. *See DeHart,* 227 F.3d at 53 ("it is not irrational to think that providing DeHart with a vegetarian diet to accommodate his religious beliefs might involve some risk of inmate jealousy").

Additionally, it is axiomatic that a prison has a vital interest in maintaining safety and order within its walls. *See Madison,* 1998 WL 531830, *8-9 (security is a legitimate penological interest); *Castle,* 15 F.Supp.2d at 661 (same). Before the 1995 reforms, prison life at SCI-Graterford was much less organized was more dangerous than at present. Part of the reforms included limiting prisoner's ability to congregate in large groups, due to the inherent security problems of large inmate gatherings. As such, the DOC has a legitimate interest in restricting group gatherings.

The policies implemented since October 1995, which include curtailing all group activities at SCI-Graterford and requiring SCI-Graterford to conform to DOC regulations, are reasonable responses to the problems existing at SCI- Graterford prior to the implementation of these new policies. The previous practice at that institution, characterized by Secretary Horn as a policy of inmate appeasement, created reasonable administrative and security concerns. Ex. P-18. The new policies are a reasonably geared to addressing those concerns. Ex. P-19, ¶ 29.

To summarize, the Court concludes that SCI-Graterford and the DOC have legitimate penological interests implicated by the activities at issue in this case including, but not limited to the following:

*10 a) deterrence of crime in general by limiting activities available to the inmates;

b) deterrence of crime within the prison by limiting opportunities for coercion of other inmates or corrections officials;

c) not promoting religion;

d) eliminating inmate perception of disparate treatment by prison officials;

e) keeping morale high within the prison population;

f) efficient use of the prison's food preparation facilities;

g) efficient prison administration relating to food delivery outside of the main dining facility; and

h) maintenance of security by limiting the ability of inmates to congregate and to pilfer food and use it for coercion on cell blocks.

Moreover, the policy of limiting the number of approved inmate organizations is rationally related to legitimate security and administrative concerns.

Defendants have met their burden in showing that the prison regulation is related to legitimate penological interests. Permitting religious groups to have special meals only when mandated by the religion is a rational way of balancing ordinary overall security and other legitimate penological goals with the religious needs of the inmates.

2. *Alternative Means of Practicing Religion*

In applying the second prong of *Turner,* "courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *DeHart,* 227 F.3d at 55. Courts should not inquire into the "orthodoxy" of the belief, as "it would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others." *Id.* at 55-56. However, the second *Turner* factor "is directed solely to evaluating the interest of the inmate in having his request accommodated. Our holding with respect to the impropriety of disregarding a sincerely held belief solely because it is not an orthodox one relates specifically to the issue of whether alternative means of expression are available to the inmate." *Id.* at 56 n. 5.

This prong places the burden of proof on defendants to show that there are adequate alternative means of expression available to the inmate. "Where the regulation leaves no alternative means of exercising the asserted right, the inmate's interest in engaging in constitutionally protected activity is entitled to greater weight in the balancing process." *Id.* at 53. However, the Court must inquire "whether [plaintiffs have] alternative means of exercising

[their religious] beliefs generally (e.g., by prayer, worship, meditation, scripture study, etc.)." *Id.* at 54. "If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable." *Id.* at 56.

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court upheld a New Jersey prison regulation which made it impossible for Muslims to attend Jumu'ah, a weekly congregational service. This regulation was deemed constitutional because Muslims had many other opportunities to express their faith, such as the ability to congregate for prayer or discussion, except during working hours, the ability to avoid pork which is forbidden by Islamic law, and the ability to observe Ramadan, a month-long period of fasting and prayer. *O'Lone* at 352, 107 S.Ct. at 2406.

*11 Further, in *DeHart*, the plaintiff wanted the prison to provide him with a vegetarian diet in conformance with his sincerely held Buddhist beliefs. He was permitted to pray, to recite the Sutras, to meditate, and to correspond with the City of 10,000 Buddhas, a center of Buddhist teaching. 227 F.3d at 54. He was also allowed to purchase special items, such as canvas shoes, rather than leather sneakers. *Id.* In remanding the case for further proceedings, the Third Circuit held that "the record shows that, while the prison's regulations have prohibited DeHart from following a diet in conformity with his religious beliefs, he has some alternative means of expressing his Buddhist beliefs." *Id.* at 57.

Moreover, the Supreme Court explained "in *Turner* [where a prison regulation barred correspondence between inmates in different institutions], that it was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available, and in *O'Lone* [it was sufficient] if prisoners were permitted to participate in other Muslim religious ceremonies." *Thornburgh v. Abbott*, 490 U.S. 401, 417-18, 109 S.Ct. 1874, 1883-84, 104 L.Ed.2d 459 (1989). In other words, the Supreme Court has made clear it that when analyzing whether alternative means are available, it is not impermissible to preclude participation in one particular avenue of faith so long as other avenues of faith are open.

Partaking in fellowship meals is not a

commandment of the Roman Catholic faith. However, having fellowship meals is part of plaintiffs' sincerely held religious beliefs. [FN10] Like the plaintiffs who were unable to attend the Jumu'ah service or the plaintiff who was unable to have a vegetarian meal, plaintiffs in this case have numerous opportunities to practice their Catholicism. At SCI-Graterford, plaintiffs are able to attend Mass each week and on the Holy Days of Obligation, attend Bible study, pray in rosary groups, and make confession. Plaintiffs are also able to pray and meditate individually, say grace before meals, and discuss religious issues with other inmates at their leisure. Facts, ¶ 6. The Court concludes that there are adequate alternative means available to inmates at SCI-Graterford to practice Catholicism without requiring the prison to provide fellowship meals following the Days of Obligation.

> FN10. It should be noted that even if plaintiffs had demonstrated that fellowship meals were a mandatory part of Catholicism, their views would not be orthodox. While the Third Circuit has held that a court should not let the orthodox/non-orthodox distinction weigh too heavily on its decision in cases such as this, the Circuit has left the door open for courts to look at this distinction. It held that "the fact that it is impermissible to discriminate against an inmate solely because of the non-orthodox character of his or her faith does not exclude the possibility that there may be legitimate administrative burdens or other penological concerns that will justify distinguishing between orthodox and non-orthodox believers." *DeHart*, 227 F.3d at 60. This Court, however, is not using an orthodox/non-orthodox distinction in making its decision in this case.

### 3. Effects on Prison if Plaintiffs Were Accommodated

*12 The Court now turns to analyzing the impact which providing plaintiffs with fellowship meals would have on other inmates and prison resources generally. The burden of proof on the third *Turner* prong, costs imposed on other inmates and prison resources generally, is again on the defendant. Like the previous prongs, the burden is a light one--the reasonable relationship test will apply. It should be noted that in the context of the third prong, the second *Turner* prong does not make it "impermissible for prison officials to distinguish between different categories of religious believers when such a distinction is reasonably related to legitimate penological interests." *DeHart*, 227 F.3d

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *12 (E.D.Pa.))

at 56 n. 5.

Much of the trial was spent demonstrating the impact that allowing fellowship meals would have on the prison. The Court concludes that allowing these meals would place a serious burden on prison resources, inmates and guards.

It should be noted that plaintiffs argue that they were treated differently from other religious groups, namely Jews and Muslims, who are allowed to have religious meals. However, this distinction is rationally related to legitimate penological interests. First of all, there is a legitimate penological interest in keeping to a minimum the number of special meals provided in the prison. Looking at the totality of the situation at SCI-Graterford, a policy which distinguishes between groups which command its adherents to partake in a religious meal and those groups for which such a meal is not mandatory provides a reasonable basis for line-drawing.

As discussed above, under the first *Turner* prong, it is reasonable to conclude allowing fellowship meals would cause resentment among the other Christian prisoners who are not given fellowship meals. *See DeHart,* 227 F.3d at 53. Further, allowing fellowship meals for members of HNS is likely to lead to demands from some or all of the 1800 Christian inmates for such meals. Providing special meals for so many people would create a substantial burden on the prison in additional security and other administrative costs. While the actual cost of the food would differ depending on the type of meal served, the overall cost of providing special meals, in terms of money and manpower, would not be insignificant. Other prisoners are also likely to resent the appearance of preferential treatment of plaintiffs.

Special group meals are also taxing on the prison's culinary facilities. Holding many special meals would put an undue burden on the prison's food services as the meals would have to be transported to another location and maintained at a specific temperature.

Further, allowing large group gatherings increases the opportunity for security breaches. Defendants presented evidence that as part of the reforms which began in 1995, the prison reduced the opportunities for large group gatherings. Since these reforms were instituted, SCI-Graterford is a more safe place for inmates, guards and for the community at large. Allowing fellowship meals to resume could lead to a rise in activity detrimental to the security at the prison by giving inmates additional opportunities to engage in illegal activities.

There are many factors which speak to the costs related to resuming fellowship meals. Considering all of the evidence on this issue, the Court concludes defendants have met their burden of showing that the impact of allowing fellowship meals would not be in the best interest of the prison.

*13 The Court notes that defendants presented evidence that by allowing special meals that are not religiously required, there might be Establishment Clause problems. More specifically, defendants argue that allowing a group to have a meal which is not religiously required might result in encouraging other inmates to attend HNS meetings, which are inherently religious. Because this case can be resolved on other grounds, and because this argument is not outcome determinative, the Court will not reach this issue.

4. *Alternatives*

The fourth *Turner* prong instructs that following plaintiffs' suggestion of alternatives, defendants have the burden of proving that such alternatives would have more than a de minimis cost to valid penological interests. However, this burden should be light, consistent with the reasonable relationship test.

There are no ready alternatives available to accommodate plaintiffs' desire for fellowship meals. They are asking for fellowship meals on the Holy Days of Obligation. As stated above, there are legitimate penological reasons for disallowing this request.

At trial, plaintiffs presented evidence that a fellowship meal could consist of coffee and donuts after Mass. Tr. 2 at 40. However, all of the concerns articulated above, such as the added costs of planning the event, providing security, inmate jealousy, and the impact on staff and prison management (with the exception of the culinary staff), remain even if only coffee and donuts are provided.

Plaintiffs argue that the number of fellowship meals

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

could be reduced, thereby minimizing the DOC concerns. In that connection, the Court notes that in 1992, the number of fellowship meals was reduced from six to two per year. However, if defendants were required to provide two such meals, that too would create an undue burden on the system. All of the concerns set forth in this Memorandum would still apply. Therefore, no ready alternatives exist to plaintiffs' proposal.

Accordingly, the Court concludes that plaintiff's request for declaratory judgment and injunctive relief on the free exercise claims are denied. Defendants have met their burden under the *Turner* test--the policy that allows only groups whose religion commands them to partake in a religious meal to have that meal is reasonably related to legitimate penological interests.

C. *Equal Protection Claims*

Plaintiffs claim that their rights under the Equal Protection Clause of the Fourteenth Amendment were violated because HNS, and other non-approved inmate organizations, are unable to hold annual banquets or fundraisers. The Equal Protection Clause requires that similarly situated persons be treated equally. *See Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Plaintiffs must demonstrate "the existence of purposeful discrimination" and that they received "different treatment from that received by other individuals similarly situated." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990); *see also Madison v. Horn,* 1998 WL 531830, *19 (E.D.Pa. Aug.21, 1998).

Plaintiffs have the burden of demonstrating that the groups which are treated differently are so similar to HNS that there is no rational basis for the distinctions which defendants make, and "that the discretion of prison officials to treat groups differently has been abused." *See Madison v. Horn,* 1998 WL 531830, *19 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977)). Defendants need only establish that they had a rational basis relating to a legitimate penological interest for treating plaintiffs differently than other groups. [FN11] *Id.*

FN11. It should be noted that the *Turner* test does not apply to the type of Equal Protection claim

advanced here by plaintiffs. Though the Supreme Court has held that "the standard of review we adopted in Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights," *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) (citing *Turner,* 482 U.S. at 85, 107 S.Ct. at 2259), there is no constitutional right implicated in the Complaint with respect to fundraising and annual banquets.

Moreover, even if the regulation at issue applied only to religious groups, a heightened level of scrutiny would not apply. The Supreme Court "has held that a rule that applies equally to all religions offends neither the Free Exercise Clause nor the Establishment Clause." *Abdul Jabbar-al Samad v. Horn,* 913 F.Supp. 373, 376 (E.D.Pa.1995) (citing *Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990)). Therefore, the general rule applies, and "the prison regulation can withstand an Equal Protection challenge if the distinction it draws between civic and religious civic groups is rationally related to a legitimate state interest." *Id.* (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)).

*14 Plaintiffs argue that HNS should be allowed to hold fundraisers and annual banquets. They assert that they were an approved inmate organization, and therefore, under DOC regulations, should be eligible to have these events. Plaintiffs further allege that treating religious and civic organizations differently violated the Equal Protection Clause.

The Court again notes that the DOC is not treating approved inmate organizations differently as HNS was never an approved inmate organization. Although at one time HNS was treated as an approved inmate organization by SCI- Graterford, it never received DOC approval. Facts, ¶ 18.

The DOC has a rational basis for treating religious and broad-based civic organizations differently. One district court found a number of differences between religious and non-religious groups in prison, such as:

Prisoners have a constitutional right to meet in religious groups; therefore such groups cannot be banned from a prison as can non-religious groups, and, for the same reason, it is much harder to keep an inmate, for disciplinary reasons, from participating in a religious group than in a non-religious group. Religious groups and their leaders

Not Reported in F.Supp.2d
(Cite as: 2001 WL 959408, *14 (E.D.Pa.))

also carry a kind of authority that non- religious groups do not because they are based on more than simply common interests.

*Madison,* 1998 WL 531830, *19. In this case, the policy of non- discrimination in approved inmate organizations is one reason for the disparate treatment. Secondly, the goal of restricting inmate activity and avenues for inmate gatherings to further security and organizational order at SCI- Graterford, and the prison system as a whole provide other legitimate reasons for differentiating between approved inmate organizations and religious groups.

Moreover, HNS is not similarly situated to the approved inmate organizations which do not discriminate based upon religion as its membership is not open to all inmates. While HNS amended its charter to allow non-Catholics to become associate members, because of the religious nature of the HNS pledge, recited at every meeting, the mission of HNS, and since non-Catholics are not permitted to become full members, the Court concludes that HNS is a religious organization.

Organized group meals, with or without outside guests, and fundraising activities increase security and other administrative problems in state prisons. There are similar concerns which surround fundraising activities within the prison. These concerns are legitimate reasons for the DOC to limit fundraisers and banquets to approved inmate organizations. Tr. 2 at 43-48. "At present, Graterford has about 15 religious denominations accommodated." Ex. P- 19, ¶ 34. If banquets and fundraisers were offered to all these religious groups, the number of activities would increase dramatically, creating serious security and logistical concerns for prison management.

Plaintiffs have not met their burden of showing that HNS and approved inmate organizations are similarly situated and that there is purposeful discrimination on the part of the DOC. Conversely, defendants have established the reasonableness of the regulations at issue. Accordingly, plaintiffs' Equal Protection claims fail on the merits. They have not established a right to injunctive relief.

D. *Roberto Montanez and Holy Name Society as Plaintiffs*

*15 A plaintiff bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiff Roberto Montanez is not an HNS member. Tr. 2 at 78. Accordingly, he lacks standing to sue because, as a non-member of HNS, he does not have a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *See Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). For that reason, Montanez will be dismissed as a plaintiff.

Defendants claim that, under the HNS Charter, any action by HNS, including the institution of a lawsuit, must be approved by its spiritual director. It is admitted that Father Rzonca, spiritual director of HNS, did not approve this suit. Accordingly, defendants argue that HNS must be dismissed as a party. The Court need not reach this issue as it has ruled in favor of defendants on the merits of the case.

IV. CONCLUSION

For the reasons set forth above, judgment will be entered in favor of defendants on all counts. An appropriate order follows.

*ORDER*

AND NOW, this 21st day of August, 2001, following a non-jury trial, based on the attached Findings of Fact and Conclusions of Law, the Court FINDS IN FAVOR of defendants, Martin Horn and Donald Vaughn, and against plaintiffs, The Holy Name Society, Joseph Hennessey, Robert Rigler, and Jerry Ganter, on all claims on all claims.

It is FURTHER ORDERED that judgment is ENTERED in favor of defendants, Martin Horn and Donald Vaughn, and against plaintiffs, The Holy Name Society, Joseph Hennessey, Robert Rigler, and Jerry Ganter, on all claims.

It is FURTHER ORDERED that plaintiff Roberto Montanez is DISMISSED AS A PLAINTIFF for lack of standing.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,                         :
                                     :
      Plaintiff,             :
                                     :        Civil Action No. 1:CV-00-2125
    v.                            :
                                     :        (Judge Caldwell)
KENNETH KYLER, et al.,               :
                                     :
      Defendants              :

## CERTIFICATE OF SERVICE

    I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of the foregoing Defendants' Brief in Support of Motion for Summary Judgment upon the person(s) and in the manner indicated below.

Service by first-class mail
addressed as follows:

John Cleary, DF-5779
SCI-Pittsburgh
P.O. Box 99901
Pittsburgh, PA  15233

Janelle C. Stapleton
Clerk Typist 2

PA Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:  March 14, 2001