

ORIGINAL

FILED
HARRISBURG

MAR 1 4 2002

MARY E. D'ANDREA, CLERK
Per
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,                    :
                                :
    Plaintiff,              :
                                :       Civil Action No. 1:CV-00-2125
    v.                      :
                                :       (Judge Caldwell)
KENNETH KYLER, et al.,          :
                                :
    Defendants               :


## <u>APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

AND NOW, come the Defendants, Kenneth Kyler, et al., by and through

their attorney, Raymond W. Dorian, Assistant Counsel, and offer the following

documents in support of their Motion for Summary Judgment:

1.    PACER docket entries for the case of *Cleary v. Vaughn, et al.*, USDC-

ED, No. 96-CV-4805.

2.    Plaintiff's Complaint filed in *Cleary v. Vaughn, et al.*, No. 96-CV-

4805 (Plaintiff's Deposition Exhibit 1).

3.    Plaintiff's Deposition Exhibit 2.

4.    Plaintiff's Deposition Exhibit 3.

5.    Declaration of Superintendent Kenneth D. Kyler.

6.    Declaration of Unit Manager William S. Ward.

7.    Excerpts from Plaintiff's deposition taken October 23, 2001.

Respectfully submitted,

Raymond W. Dorian
Assistant Counsel
Attorney I.D. No. 48148

Pennsylvania Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:        March 14, 2001

Docket as of April 9, 2000 4:04 pm          Web PACER (v2.3)

# U.S. District Court

## U.S. District Court of Eastern Pennsylvania (Philadelphia)

### CIVIL DOCKET FOR CASE #: 96-CV-4805

### CLEARY v. VAUGHN, et al

Filed: 07/05/96
Assigned to: JUDGE EDMUND V. LUDWIG
Demand: $0,000
Nature of Suit: 550
Lead Docket: None
Jurisdiction: Federal Question
Dkt# in other court: None
Cause: 42:1983 Prisoner Civil Rights

```
JOHN CLEARY                    STEPHEN D. BROWN
       PLAINTIFF               FAX 215-994-2222
                               [COR LD NTC]
                               MICHAEL S. DOLUISIO
                               FAX 215-994-2222
                               [COR LD NTC]
                               CHRISTOPHER J. CULLETON
                               [COR LD NTC]
                               DECHERT, PRICE & RHOADS
                               1717 ARCH STREET
                               4000 BELL ATLANTIC TOWER
                               PHILA, PA 19103-2793
                               USA
                               TEL 215-994-2901
                               JOHN CLEARY
                               #DF5779
                               [COR LD NTC] [PRO SE]
                               S.C.I. - CAMPHILL
                               P.O. BOX 200
                               CAMPHILL, PA 17001-0200
                               USA

       v.
DONALD T. VAUGHN,
SUPERINTENDENT
       DEFENDANT
   [term 03/27/97]
THOMAS D. STACHELEK, DEPUTY
SUPERINTENDENT
       DEFENDANT
   [term 03/27/97]
DAVID DIGUGLIELMO, HIS
SUCCESSOR IN OFFICE
       DEFENDANT
```

```
      [term  03/27/97]
J. J. WELBY, HEARING EXAMINER
      DEFENDANT
      [term  03/27/97]
G. SMITH, CORRECTIONAL OFFICER      SUE ANN UNGER
CAPTAIN                             FAX 215-560-2494
      DEFENDANT                     [COR LD NTC]
                                    CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    [COR LD NTC]
                                    OFFICE OF ATTORNEY GENERAL
                                    21 S. 12TH ST.
                                    3RD FL.
                                    PHILA, PA 19107-3603
                                    USA
                                    TEL 215-560-2127
DENNIS BRUMFIELD, CORRECTIONAL      SUE ANN UNGER
OFFICER LT.                         (See above)
      DEFENDANT                     [COR LD NTC]
                                    CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    (See above)
                                    [COR LD NTC]
TIMOTHY LEGRANDE, CORRECTIONAL      SUE ANN UNGER
OFFICER                             (See above)
      DEFENDANT                     [COR LD NTC]
                                    CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    (See above)
                                    [COR LD NTC]
HEADEN, CORRECTIONAL OFFICER        SUE ANN UNGER
      DEFENDANT                     (See above)
                                    [COR LD NTC]
                                    CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    (See above)
                                    [COR LD NTC]
PAJIL, CORRECTIONAL OFFICER         SUE ANN UNGER
      DEFENDANT                      [term  04/03/98]
      [term  04/03/98]             (See above)
                                    [COR LD NTC]
                                    CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    (See above)
                                    [COR LD NTC]
WHITMAN, CORRECTIONAL OFFICER,      SUE ANN UNGER
STATE CORRECTIONAL INSTITUTION       [term  04/03/98]
AT GRATERFORD                       (See above)
      DEFENDANT                     [COR LD NTC]
      [term  04/03/98]             CLAUDIA M. TESORO
                                     [term  11/19/97]
                                    (See above)
                                    [COR LD NTC]
```

# DOCKET    PROCEEDINGS

DATE   #          DOCKET   ENTRY

| 7/5/96 | 1 | MOTION BY PLAINTIFF JOHN CLEARY TO PROCEED IN FORMA PAUPERIS. (fb) [Entry date 07/05/96] |
|---|---|---|
| 7/5/96 | -- | Standard Case Management Track. (fb) [Entry date 07/05/96] |
| 7/11/96 | 2 | MOTION BY PLAINTIFF JOHN CLEARY FOR APPOINTMENT OF COUNSEL, MEMORANDUM. (ar) [Entry date 07/11/96] |
| 8/2/96 | 3 | ORDER THAT MOTION TO PROCEED IN FORMA PAUPERIS IS DENIED FOR LACK OF COMPLIANCE WITH THE FILING FEE REQUIREMENTS OF THE PRISONER LITIGATION REFORM ACT OF 1995, ETC. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 8/5/96 ENTERED AND MAILED. (lvj) [Entry date 08/05/96] |
| 8/2/96 | -- | Case closed (kv) [Entry date 08/06/96] |
| 9/18/96 | 4 | MOTION BY PLAINTIFF JOHN CLEARY TO PROCEED IN FORMA PAUPERIS . (lvj) [Entry date 09/19/96] |
| 9/30/96 | 5 | MEMORANDUM AND ORDER THAT THE CLERK IS DIRECTED TO CLOSE THIS CIVIL ACTION. IF PLFF FILES WITH THE COURT, WITHIN TWENTY DAYS, A NOTICE THAT HE WISHES TO PROCEED WITH THIS ACTION AND THEREBY OBLIGATE HIMSELF TO PAYMENT OF THE $120 FILING FEE, THIS ACTION WILL BE REINSTATED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 10/01/96 ENTERED AND COPIES MAILED (lvj) [Entry date 10/01/96] [Edit date 10/01/96] |
| 10/10/96 | 6 | Notice to Procede by PLAINTIFF JOHN CLEARY (lvj) [Entry date 10/10/96] |
| 11/13/96 | 7 | MEMORANDUM AND ORDER THAT THE CLERK IS DIRECTED TO REINSTATE THIS CIVIL ACTION. PLFF SHALL PAY IN INSTALLMENTS THE FILING FEE OF $120.00. PLFF IS ASSESSED AN INITIAL PARTIAL FILING AT S.C.I. CRESSON OR AT ANY PRISON AT WHICH PLFF IS OR MAY BE INCARCERATED IS DIRECTED TO DEDUCT $1.81 FROM PLFF'S INMATE TRUST FUND ACCOUNT, ETC. THE CLERK IS DIRECTED TO FORWARD A COPY OF THIS ORDER TO THE SUPERINTENDENT OF SCI CRESSON. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 11/14/96 ENTERED AND COPIES MAILED. (lvj) [Entry date 11/14/96] |
| 3/27/97 | 8 | ORDER THAT: LEAVE TO PROCEED IN FORMA PAUPERIS IS GRANTED. PLFF'S CLAIM THAT HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BY HEARING EXAMINER J.J. WELBY AT HIS INSTITUTIONAL MISCONDUCT HEARING, AND BY SUPERINTENDENT DONALD T. VAUGHN AND DEPUTY SUPERINTENDENT THOMAS D. STACHELEK DURING HIS APPEAL OF HIS MISCONDUCT CONVICTION IS DISMISSED AS LEGALLY FRIVOLOUS. THE CLERK IS DIRECTED TO STRIKE THE NAMES OF SUPERINTENDENT DONALD T. VAUGHN, DEPUTY SUPERINTENDENT THOMAS D. STACHELEK, AND HEARING EXAMINER J.J. WELBY FROM THE CAPTION OF THE COMPLAINT. PLFF'S CLAIM AGAINST DEPUTY SUPERINTENDENT DAVID DIGUGLIELMO IS ALSO DISMISSED AS LEGALLY FRIVOLOUS. THE CLERK IS DIRECTED TO STRIKE THE NAME OF DEPUTY SUPERINTENDENT DAVID DIGUGLIELMO FROM THE CAPTION OF THE COMPLAINT. THE BALANCE OF THE COMPLAINT, IN WHICH PLFF ALLEGES THAT HE WAS BEATEN BY CORRECTIONAL OFFICERS, MAY PROCEED. THE COMPLAINT IS TO BE FILED, THE SUMMONSES ARE TO ISSUE, SERVICE OF THE SUMMONSES AND COMPLAINT IS TO BE MADE UPON CAPTAIN G. SMITH, LT. DENNIS BRUMFIELD, C.O. TIMOTHY LEGRANDE, C.O. HEADEN, C.O. PAJIL, AND C.O. WHITMAN BY THE U.S. MARSHALS SERVICE IN THE EVENT WAIVER OF SERVICE |



```
                    IS NOT EFFECTED UNDER FED.R.CIV.P. 4(d) (2). THE CLERK OF
                    COURT SHALL ALSO SEND A COPY OF THE COMPLAINT TO THE
                    ATTORNEY REPRESENTING THE CORRECTIONAL INSTITUTION WHERE
                    THE CLAIM IS ALLEGED TO HAVE ARISEN, ETC.. (SIGNED BY JUDGE
                    EDMUND V. LUDWIG) 3/27/97 ENTERED AND COPIES MAILED. (fb)
                    [Entry date 03/27/97]

3/27/97   9         Complaint. (filing fee $ ifp). (fb) [Entry date 03/27/97]

3/27/97   10        Request for Waiver of Service by PLAINTIFF JOHN CLEARY as
                    to DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD,
                    DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT
                    PAJIL, DEFENDANT WHITMAN 3/27/97 Waiver of Service due by
                    4/26/97 for G. SMITH, for DENNIS BRUMFIELD, for TIMOTHY
                    LEGRANDE, for HEADEN, for PAJIL, for WHITMAN. (fb)
                    [Entry date 03/27/97]

3/27/97   --        Notice to Plff RE: waiver of service. (fb)
                    [Entry date 03/27/97]

3/27/97   --        Case reopened (kv) [Entry date 03/28/97]

4/18/97   11        Waiver of Service Returned Executed as to DEFENDANT G.
                    SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY
                    LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT
                    WHITMAN  3/27/97 Answer due on 5/26/97 for WHITMAN, for
                    PAJIL, for HEADEN, for TIMOTHY LEGRANDE, for DENNIS
                    BRUMFIELD, for G. SMITH . (lvj) [Entry date 04/21/97]

5/23/97   12        Answer to Complaint with affirmative defenses and
                    counterclaims by DEFENDANTS, G. SMITH, DENNIS BRUMFIELD,
                    TIMOTHY LEGRANDE, HEADEN, PAJIL and WITMAN (Attorney SUE
                    ANN UNGER), certificate of service. (sj)
                    [Entry date 05/27/97]

5/23/97   --        ISSUE JOINED. (sj) [Entry date 05/27/97]

6/5/97    13        Affidavit of William A. Ross  Re: certain facts (lvj)
                    [Entry date 06/05/97]

6/5/97    14        Request by PLAINTIFF JOHN CLEARY to amend original
                    complaint after defts answer (lvj) [Entry date 06/05/97]

6/6/97    15        Affidavit by PLAINTIFF JOHN CLEARY  Re: extension of time.
                    (aa) [Entry date 06/09/97]

6/6/97    16        MOTION BY PLAINTIFF JOHN CLEARY FOR APPOINTMENT OF
                    COUNSEL. (aa) [Entry date 06/09/97]

6/11/97   17        Response of Commonwealth Corrections Officials to plff's
                    request for an extension, certificate of service. (lvj)
                    [Entry date 06/12/97]

6/11/97   18        Response of Commonwealth Corrections Officials in
                    opposition to Plff's MOTION FOR APPOINTMENT OF COUNSEL,
                    Memorandum of law in support, certificate of service. (lvj)
                    [Entry date 06/12/97]

6/11/97   19        Response of Commonwealth Corrections Officials in
                    opposition to Plff's Motion to amend complaint, Memorandum
                    of law in support, certificate of service. (lvj)
                    [Entry date 06/12/97]

6/16/97   20        MOTION BY PLAINTIFF JOHN CLEARY FOR RECONSIDERATION OR
```

| | | |
|---|---|---|
| | | REARGUMENT FOR MOTION TO APPOINT COUNSEL, MEMORANDUM. (jef) [Entry date 06/16/97] |
| 6/17/97 | 21 | Response of Commonwealth Corrections officials in opposition to Plff's MOTION FOR APPOINTMENT OF COUNSEL, certificate of service. (lvj) [Entry date 06/18/97] |
| 6/26/97 | 22 | ORDER THAT PLFF' S MOTION TO AMEND  COMPLAINT IS DENIED WITHOUT PREJUDICE TO PLFF'S SUBMITTING A PROPOSED AMENDED COMPLAINT. BY JULY 25, 1997, PLFF MAY SUBMIT A PROPOSED AMENDED COMPLAINT FOR CONSIDERATION. PLFF IS GRANTED AN EXTENSION UNTIL AUGUST 1, 1997 TO RESPOND TO DEFTS' COUNTERCLAIMS. PLFF SHALL SERVE DEFTS WITH A COPY OF ALL DOCUMENTS SUBMITTED TO THE COURT, BY MAILING A COPY TO DEFENSE COUNSEL BY FIRST CLASS MAIL. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 6/27/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 06/27/97] |
| 6/26/97 | -- | ORDER THAT MOTION FOR APPOINTMENT OF COUNSEL IS DENIED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 6/27/97 ENTERED AND COPIES MAILED AND FAXED. (SEE PAPER #16) (lvj) [Entry date 06/27/97] |
| 6/26/97 | -- | ORDER THAT MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED, ETC. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 6/27/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 06/27/97] [Edit date 06/27/97] |
| 6/26/97 | 23 | ORDER THAT PLFF'S MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 6/26/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 06/27/97] |
| 6/27/97 | 24 | MOTION BY PLAINTIFF JOHN CLEARY FOR LEAVE TO AMEND COMPLAINT . (lvj) [Entry date 06/27/97] |
| 7/7/97 | 24 | Exhibits by PLAINTIFF JOHN CLEARY (lvj) [Entry date 07/07/97] |
| 7/9/97 | 25 | MOTION BY DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT WHITMAN FOR ENLARGEMENT OF TIME , CERTIFICATE OF SERVICE. (lvj) [Entry date 07/09/97] |
| 7/18/97 | 26 | Response by of Commonwealth Corrections Officials in opposition to Plff's MOTION TO AMEND COMPLAINT, Memorandum of law in support, certificate of service. (lvj) [Entry date 07/21/97] |
| 7/28/97 | 27 | MOTION BY DEFENDANT CORRECTIONS OFFICIALS FOR AUTHORIZATION TO DEPOSE PLAINTIFF, MEMORANDUM, CERTIFICATE OF SERVICE. (gm) [Entry date 07/29/97] |
| 8/4/97 | 28 | Response by PLAINTIFF JOHN CLEARY to defts counterclaims, memorandum of law in support, certificate of service. (lvj) [Entry date 08/04/97] |
| 8/19/97 | 29 | Reply of Commonwealth Corrections Officials to Plff's response to Defts' counterclaims, certificate of service. (lvj) [Entry date 08/19/97] |
| 8/21/97 | 30 | Supplemental reply of Commonwealth Corrections officials to Plff's defts' counterclaims, certificate of service. (lvj) [Entry date 08/22/97] |

| 9/9/97 | 31 | Letter dtd. 8/27/97 from Plff J. Clearly to Kathryne Crispell, courtroom Deputy re: Plff does not oppose deft's motion to depose plff in person or telephonically. (jef) [Entry date 09/09/97] |
|---|---|---|
| 9/30/97 | 32 | ORDER THAT MOTION OF DEFT CORRECTIONS OFFICIALS FOR AUTHORIZATION TO DEPOSE PLAINTIFF IS GRANTED. MOVANTS SHALL DEPOSE PLFF IN PERSON OR TELEPHONICALLY, AT A STATE CORRECTIONAL INSTITUTION. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 9/30/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 09/30/97] |
| 10/20/97 | 33 | Notice of change of address by JOHN CLEARY (lvj) [Entry date 10/20/97] |
| 11/6/97 | 34 | ORDER APPOINTING STEPHEN D. BROWN, MICHAEL S. DOLUISIO, CHRISTOPHER J. CULLETON FOR PLAINTIFF JOHN CLEARY IN THE ABOVE CAPTIONED CASE.  THIS APPOINTMENT IS TO REMAIN IN EFFECT UNTIL THE FINAL DETERMINATION OF THIS CASE UNLESS, PRIOR THERETO, IT IS AMENDED OR REVOKED BY ORDER OF COURT. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 11/7/97 ENTERED AND COPIES MAILED. (lvj) [Entry date 11/07/97] |
| 11/14/97 | -- | Scheduling conference set at 11:00 11/25/97. (td) [Entry date 11/17/97] |
| 11/19/97 | 35 | Withdrawal of appearance by CLAUDIA M. TESORO for DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, certificate of service. (lvj) [Entry date 11/20/97] |
| 11/25/97 | 36 | TRIAL SCHEDULING ORDER THAT  DISCOVERY COMPLETED BY 2/27/98 ; ETC. TRIAL DATE SCHEDULED FOR 3/30/98 ; BY FEB. 27, 1998 PLFF WILL REPORT IN WRITING ON COUNSELS SERIOUS SETTLEMENT EFFORTS. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 11/26/97 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (lvj) [Entry date 11/26/97] |
| 11/26/97 | 37 | ORDER THAT PLFF'S MOTION FOR LEAVE TO AMEND COMPLAINT IN ORDER TO VACATE THE WAIVER OF HIS JURY TRIAL RIGHT IS GRANTED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 11/26/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 11/26/97] |
| 11/26/97 | 38 | ORDER THAT DEFTS' MOTION FOR ENLARGEMENT OF TIME IS MOOT. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 11/26/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 11/26/97] |
| 12/17/97 | 39 | MOTION BY PLAINTIFF JOHN CLEARY FOR A PROTECTIVE ORDER PURSUANT TO F.R.C.P. 26(c)(5), MEMORANDUM, CERTIFICATE OF SERVICE. (kw) [Entry date 12/17/97] |
| 12/19/97 | 40 | STIPULATION AND ORDER THAT DEFTS MAY HAVE A ONE-WEEK EXTENSION TO RESPOND TO ANY AND ALL MOTIONS FILED BY PLFF IN DECEMBER 1997. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 12/22/97 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 12/22/97] |
| 12/30/97 | 41 | Response by DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT WHITMAN in opposition to PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER, memorandum, certificate of service. (jjc) [Entry date 12/31/97] |

| 1/9/98 | 42 | ORDER THAT UPON CONSIDERATION OF PLFF'S MOTION FOR A PROTECTIVE ORDER, ETC., IT IS HEREBY ORDERED AND DECREED THAT SAID MOTION IS DENIED WITHOUT PREJUDICE, ETC. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 1/12/98 ENTERED AND COPIES MAILED AND FAXED. (gm) [Entry date 01/12/98] |
|---|---|---|
| 1/14/98 | 43 | MOTION by PLAINTIFF JOHN CLEARY FOR APPOINTMENT OF AN IMPARTIAL MEDICAL EXPERT UNDER FEDERAL RULE OF EVIDENCE 706 , MEMORANDUM, CERTIFICATE OF SERVICE. (jl) [Entry date 01/15/98] |
| 1/20/98 | 44 | Response by COMMONWEALTH CORRECTIONS OFFICIALS in opposition to plff's MOTION FOR A PROTECTIVE ORDER, memorandum, Certificate of Service. (gm) [Entry date 01/21/98] |
| 1/20/98 | 45 | ORDER THAT THE WARDEN OF SCI CAMP HILL PRODUCE BEFORE THIS COURT JOHN CLEARY #BJ4569 ON 3/30/98 AT 10:00 AM BEFORE THE HONORABLE EDMUND V. LUDWIG TO APPEAR FOR JURY TRIAL IN THE ABOVE-CAPTIONED MATTER, ETC.. (SIGNED BY JUDGE EDMUND V. LUDWIG) 1/21/98 ENTERED AND COPIES MAILED. (fb) [Entry date 01/21/98] |
| 2/13/98 | 46 | ORDER THAT PLFF CLEARY'S MOTION FOR A COURT-APPOINTED INDEPENDENT MEDICAL EXPERT IS GRANTED.  A QUALIFIED EXPERT WILL BE APPOINTED AS SOON AS PRACTICABLE.  TOWARD THAT END, BY FRIDAY, FEBRUARY 20, 1998 THE PARTIES ARE TO SUBMIT A JOINT LIST OF QUALIFIED OPTHALMOLOGISTS IN THE CAMP HILL, PA. AREA.  SET RESPONSE DUE 2/20/98 .  ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 2/13/98 ENTERED AND COPIES MAILED AND FAXED. (gm) [Entry date 02/13/98] |
| 2/23/98 | 47 | (Defts) Joint list of ophthalmologists (signed by counsel), certificate of service. (gm) [Entry date 02/24/98] |
| 3/5/98 | 48 | ORDER THAT DR. DAVID ARMESTO IS APPOINTED BY THE COURT TO SERVE AS AN INDEPENDENT MEDICAL EXPERT, ETC. TRIAL DATE REMAINS 3/30/98. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 3/6/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (lvj) [Entry date 03/06/98] |
| 3/13/98 | 49 | ORDER THAT THE PARTIES' JOINT STATEMENT OF THEIR RESPECTIVE POSITIONS TOGETHER WITH PLFF'S ENTIRE MEDICAL FILE, ETC., SHALL BE SUBMITTED TO DAVID ARMESTO, M.D., ETC. DR. ARMESTO IS FURTHER REQUESTED TO SEND THE COURT A REPORT SETTING FORTH HIS OPINIONS RELATING TO PLFF JOHN CLEARY'S ALLEGED EYE CONDITION AND, IF ABNORMAL, THE CAUSE OR CAUSES OF SUCH CONDITION. TRIAL: MARCH 30, 1998. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 3/16/98 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 03/16/98] |
| 3/17/98 | -- | Settlement conference  SET on 2:30 3/24/98 in chambers room 12614, etc. (lvj) [Entry date 03/18/98] |
| 3/20/98 | 50 | Notice of change of address by JOHN CLEARY (lvj) [Entry date 03/20/98] |
| 3/20/98 | 51 | Joint Pretrial Memorandum, certificate of service, filed. (lvj) [Entry date 03/23/98] |
| 3/23/98 | 52 | MOTION BY PLAINTIFF JOHN CLEARY IN LIMINE TO EXCLUDE CERTAIN PREJUDICIAL EVIDENCE, MEMORANDUM, CERTIFICATE OF SERVICE. (fb) [Entry date 03/24/98] |

| 3/24/98 | 53 | MOTION BY DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT WHITMAN IN LIMINE , CERTIFICATE OF SERVICE. (lvj) [Entry date 03/25/98] |
|---|---|---|
| 3/24/98 | 54 | Defendants' Amendment to Joint Pretrial Memorandum, Certificate of Service. (lvj) [Entry date 03/25/98] |
| 3/26/98 | 55 | Plff's Amendments to exhibit list in parties' joint pretrial memorandum (lvj) [Entry date 03/26/98] |
| 3/31/98 | 56 | ORDER THAT AUTHORIZATION IS GIVEN FOR THE PAYMENT OF EXPERT FEES OF DR. DAVID ARMESTO IN THE AMOUNT OF $500 TO PREMIER EYE CARE GROUP, INC. THE CLERK OF COURT IS DIRECTED TO SUBMIT A COPY OF THIS ORDER AND ATTACHED INVOICE TO THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS FOR PAYMENT. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 4/1/98 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 04/01/98] |
| 3/31/98 | 57 | Proposed Jury instructions by DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT WHITMAN, certificate of service. (lvj) [Entry date 04/01/98] |
| 3/31/98 | 58 | Minute entry dated 3/30/98 re: civil jury trial; jurors called, voir dire, selected; jurors sworn; plff and deft opening statements; (lvj) [Entry date 04/01/98] |
| 4/1/98 | 59 | Minute entry dated 3/31/98 re: civil jury trial; deft's motion for judgment as a matter of law - granted as to some defts; witnesses sworn (lvj) [Entry date 04/02/98] |
| 4/1/98 | 60 | ORDER THAT THE CLERK OF COURT FOR THE EASTERN DISTRICT OF PA BE AND HE IS HEREBY DIRECTED TO FURNISH LUNCH FOR JURORS AND ONE DEPUTY CLERK ENGAGED IN THE ABOVE ENTITLED CASE. (lvj) [Entry date 04/02/98] |
| 4/2/98 | 61 | Defts' Proposed Jury Interrogatories , certificate of service. (lvj) [Entry date 04/03/98] |
| 4/3/98 | 62 | Minute entry dated 4/1/98 re: trial resumes; witnesses sworn; deft's renewed motion for judgment as a matter of law; plff and defts closing; plff's rebuttal; judge's charge to jury who retire to deliberate; jury question answered on the record; verdict recorded; jurors dismissed. (lvj) [Entry date 04/03/98] |
| 4/3/98 | 63 | Questions to jurors and answers thereof. (lvj) [Entry date 04/03/98] |
| 4/3/98 | 64 | ORDER THAT JUDGMENT AS A MATTER OF LAW IS GRANTED IN FAVOR OF DEFTS CORRECTIONS OFFICER PAHIL AD CORRECTIONS OFFICER WHITMAN. THESE TWO DEFTS ARE DIMISSSED FROM FURTHER PROCEEDINGS IN THIS ACTION. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 4/3/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (lvj) [Entry date 04/03/98] |
| 4/3/98 | 65 | ORDER  THAT JUDGMENT BE AND THE SAME IS HEREBY ENTERED IN FAVOR OF DEFTS SMITH, BRUMFIELD, LEGRANDE, HEADEN, AND AGAINST THE PLFF. ON THE COUNTERCLAIMS JUDGMENT IS ENTERED IN FAVOR OF JOHN CLEARY, AND AGAINST CORRECTIONAL OFFICER BRUMFIELD AND LEGRANDE. NO MONEY DAMAGES ARE AWARDED.( |

|         |     | SIGNED BY JUDGE EDMUND V. LUDWIG ) 4/3/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (lvj) [Entry date 04/03/98] |
|---------|-----|---|
| 4/3/98  | --  | Case closed (kv) [Entry date 04/07/98] |
| 5/21/98 | 66  | Bill of costs by DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN, DEFENDANT PAJIL, DEFENDANT WHITMAN , Certificate of Service. (krl) [Entry date 05/21/98] |
| 5/26/98 | 67  | MOTION by PLAINTIFF JOHN CLEARY TO DENY COSTS , MEMORANDUM, CERTIFICATE OF SERVICE. (krl) [Entry date 05/27/98] |
| 5/27/98 | 68  | Response by DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN  to Plff's MOTION TO DENY COSTS  , Certificate of Service. (lvj) [Entry date 05/28/98] |
| 7/23/98 | 69  | Clerk's taxation of costs. 7/24/98 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 07/24/98] |
| 7/23/98 | 70  | ORDER THAT JUDGMENT IS ENTERED FOR DONALD T. VAUGHN, THOMAS D. STACHELEK, DAVID DIGUGLIELMO, J. J. WELBY, G. SMITH, DENNIS BRUMFIELD, TIMOTHY LEGRANDE, HEADEN, PAJIL, WHITMAN AGAINST JOHN CLEARY FOR $1,417.10. 7/24/98 ENTERED AND COPIES MAILED AND FAXED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) (lvj) [Entry date 07/24/98] |
| 7/30/98 | 71  | Appeal by PLAINTIFF JOHN CLEARY from Clerk's Taxation of Costs, memo, cert. of service. (jef) [Entry date 07/31/98] |
| 7/31/98 | 72  | Response by DEFENDANT G. SMITH, DEFENDANT DENNIS BRUMFIELD, DEFENDANT TIMOTHY LEGRANDE, DEFENDANT HEADEN to plff's appeal from the clerk's taxation of costs, Certificate of Service. (mc) [Entry date 08/03/98] |
| 8/13/98 | 73  | ORDER THAT THE CLERK'S TAXATION OF COSTS IS AFFIRMED. ( SIGNED BY JUDGE EDMUND V. LUDWIG ) 8/14/98 ENTERED AND COPIES MAILED AND FAXED. (lvj) [Entry date 08/14/98] |
| 12/7/99 | --  | Filing Fee Paid;  filing fee $ 3.12   receipt # 718544 (ajf) [Entry date 12/07/99] |
| 1/13/00 | --  | Partial Filing Fee Paid;  filing fee $ 2.58   receipt # 721386 (ajf) [Entry date 01/14/00] |

Case Flags:
f-STND
CLOSED

END OF DOCKET: 2:96cv4805


| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/07/2001 08:07:07 | | | |
| **PACER Login:** | cc0489 | **Client Code:** | |
| **Description:** | docket report | **Search Criteria:** | 2:96cv04805 |
| **Billable Pages:** | 12 | **Cost:** | 0.84 |

267 299 7135    P.02/11



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CLEARY,                                              :  CIVIL ACTION
      Plaintiff                                          :
          v.                                              :
                                                         :
                                                         :
DONALD T. VAUGHN, Superintendent                         :  FILED
THOMAS D. STACHELEK, Deputy Superintendent               :
and DAVID DIGUGLIELMO, his successor in office           :  MAR 27
J.J. WELBY, Hearing Examiner,                            :
G. SMITH, Correctional Officer Captain                   :  MICHAEL E. KUNZ, Clerk
DENNIS BRUMFIELD, Correctional  Officer Lt.              :
TIMOTHY LEGRANDE, Correctional Officer,                  :
CORRECTIONAL OFFICER HEADEN,                             :
CORRECTIONAL OFFICER PAJIL,                              :
CORRECTIONAL OFFICER WHITMAN,                            :
State Correctional Institution at Graterford,            :
Post Office Box 244, Graterford, PA 19426,               :  NO. 96-CV-480
         Defendants

## I.  COMPLAINT

    This  is  a  § 1983 action filed by John  Cleary,  a  state
prisoner, alleging violations of his constitutional rights by the
below  named defendants who have acted under the color  of  state
law.  Defendants are being sued individually and in his  official
capacities.  Plaintiff  seeks monetary  awards  compensatory  and
punitive damages in excess of the court's jurisdiction amount. as
prescribed by law.

## II.  JURISDICTION

    This action is authorized by 42 U.S.C. § 1983 to address the
deprivations  under the color of state law, rights secured by the
Constitution of the United States.  This court's jurisdiction  is
invoked  pursuant  to 28 U.S.C. § 1343 and  relief  requested  is
authorized by 28 U.S.C. §§ 2201, 2202.

EXHIBIT

10-23-01

York Steno Svcs.

## III. PLAINTIFF

1.    Plaintiff, John Cleary, is United States citizen and resident of the Commonwealth of Pennsylvania, and is currently incarcerated at State Correctional Institution at Graterford (Graterford) under court imposed sentence.

### IV.  DEFENDANTS

2.    Donald T. Vaughn, is and was at all times relevant to action, superintendent at Graterford. As superintendent, he is legally responsible for all officers and inmates at all times mentioned in this complaint.

3.    Thomas D. Stachelek, is and was at all times relevant to this complaint, deputy superintendent, and is legally responsible for all staff and inmates under the superintendent.

4.    David DiGuglielmo, (now deputy superintendent) Thomas D. Stachelek's successor in office, is and was at all times in this action, legally responsible for all staff and inmates under the superintendent.

5.    J.J. Welby, is and was at all times herein this action, hearing examiner, and is legally responsible for conducting inmate misconduct hearings for infractions of Department of Corrections rules and regulations.

6.    C. Smith, is and was at all times relevant to this action, captain of the corrections officers and is legally responsible for all lieutenants, sergeants, and corrections officers.

7.    Dennis Brumfield (now captain), is and was at all times relevant to this action, corrections officer lieutenant, and is

2

legally responsible for the actions of subordinate officers.

8.    Timothy LeGrande, corrections officer is and was at all times relevant to this complaint, an employee at Graterford.

9.    Corrections Officer Headen, is and was at all times relevant to this complaint, an employee at Graterford.

10.    Correction Officer Pajil, is and was at all times relevant to this action, an employee at Graterford.

11.    Corrections Officer Whitman, is and was at all times relevant to this complaint, an employee at Graterford.

## V.    FACTS

12.    On November 29, 1995 at approximately 09:15, plaintiff was returning from the exercise yard and was going to C block housing unit with Todd Mack, AY 8427.

13.    Because his cellmate was on cell restriction[1] and the cell door doubled-locked, plaintiff went to the block bridge control center to find his section officer to open his cell.

14.    Plaintiff saw Defendant LeGrande approximately 10 cells from his cell, which is numbered cell 23.

15.    LeGrande approached plaintiff and asked him "Where do you live.?"

16.    LeGrande further asked "What the fuck are doing back here?", and plaintiff told LeGrande that he was looking for an officer to let him into his cell.

---

1.    Inmates on cell restriction are double-locked and feed in their cells 22 hours daily. Cell mates who are in general population must be keyed in and out for any and all activities. In order to gain access, a section officer must be called to key the cellmate in or out the cell depending upon the cellmate's work schedule and other activities.

17.    LeGrande then hollered to Lt. Brumfield who was  sitting on bridge and said "Look what we got here," and Lt. Brumfield responded and said "Looks like we got one to go.!"

18.    Defendant LeGrande then ordered plaintiff to  go  the bridge,  and plaintiff went to the bottom of the staircase  which leads to the top of the bride located on the second tier.

19.    Lt. Brumfield was descending the stairs and  plaintiff then backed down the stairs, but his retreat was  blocked  by Defendant LeGrande who was standing behind him.

20.    Lt. Brumfield then asked plaintiff for his I.D.  card, and plaintiff told him it was locked in his cell.

21.    Both Lt. Brumfield and LeGrande escorted plaintiff  to his  cell and when they arrived, the cell was searched  and  upon completion, Lt. Brumfield ordered plaintiff handcuffed.

22.    Plaintiff was then escorted to the Day Captain's Office (DOC) and  Defendants Captain C. Smith  and  Defendants  Headen, Pajil and Whitman were there.

23.    When plaintiff entered the DOC, Lt.  Brumfield  then squared off nose-to-nose with plaintiff who was still handcuffed.

24.    Lt. Brumfield then said "What's up now, tough guy?  say something now!" However, plaintiff remained silent.

25.    Lt. Brumfield ordered Defendant LeGrande to remove  the handcuffed and once removed, Brumfield goaded plaintiff to  "Take a swing" i.e. take punch at him.

26.    Plaintiff refused, however.

27.    Defendant  C/O Headen said, "It doesn't  matter.  He's still  going  to  taste some brass today." i.e. the  brass  keys

4

officers use throughout the prison.

28.   Brumfield stepped toward plaintiff and said, "You're a bitch" and then feigned a punch causing him to take a step backwards.

29.   Defendant LeGrande, without provocation, punched plaintiff in his right eye, which knocked him to the floor.

30.   Defendants LeGrande, Pajil, Whitman kicked, punched and beat plaintiff with clubs while Captain Smith watched for several minutes and then said "Okay fellows, he's had enough."

31.   During the beating, plaintiff was handcuffed again by Defendants Pajil and Whitman while he remained on the floor.

32.   Plaintiff was issued a misconduct for an assault on staff and various other minor charges first, and then arrested by State Policeman Thomas M. Gilhool of the Limerick Barracks and charged with an assault by prison pursuant to 18 Pa.C.S. § 2703.

33.   On March 11, 1996 plaintiff appeared before the Honorable Albert J. Augustine, District justice and was acquitted of all charges. (See Exhibit A.

34.   Plaintiff, however, at his misconduct hearing was found guilty of assault on staff and was given 90 days disciplinary custody in Restrictive Housing Unit (RHU) on December 5, 1995, where he remains to date awaiting transfer to another state facility as yet unknown.

35.   Defendant J.J. Welby's decision was timely appealed to the Program Review Committee (PRC), which affirmed his actions.

36.   A timely appeal was then filed with Defendant Vaughn, who failed to reply within 3 days pursuant to DC AMD 801 I. 2.(c)

(Department of Corrections Administrative Directive Inmate Disciplinary and Restrict Housing Procedures, Appeals.

37.    Plaintiff then contacted Defendant Stachelek a letter asking him for relief, but was instructed to use the Misconduct appeal system described in averment 36, supra. See Exhibits B and C.

38.    A grievance was filed with Mary Anne Williams, grievance officer (coordinator) on November 30, 1995, but received no reply. See Exhibit D.

40.    Plaintiff then filed a grievance with Martin F. Horn, Commissioner, Department of Corrections on November 30, 1995.

41.    In response to plaintiff's grievance Mr. Horn sent Mr. Ernest Macon, Jr., to investigate and take an official statement from plaintiff on January 24, 1996. See Exhibit E.

42.    In the interim, plaintiff filed a request with PRC members, i.e. Major John Miller, et al, asking release from disciplinary custody on April 28, 1996 and May 16, 1996 respectively.

43.    The April and May 1996 requests for release from disciplinary custody was summarily denied. See Exhibit F and G.

## VI. LEGAL CLAIMS

44.    The actions of officers used was excessive force and malicious physical force to punish plaintiff; to deprive him of the right to be free cruel and unusual punishment.

45.    The acts of defendants deprived plaintiff the right to be released from disciplinary confinement after charges were dismissed by a court of law.

6

46.    The acts of defendants deprived plaintiff his right  to
due process  and  equal protection of  law guaranteed  by  14th
Amendment he has no remedy at law expect through this court.

### VII. CAUSES OF ACTION

47.    Defendant  Donald T. Vaughn violated  plaintiff's  due
process and equal protection of law rights by refusing to address
plaintiff's  appeal  of  his  misconduct,  and  in  violation  of
Department  of  Corrections  ADM 801  which  requires  the
superintendent  to address appeals within 3 days receipt  of  the
appeal.

48.    Defendant Stachelek violated plaintiff's due  process
and  equal  protection  of  law rights  by  refusing  to  address
plaintiff's  letters and appeal  of  his  misconduct.

49.   Defendant Welby violated plaintiff's right due  process
and equal protection of law by conducting a disciplinary  hearing
with  the  knowledge that Defendants had  filed  formal  criminal
charges in the Court of Common Pleas for Montgomery County.

50.    Defendants Smith, violated plaintiff's right to be free
of  cruel  and  unusual punishment by acquiescence  of  duty  by
permitting. Defendants  Brumfield, Headen, Pajil and  Whitman  to
punch,  kick,  and  beat plaintiff with clubs  in  an  unprovoked
attack in the DCO.

51.    Defendants  Brumfield,  Headen,  Pajil  and  Whitman
violated  plaintiff's 8th Amendment right to be free  from  cruel
and unusual punishment in their unprovoked attack on plaintiff in
the  DCO, which caused serious internal and external injuries to
his right eye, which required extensive medical treatment.

52.    Defendants Brumfield, Headen, Pajil and   Whitman
violated plaintiff's 8th and 14 Amendment rights when they   filed
a  false  misconduct alleging an assault on  staff,  and  further
compounded  their  actions by filing false  criminal  charges  of
assault in state court.

## VIII.    RELIEF SOUGHT

53.    Plaintiff seeks the following relief:

(a)  that  this  court declare  all  named Defendants'
actions violated plaintiff's rights secured by the 8th  and   14th
Amendments to the United States Constitution;

(b)  Plaintiff  seeks compensatory awards  for  damages
from  Lt. Brumfield, C/Os Headen, Pajil and Whitman  individually
and  severally  in the amount of $100,000  for  their  unprovoked
attack and subsequent beating and injuries;

(c)  Plaintiff seeks punitive awards for  damages  from
Defendants   Lt.  Brumfield,  C/Os  Headen,  Pajil  and   Whitman
individually  and severally in the amount of $100,000  for  their
unprovoked attack and subsequent beating and injuries;

(d)   Plaintiff   seeks  compensatory  damages   from
Defendant  Captain  C.  Smith, for  acquiescesing  his  duty  by
permitting  Defendants  Brumfield, Headen, Pajil and  Whitman  to
carry out their unprovoked attack against him.

(e)  Plaintiff seeks punitive damages  from  Defendant
Captain  C.  Smith for for acquiescesing his duty  by  permitting
Defendants  Brumfield,  Headen, Pajil and Whitman  to  carry  out
their unprovoked attack against him causing serious eye injuries.

8

(f)  Plaintiff  seeks compensatory awards  for  damages
from  each Defendant individually and severally in the amount  of
$50,000 from Defendant Vaughn for refusing  to review plaintiff's
appeal  from the decision of the Program Review  Committee;  from
Defendant Stachelek for refusing to address his letter requesting
relief.

(g)  Plaintiff  seeks compensatory awards  for  damages
from Defendant Welby in the amount of $50,000  (i) for conducting
a   misconduct  hearing  with  the  knowledge   that   Defendants
Brumfield,  Headen, Pajil and Whitman had filed  formal  criminal
charges  against  him, (ii) finding  plaintiff   guilty  without
substantive evidence at plaintiff's misconduct hearing.

(h)  Plaintiff seeks exemplary awards for damages  from
each  defendant  individually and severally  in  the  amount  of
$50,000 for deprivations of civil and constitutional rights.

(i)  Plaintiff  further requests any other  relief  the
court deems just and equitable.

Respectfully submitted,

John Clearly

9

## VERIFIED STATEMENT

I, JOHN CLEARLY, hereby depose and say pursuant to 18 U.S.C. § 10001, that all the foregoing the facts and statements are true and correct to the best of his knowledge, information and belief. He further states that this action is not dilatory and that he believes he is, according to law, entitled to the relief he seeks.

John Clearly
Plaintiff

Date: 6/26/96

10

3



**Dechert Price & Rhoads**

4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania
19103-2793

PHILADELPHIA PA
DEC 0 5 '01

Pb METER
7152418  U.S. POSTAGE
$3.00

Mr. John Cleary
DF 5779
P. O. Box 200
Camp Hill Prison
Camp Hill, PA 17001-0200

PERSONAL AND CONFIDENTIAL ~ ATTORNEY-CLIENT
PRIILVEGE

EXHIBIT
2
Reger 10-23-01
York Steno Svcs.



U.S. POSTAGE
PB METER
8407794

ABILENE
JUN '98
T·X

**RELIGIOUS MATERIAL**
*DIRECT FROM PUBLISHER*

# LIBRARY RATE

**THE HOUSE OF YAHWEH**
The Pillar and Ground of the Truth, 1 Timothy 3:15
P.O. Box 2498
Abilene, TX 79604

TO:

J CLEARY #DF5779
P O BOX 200
CAMP HILL PA 17001-0200

**RELIGIOUS MATERIAL**
*DIRECT FROM PUBLISHER*

3
EXHIBIT
Reya 10-23-01
York Steno Svcs.

Wareham #969

U.S. POSTAGE
2.16

PB METER
8346042

KINGDOM CITY, MO
NOV 30 '98

# FIRST CLASS MAIL

Yahweh's New Covenant Assembly
P. ?
Kingdom City, MO 65262

J. Cleary    DFS779
1500 Lisburn Rd.
PO Bx. 200
Camp Hill, PA 17001-0200

#904

Warrant

FIRST CLASS · FIRST CLASS · FIRST CLASS



BOOK RATE

U.S. POSTAGE
NJ1201326200?
17001

SADDLE BROOK NJ
NOV 20'98

**From:  Hizmet Religious Books, Inc.**
P.O. Box 916   Saddle Brook, NJ 07663

This Package contains Religious Books. #: 1, 7, 8, 9

To: J. Cleary   # D F 5779
P.O. Box 200
Camp Hill, PA   17001-0200

17001
SF01053222237

*Abounding Love Ministries, Inc.*
Box 425
Jackson, CA 95642

To:
Warrend Ketchmore AY-5250
P.O. Box 200
Camp Hill, PA 17001

Houtzdale    #913

LIBRARY RATE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,                          :
                                      :
    Plaintiff,              :
                                      :     Civil Action No. 1:CV-00-2125
    v.                      :
                                      :     (Judge Caldwell)
KENNETH KYLER, et al.,                :
                                      :
    Defendants               :

## DECLARATION OF KENNETH D. KYLER

    I, Kenneth D. Kyler, hereby declare under penalty of perjury that the following statements are true and correct based upon my personal knowledge and belief:

    1.    I am currently employed by the Pennsylvania Department of Corrections at the Superintendent at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"). I have held that position since January 9, 2000. Prior to that, I was Superintendent of the State Correctional Institution at Camp Hill ("SCI-Camp Hill"), starting in July of 1995.

    2.    As Superintendent of SCI-Camp Hill, I was the administrative head of the institution there. There were two Deputy Superintendents who reported directly to me. I did not normally get involved in the day-to-day operations of the individual housing units at SCI-Camp Hill, including the Special Management Unit ("SMU").

    3.    As part of my duties, I considered inmates' appeals from responses to inmate grievances, under Department Policy DC-ADM 804. On appeal, the Superintendent may approve, disapprove, modify, reverse, remand or reassign for further fact finding the initial review decision made in response to the inmate's grievance.

    4.    According to the records at SCI-Camp Hill, inmate John Cleary, DF-5779, filed an inmate grievance on April 13, 2000, which grievance was assigned No. CAM-0260-00. In that grievance, Cleary complained that his legal, religious and personal mail had been withheld

for a period of one to two years and that this deprived him of access to the courts as well as access to information vital to his religious beliefs and practices. On April 20, 2001, Business Manager Robert Gimble responded to his grievance by stating in part: "Cleary, it should not have taken this long for the mail you referenced to reach you. We apologize for any inconvenience this may have caused."

5.      Cleary appealed Gimble's response. However, I was no longer the Superintendent at SCI-Camp Hill at that time and the appeal was addressed by my successor, Superintendent Martin L. Dragovich. On July 5, 2000, Superintendent Dragovich denied the appeal as untimely. Inmate Cleary subsequently appealed the denial to final review. On July 31, 2001, Chief Hearing Examiner Robert S. Bitner, denied the appeal to final review. True and correct copies of Inmate Grievance CAM-0260-00, the official response and subsequent appeals are attached hereto and marked Exhibit "A."

6.      I have had no personal contact with the Plaintiff concerning the delay in his mail. I also was in no way responsible for the delay in the Plaintiff's legal and religious mail. There was an investigation by the Security Office at SCI-Camp Hill into the delay in delivery of inmate mail, which discovered numerous boxes of undelivered inmate mail. The Security Office recommended that the Mailroom Supervisor, Howard Imschweiler, be given a Pre-Disciplinary Conference, which was done. Mr. Imschweiler was subsequently terminated.

Executed this _3rd_ day of
December, 2001

_____
Kenneth D. Kyler
Superintendent
SCI-Huntingdon

2

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1451 N. MARKET STREET**
**ELIZABETHTOWN, PA 17022**

OFFICE OF THE
CHIEF HEARING EXAMINER

July 31, 2000

John Cleary, DF-5779
SCI Pittsburgh

Re:    DC-ADM 804 - Final Review
       Grievance No. CAM-0260-00

Dear Mr. Cleary:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of this grievance; including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response. I have also carefully reviewed the issues you raise to final review.

Upon completion of this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I find the issues raised for final review have been addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and appropriate.

I concur with the responses already provided at the institution level. Accordingly, your appeal to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

RSB:bjk

pc:    Superintendent Johnson
       Superintendent Dragovich

**EXHIBIT**

tables'

A

U1R

# FINAL REVIEW
## DC-ADM 802, 804 AND 814

**INMATE NAME:**  John Cleary

**INMATE DOC ID #:**  DF-5779

**PRESENT SCI:**  Pittsburgh    (Johnson)

**GRIEVANCE #:**  CAM-0260-00    Camp Hill. Aragonch
Fax Both

**DISPOSITION:**

   While at Waymart, the Cleary received a package of old mail (postmark 12/97 to 8/98) from Camp Hill. He believes Camp Hill intentionally withheld his mail from him, violating his legal/religious rights. Why did Cleary wait 4 months to file this grievance? Nonetheless, Camp Hill did not "intentionally" hold Cleary's mail. There was a mailroom incident and bundles of old mail were found. As soon as the problem was discovered, the mail was forwarded to all the inmates. It was nothing personal towards any one inmate. Camp Hill did their best to resolve the situation.

another grievance from the Camp Hill mail room incident. U should I not per Rorely sees

July 14, 2000

J. Cleary  DF5779
Box 99901
Pittsburgh, Pa 15233

Chief Hearing Examiner
1451 S. Market St.
Elizabethtown, Pa 17022

OFFICE
OF THE

JUL 19 2000

CHIEF
HEARING EXAMINER

RE: DC ADM 804 # CAM-0260-00

Dear Hearing Examiner;

This appeal is filed in response to the superintendent of camphill. I requested an extention of time pursuant DC ADM 804-4 (May 1, 1998). As explained in my appeal to superintendent, I had believed that the camphill mailroom supervisor, Howard Imschweiler had violated my 1st & 14th amendment rights by withholding my mail for 23 months, and it took several weeks to schedule a library slot in accordance with the SCI Pittsburgh rules, and the research time necessary to identify a violation of my constitutional rights by Howard Imschweiler, and whether or not to pursue this if indeed I had found a violation of my rights.

With all due respect to this office, as a good faith effort to resolve this matter without the federal courts, I request $10,000.00 as compensation for damages incurred, as noted in the record of this grievance.

Sincerly

cc: NTC/ivd
    File

**COMMONWEALTH OF PENNSYLVANIA**
**State Correctional Institution at Camp Hill**

DATE:       July 5. 2000

SUBJECT:    Appeal to Superintendent
            Grievance No. CAM-0260-00

TO:         John Cleary
            DF-5779
            SCI-Pittsburgh

FROM:       *Martin L. Dragovich*
            Martin L. Dragovich
            Superintendent

Receipt of your Appeal to Superintendent of Grievance CAM-0260-00 is acknowledged. In preparing this response, I have reviewed your original grievance, the grievance officer's response, and your appeal to this office.

Your request to have a grievance appeal extension granted in this matter is denied. While DC-ACM 804 allows for an extension for good reason, you have provided none. Your first level response from the Business Manager is dated April 20 and it is now July 5. Absent any compelling reason to grant you an extension, your request must be denied. Additionally, please note that I am not in a position to grant you the compensation you have requested in the amount of $10,000 for not receiving your mail in a timely fashion.

Based on the foregoing, your appeal is denied.

MLD/lp

cc:    Deputy Novotney
       Deputy Palakovich
       Mr. Livingood
       Mr. Gimble
       DC-15
       File – CAM-0260-00



June 29, 2000

J. Cleary *DF5779
Box 99901
Pittsburgh, Pa 15233

Kenneth Kyler; Superintendent
2500 Lisburn Rd, Box 200
Camphill, Pa 17001-0200

RE: Grievance *CAM-0260-00.

Mr. Kyler,

    I would like to appeal this initial grievance decision to your office upon approval from the Facility Manager/Regional Director for an extention of time for appeal as specified in DCADM 804-4 effective May 1, 1998.

    I have reason to believe that a violation of my 1st and 14th amendment rights were violated by your mail room supervisor, Mr. Howard Imschweiler, who intentionally, and maliciously withheld my legal mail for 23 months, and I lost a decision in my civil action as a result of Mr. Imschweiler withholding my legal mail. I had a substantial stake in the outcome of my civil action which I've lost as a direct result of Mr. Imschweiler's actions.

June 29, 2000
Kenneth Kyler
Page 2

As a good, faith effort to ~~resolve~~ resolve this matter with out the federal courts, I request that I would recieve $10,000.00 as compensation for damages caused by my not recieving my legal mail for 23 months past the postmark.

Please render a fair and just decision in this manner.

Sincerly

John Cleary

cc: NTC\vcl.
    Regional Director
    file

DC-804
Part II, A

**RECEIVED**
SUPT. SCIC

APR 2 0 2000

Referred _____

**ATTACHMENT #4**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA  17001**

CAM 0260—00

**Official Inmate Grievance - Review by Grievance Officer**
 **Complaint File Number Assigned by Grievance Officer**

| To:   Number<br>DF 5779 | Name<br>JOHN CLEARY | Quarters Assignment<br>SCI-ALBION | Date<br>04/13/00 |
|---|---|---|---|

This complaint has been reviewed.  Below is a summary of my review and/or investigation and recommendations.  Objections may be filed with the Superintendent within five (5) days.

CLEARLY, IT SHOULD NOT HAVE TAKEN AS LONG FOR THE MAIL YOU REFERENCED TO REACH YOU.  WE APOLOGIZE FOR ANY INCONVENIENCE THIS MAY HAVE CAUSED.

THE SITUATION HAS BEEN REVIEWED AND ALL INMATE MAIL THAT COULD BE DELIVERED HAS BEEN DELIVERED.  YOUR PARTICULAR SITUATION WAS COMPOUNDED BY WRIT MAIL THAT WAS NOT FORWARDED CORRECTLY.  WE HOPE TO AVOID A RECURRENCE OF THIS SITUATION IN THE FUTURE.

Dragovich
Deps
Gamble
Inmate
Cert File

| Signature of Grievance Officer | Date<br>04/20/00 |
|---|---|

000260.CAM.doc
grivform.wpd

**DC-804**
**PART 1**

RECEIVED
SCI-PITTSBURGH
APR 1 0 2000
SUPERINTENDENT
ASSISTANT II

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
RECEIVED
P.O. BOX 598
CAMP HILL, PA. 17001-0598
APR 1 7 2000

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. CAM-0260-00

| TO: GRIEVANCE COORDINATOR ~~xxxxxxx~~ Ben Livingood | Referred | INSTITUTION S.C.I. Camphill | DATE 4/13/00 |
|---|---|---|---|
| FROM: (Commitment Name & Number) John Cleary DF5779 | | INMATE'S SIGNATURE X | |
| WORK ASSIGNMENT BLK | | QUARTERS ASSIGNMENT B1B1018 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

While at F.T.C. Waymart, I had recieved 1 pkg of legal mail, postdated 12/5/97, 3 pkgs of religious books, postdated 6/4/98 8/20/98, and 11/23/98, and a personal letter, postdated 8/14/98. I recieved this mail in November 1999, and December 1999, after a transfer petition was submitted for me to Pittsburgh. Camphill had intentionally withheld my legal, religious, and personal mail for a time span of one to two years, and deprived me access to the courts, access to information vital to my religious beliefs & practices, and denied me correspondance with my immediate family members, by not delivering my mail to me in a timely manner.

B. Actions taken and staff you have contacted before submitting this grievance:

I wrote a letter to Kenneth Kyler, Superintendent at Camphill, and have recieved no response.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_Ben Livingood_                                           4/17/00
Signature of Grievance Coordinator                        Date

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,          :

           Plaintiff,     :

                     :     Civil Action No. 1:CV-00-2125

      v.            :

                     :

KENNETH KYLER, et al.,    :     (Judge Caldwell)

                     :

          Defendants    :

## DECLARATION OF WILLIAM S. WARD

I, William S. Ward, hereby declare under penalty of perjury that the following statements are true and correct based upon my personal knowledge and belief:

1.    I am currently employed by the Pennsylvania Department of Corrections at the State Correctional Institution at Camp Hill ("SCI-Camp Hill") as the Unit Manager of A & B Block. I have held that position since May, 2000. Prior to that, I was the Unit Manager of the Special Management Unit ("SMU"), which position I held from January, 1995.

2.    I am familiar with inmate John Cleary, DF-5779. Cleary was housed in the SMU at SCI-Camp Hill, while I was the Unit Manager there.

3.    Cleary often complained to me about his mail being delayed while he was at SCI-Camp Hill. However, I was not personally involved in the delivery of inmate Cleary's mail at SCI-Camp Hill, nor did I delay his mail in any way. I understand that there was an investigation into this matter and an employee in the mail room at SCI-Camp Hill was terminated as a result.

4.    At no time did I interfere with the Plaintiff's access to the courts or his right to practice his religion.

Executed this 11th day of
December, 2001

_William S. Ward_
William S. Ward
Unit Manager
SCI-Camp Hill

7

1                    COMMONWEALTH OF PENNSYLVANIA
2                    DEPARTMENT OF CORRECTIONS
3
4
5    JOHN CLEARY,                :
6                                :
7         Plaintiff              :   Civil Action No. 1:CV-00-2125
8         vs.                    :
9
10   KENNETH KYLER, et al        :
11                               :
12        Defendants             :
13
14                    TRANSCRIPT OF PROCEEDINGS
15                          taken on
16                       October 23, 2001
17                       at 1 Kelly Drive
18                  Coal Township, Pennsylvania
19
20
21   APPEARANCES:
22
23   JOHN CLEARY
24        Appearing Pro se
25
26   RAY DORIAN, ESQUIRE
27        On behalf of the Department of Corrections
28
29                              Reported by:
30                              Ralph Keffer,
31                              Official Court Reporter
32
33

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

1    A.    Yes.

2    Q.    Okay.

3    A.    14 or 15.  I'm not sure but right around

4    there.

5    Q.    Did you ever hold any jobs before you got

6    into the prison system?

7    A.    Not legally.

8    Q.    All right.  You mean were paid under the

9    table.  Is that what you mean?

10    A.    I have been.

11    Q.    Okay.  Well, I don't really care about that.

12    Now, you sued a number of people.  You sued Kenneth

13    Kyler who used to be the superintendent at Camp Hill.

14    Is that right?

15    A.    That's correct.

16    Q.    How would you describe your dealings with

17    Superintendent Kyler?

18    A.    All paperwork.

19    Q.    You never met him face-to-face?

20    A.    No.

21    Q.    Okay.  And when you say paperwork, what --

22    like what kind of paperwork did you have with

23    Superintendent Kyler?

8

1      A.   Appeals and decisions made and grievances

2  and misconduct.

3      Q.   Okay.  What about William Ward, Unit

4  Manager, how would you describe your dealings with

5  him?

6      A.   I couldn't really say.  I have no idea.  I

7  know who he is and I've dealt with him.

8      Q.   All right.  Did you ever meet with him face-

9  to-face?

10      A.   Many times.

11      Q.   All right.  Now, what housing unit were you

12  in back at Camp Hill in '97?  Where were you?

13      A.   "E" block.

14      Q.   "E" block.  Is that the SMU?

15      A.   That's the special management unit.

16      Q.   And Mr. Ward was the unit manager in the

17  SMU?

18      A.   Correct.

19      Q.   Okay.  Did you ever have any problems with

20  Mr. Ward on the SMU?

21      A.   Can you clarify that?

22      Q.   Well, did you ever have any disagreements

23  with him?

1  how long was your interview with Mr. Imschweiler?

2      A.   Approximately or...

3      Q.   Approximately.

4      A.   I can't truthfully say, but it had to have

5  been about five minutes approximately.

6      Q.   All right.  Were you satisfied after that

7  meeting...

8      A.   No.

9      Q.   ...with his answers?

10     A.   I appealed his decision when I received it.

11     Q.   Okay.  Have you brought any lawsuits before

12  this lawsuit?

13     A.   Yes.

14     Q.   Okay.  Well, how many lawsuits have you

15  brought before this one?

16     A.   Only one.

17     Q.   And what was the name of that lawsuit?

18     A.   Cleary versus -- Cleary versus Vaughn which

19  was amended to include versus Smith.

20     Q.   And what was Cleary versus Vaughn all about?

21     A.   It was an excessive force case stemming from

22  the -- from the incident at Graterford in 1995.

23     Q.   Okay.  You had been in Graterford in '95?

1      A.   I was in Graterford from '90 until '92 and

2   then again from '92 until '95.

3      Q.   You were there before coming to Camp Hill?

4      A.   Right.

5      Q.   How long were you in the SMU?

6      A.   From December -- from October 10, '97.  My

7   last day was August 27 -- no, let me take that back.

8   I was in the POC cell from the middle of June '99

9   until July 7, '99, which is the time I was sent to

10  Graterford MHU.

11     Q.   Okay.  All right.  Whatever happened to that

12  lawsuit of Cleary versus Vaughn?

13     A.   It was dismissed in a jury trial.

14     Q.   You had a jury trial.  Where was that jury

15  trial?

16     A.   In Philadelphia.

17     Q.   All right.  Did you have an attorney for

18  that case?

19     A.   Yes.

20     Q.   What was his name?

21     A.   Christopher J. Culletin (ph).

22     Q.   And how did you get him?

23     A.   He was court appointed.

15

1      Q.   All right.  Was he from Philly?

2      A.   I don't know his, you know, his home address

3  if that's what you mean.

4      Q.   Okay.  You don't know where his office was?

5      A.   Oh, his office is in Philadelphia.

6      Q.   Okay.  All right, and was he with a firm or

7  was he by himself?

8      A.   He was with a firm.

9      Q.   Do you remember the name of that firm?

10     A.   Dechert Price & Rhoads.

11     Q.   All right.  That's a pretty big firm, isn't

12  it?

13     A.   I don't know.  I have never seen the place.

14     Q.   Okay.  What did you think of Mr. Culletin?

15  What did you think of his representation of you?

16     A.   It was -- he did the best he could under the

17  circumstances.

18     Q.   Okay.  How long was that jury trial?

19     A.   About a week.

20     Q.   All right.  And you say that you lost?

21     A.   Right.

22     Q.   What did the jury -- did the jury find in

23  favor of the officer that you had sued?

16

1    A.    They found in favor in part on me and in

2    favor in part of them.  It was a split decision.

3    Q.    All right.  What was the -- did you get any

4    money out of that decision?

5    A.    No, neither one of us got money.  Both of us

6    were seeking claims and neither one of us got

7    anything.

8    Q.    When you say both, who do you mean both?

9    A.    The officers that were seeking claims

10   against me while I was seeking claims against them.

11   Q.    All right.  So you both lost?

12   A.    Yeah.  We had a stalemate.

13   Q.    Okay.  But a jury didn't give you any money?

14   A.    No.

15   Q.    Was there anything about the trial you think

16   could have been differently by Mr. Culletin?

17   A.    No.  I believe Mr. Culletin did everything

18   he could in his power.

19   Q.    Okay.  I'm going to ask you to take a look

20   at a complaint.

21                              ***

22   MR. DORIAN:

23        We'll mark that Exhibit 1.

1                                    ***

2    BY MR. DORIAN:

3         Q.   Okay, do you want me to turn the pages for

4    you or can you -- do you need to look at the rest of

5    that?

6         A.   You want me to look at this?

7         Q.   Well, do you recognize what this is?

8         A.   Yes, sir.

9         Q.   What is it?  What is this Exhibit 1?

10        A.   It's Cleary versus Smith.

11        Q.   Is that the complaint -- is that the case we

12   were just talking about...

13        A.   Right.

14        Q.   ...where the jury trial there was a

15   stalemate?

16        A.   Right.

17        Q.   All right.  This is an extra copy.  Do you

18   want this?

19        A.   Yeah.  I don't have copies of that.

20        Q.   Before the trial did you meet with Mr.

21   Culletin and prepare for the trial?

22        A.   I'm trying to remember.  Yes, I did.  Yes,

23   before the trial.

18

1      Q.   Do you remember when that trial was, what

2  year?

3      A.   It was in the beginning of '98 I believe.

4  I'm not exactly sure on dates on that.

5      Q.   Okay.  Did you put on any witnesses before

6  your trial?

7      A.   I can't recall.

8      Q.   Or not before the trial.  During the trial

9  did you have any witnesses in your favor?

10      A.   I can't recall.

11      Q.   All right.  Did you communicate with

12  Attorney Culletin before the trial?

13      A.   Yes.

14      Q.   All right.  And how did you do that, by

15  writing, phone, face-to-face?

16      A.   I was at Graterford and he visited me.

17      Q.   Okay.  How many times did he visit you at

18  Graterford?

19      A.   I can't recall.  It was more than once, but

20  I can't recall the exact number.

21      Q.   Okay.  When you were at Camp Hill, did Mr.

22  Culletin ever visit you?

23      A.   Not that I recall.

1    Q.    Okay.  Did he ever call you?  Or did you

2    call him?

3    A.    Not that I recall.

4    Q.    Okay.  Did you ever write letters to Mr.

5    Culletin while you were at Camp Hill?

6    A.    I had to send him stuff.  I sent stuff to

7    him.

8    Q.    All right.  So you sent him letters, you

9    wrote letters to him?

10    A.    Right.  I remember that I sent mostly stuff

11    of exhibits.  I remember because there was a request

12    process I needed first for photocopying...

13    Q.    Okay.

14    A.    ...which I can't recall the outcome and then

15    -- which I believe was denied because I was in

16    indigent.  I had no money on the books...

17    Q.    All right.

18    A.    ...for the photocopying so he agreed to do

19    it and it was something about -- it was about a

20    request.  I remember there was a request for -- to be

21    placed in the red for postage to send my exhibits and

22    all my paperwork to him.

23    Q.    How many times would you say you wrote to

1   Mr. Culletin while you were in -- at Camp Hill?

2      A.   I can't recall.

3      Q.   Was it more than once?

4      A.   Yeah, more than once.

5      Q.   More than five times?

6      A.   I can't recall.

7      Q.   Okay.  Did he write to you during that time?

8      A.   I would say he did, but I haven't received

9   it.  I received it lately.

10      Q.   Did you ever -- do you recall how many times

11   -- or how many letters you got from Mr. Culletin while

12   you were in Camp Hill before the trial?

13      A.   Not really because it's blending together

14   with Graterford.  I remember receiving mail at

15   Graterford from him.

16      Q.   Okay.  How did you find out that there was

17   going to be a trial in 1998?

18      A.   When they came and took me to court.

19      Q.   Well, did you know ahead of time from your

20   lawyer that -- when the trial was supposed to be?

21      A.   No.

22      Q.   He never contacted you and said, "Hey, we've

23   got a trial coming up"?

1    A.    Not that I knew of.

2    Q.    Okay.

3    A.    I didn't receive any mail or -- I believe I

4    didn't.

5    Q.    Okay.  I understand one of your complaints

6    about the -- about the mail is that you didn't get a

7    letter from Attorney Culletin.  Is that right?

8    A.    Right.

9    Q.    Do you know -- well, when did you first find

10   out that there was this delay in the mail?

11   A.    In November of '99.

12   Q.    That's the first time you heard about it?

13   A.    I received the package on one of the days, I

14   can't recall the exact day, November of 1999.  I

15   believe it was in the complaint.

16   Q.    Okay.  Had you heard before that, before you

17   got that letter in the mail, that other inmates were

18   not getting their mail on time?  Had you heard

19   anything about that?

20   A.    No, but I knew about a lot of grievances

21   going on down there about people's mail and people

22   were expecting stuff and filing grievances on their

23   mail.

22

1     Q.   All right.

2     A.   I wasn't one of the noisemakers down there,

3  so I didn't do a lot of hollering.  I only filed stuff

4  when it was, you know, when it was directly affecting

5  me...

6     Q.   So you're saying...

7     A.   ...that I knew of.

8     Q.   You're saying other inmates in the SMU were

9  complaining they were not getting their mail?

10    A.   Right.

11    Q.   All right.  Did you -- well, you were

12  complaining about your newspapers.  Right?

13    A.   Right.

14    Q.   Did someone tell you that the mailroom was

15  messing up?

16    A.   No, I had no idea.

17    Q.   When did you first find out that -- about

18  the problem?

19    A.   When I received the mail in 1999.

20    Q.   Okay.  And the letter from Attorney

21  Culletin, do you remember what was in that letter?

22    A.   Actually, it was a big legal package.  It

23  was -- it was the hardcopy of the deposition regarding

1  Cleary versus Smith.

2      Q.   Okay.

3      A.   It was a trial scheduling Order informing me

4  of trial that was in 1998.  There was a letter inside

5  there.  And as a matter of fact I sent you a copy of

6  the letter.  It has all the contents of what's in

7  there.  I didn't send that to you, I forgot.

8      Q.   Okay.  So you have the letter?

9      A.   Not with me, no.

10     Q.   You have it at Pittsburgh?

11     A.   Right.  I'll send you a copy when I get

12  back.  I'll make some copies and I'll send you one.

13     Q.   Okay, I appreciate that.  And...

14     A.   It will have -- there's a personal note he

15  wrote to me and the contents of the envelope which was

16  the hardcopy of the deposition...

17     Q.   Okay.

18     A.   ...the trial scheduling Order, another court

19  Order and -- from Judge Ludwig (ph) who was the

20  presiding Judge in Cleary versus Smith.

21     Q.   What's the other Order talk about?

22     A.   Pardon me?

23     Q.   You said there was a second Order.  What was

31

1      A.    Right.

2      Q.    Did -- during that four month -- four to

3  five month period, do you recall if you had any

4  contact with Culletin?

5      A.    I could have, but I can't really recall.  I

6  don't want to lie on the record and say that I did and

7  not.  I mean, I could have and I might not have.

8      Q.    Did you wonder where -- what was going on

9  with your case during that time?

10     A.    Yes, I did.

11     Q.    All right.  Is there anything you think that

12  would have been different about your case and your

13  trial if you had received that package earlier?

14     A.    I can't say, you know.  That was up to the

15  jury.  I mean, it could have, it could not have, you

16  know.  It could have went either way, you know.  I

17  believe I might have had a better chance.  I'm not

18  saying that I would definitely have been victorious if

19  I had that.  That's not what I'm trying to say.

20     Q.    Why do you say that?

21     A.    Because, you know, that's up to the jury

22  what they was going to find, you know.  I could have

23  been more prepared I believe, you know, than I

1   actually was.  I mean, then I could have been more

2   prepared than anything and still could have lost, you

3   know.  It's...

4        Q.   Well, did you...

5        A.   I can't really say.

6        Q.   Did you testify to the best of your ability

7   at that trial?

8        A.   Yeah, I said everything that I remember.

9        Q.   All right.  And did it come down to a

10  credibility determination between you and the guards?

11       A.   I believe that's about what it came down to.

12       Q.   You were saying the guards at Graterford

13  beat you up and they were saying they didn't beat you

14  up.  Is that basically what it was all about?

15       A.   Yes.

16       Q.   Okay.

17       A.   It came down to something that I changed in

18  my statement that was, you know, that I didn't recall

19  saying in the deposition that changed when I was on

20  the stand even though there was clear evidence, you

21  know, that at least one of them assaulted me.

22       Q.   Okay.  Are you saying that the -- was Sue

23  Ann Unger the attorney for the -- from the AG's

33

1   office?  Is she the one that did the trial...

2        A.   Right.

3        Q.   ...for the -- for the guards?

4        A.   Yes.

5        Q.   And you're saying she brought up something

6   in your deposition that you had -- you didn't recall?

7        A.   I didn't recall, but I jumped out and

8   answered it anyway and it came down to that.  She used

9   that.  I didn't have a chance to refresh my mind.

10  This was like a year later, you know.

11       Q.   Had your attorney reviewed your deposition

12  with you?

13       A.   Briefly but not over that issue.  When he

14  visited me at Graterford, we went over other things

15  that were more precedent at the time.  I can't recall

16  exactly what.

17       Q.   Okay.  Did he have a copy of the transcript,

18  to your knowledge?

19       A.   Yes, I know he did.

20       Q.   All right.  Now, the other thing you

21  complain about in your complaint is your -- some

22  religious items.

23       A.   Right.

34

1    Q.   What is your religious faith today?

2    A.   I'm a Nazarite.  That's a branch of the

3 Rastafori.

4    Q.   Naza -- how do you spell that?  Naza...

5    A.   N-a-z-a-r-i-t-e.

6    Q.   ...r-i-t-e, Nazarite.  Nazarite, is that how

7 you say it?

8    A.   Yes.

9    Q.   And that's -- that's...

10    A.   That's a branch of the Hebrew faith.

11    Q.   Okay.  The Rastafarian did you say?

12    A.   No, not Rastafarian.  That's something else.

13 It's called Rastafori.  It's...

14    Q.   Rastafori.  How do you spell that?

15    A.   Basically it's about...

16    Q.   How do you spell...

17    A.   R-a-s-t-a-f-o-r-i.

18    Q.   F-o-i?

19    A.   F-o-r-i.

20    Q.   Rastafori.  Rastafori, I never heard of

21 that.  And you say that's like a Jewish...

22    A.   Yeah, it's Judah Coptic.

23    Q.   Coptic?

35

1       A.   Yeah, it's Judah Coptic.

2       Q.   And how long have you been a Nazarite?

3       A.   Actually, I took the vow of the Nazarite in

4    '92 when I was in prison.  About '92 I took the vow as

5    a Nazarite, but I've been in the Hebrew faith since I

6    was about 12.

7       Q.   '92, okay.  You took a vow?

8       A.   Right.

9       Q.   All right.  And is there a -- I know they

10   have like a Muslim service in the prison for the

11   Muslims and, you know, for the Protestants they have

12   like a Protestant thing.

13      A.   Right.

14      Q.   Do they have anything for the Nazarites?

15      A.   No.

16      Q.   Like, for example, at Camp Hill did they

17   have something for Nazarites?

18      A.   I wouldn't know about Camp Hill.  I was

19   never in population.

20      Q.   Oh, you were in the SMU.  Okay, so you --

21   since you were in SMU you could not attend...

22      A.   Any services.

23      Q.   ...any services?

36

1     A.   But as far as I understand, there's no --

2  there's no, how do you say it, organized congregation

3  of Nazarites.  The closest thing to it would probably

4  be the Orthodox Jews.

5     Q.  All right.  Now, I know -- did -- when you

6  were at Graterford did -- was there any kind of Jewish

7  service?

8     A.   Yeah, but they were Orthodox.  I didn't...

9     Q.   You didn't associate with them?

10    A.   No.

11    Q.   Okay.  So there was no service you could go

12  to as a Nazarite at Graterford?

13    A.   No, there was no organized service.

14    Q.   All right.

15    A.   See,...

16    Q.   How about since...

17    A.   Judah Coptic and Nazarite is the vow that I

18  was under which, you know, governed most of the stuff

19  that I did in my worship.

20    Q.   All right.  When did this Nazarite religion

21  start?

22    A.   Back in the time of Abraham I guess.

23    Q.   Okay.

1    A.    Jesus was a Nazarite.

2    Q.    Now, is there like a church for the

3    Nazarites somewhere in the United States?

4    A.    In Israel.

5    Q.    It's in Israel.  Have you met any other

6    Nazarite people while in the state prison system?

7    A.    I've met some.

8    Q.    How about at Graterford, how many other

9    Nazarites were there?

10    A.    There was a handful of prisoners that was

11    Nazarites in Graterford.

12    Q.    All right.  So there was only a handful?

13    A.    Yeah.

14    Q.    All right.  So you guys didn't have your own

15    -- did you guys ever meet?  Did you like have a

16    service on your own?

17    A.    Basically, you know, the Nazarite is

18    basically individual, you know.  That's the Rastafori.

19    Q.    But how does...

20    A.    It's more of an individual between self and

21    God.  We're not like a congregated type.  That's why

22    there is no congregation and there's no call for a

23    congregation from the Nazarite or the Rastafori.

1    Q.   Well, how do you guys practice your

2    religion?  How does someone know your -- how do you do

3    your -- practice your faith?

4    A.   It's not for, you know, to proclaim to

5    people what you are, you know.  It's between, you

6    know, it's between you and God, you know.

7    Q.   Well, does the Nazarite -- people that

8    believe in the Nazarite faith do they have prayer

9    services?

10    A.   Not in congregations, no.

11    Q.   So they don't meet together and pray?

12    A.   We pray individually.

13    Q.   You pray separately.  So as a Nazarite back

14    in when you were in Camp Hill, how often did you pray?

15    A.   Pretty often.  Almost every day.

16    Q.   Okay.  Okay, you prayed daily.  How -- what

17    other things did you do as a Nazarite?  Did you read

18    anything?  Is there anything you read?

19    A.   I read the torah.

20    Q.   You read the torah.  That's a Jewish book,

21    isn't it?

22    A.   That's what I said.  We're basically Hebrew

23    faith.  We believe in the Old Testament.  We don't

1   believe in the new.

2       Q.   Is the torah the first...

3       A.   The Old Testament basically.  What you would

4   call the Old Testament.

5       Q.   Is the torah the first couple books of the

6   Old Testament?  Or what is the torah?

7       A.   It's basically almost the whole...

8       Q.   The whole Old Testament?

9       A.   Yeah, excluding the Catholic version.

10      Q.   Okay.  All right, so how often while you

11  were at Camp Hill would you read the torah?

12      A.   I tried to read it every day, but I'd be

13  lying if I said I read it every single day.

14      Q.   Okay.  All right, any other thing that you

15  did as a Nazarite?

16      A.   Basically there wasn't nothing to do down

17  there.  I read my books.  I studied.  I wrote to

18  several religious organizations that cover our faith,

19  you know.

20      Q.   How about fasting, was that part of your

21  religion?

22      A.   Yes.

23      Q.   How would you fast?

1      A.   I would have to fast with the Muslims

2   because we wasn't allowed to fast.  Like I said, we

3   don't have no organized congregation like the Muslims

4   do or some other faiths do.

5      Q.   How often would you fast as a Nazarite?

6      A.   I always tried just to do Ramadan.  I would

7   just go during the month of Ramadan because that's the

8   only time they would feed us at that time while I was

9   in SMU.  Now I can fast -- in a normal population I

10  can fast on my own days.

11     Q.   All right.  So you try to fast during

12  Ramadan.  Is there -- you said about the torah.  Any

13  other holy books that the Nazarite people look to or

14  believe in?

15     A.   We believe in all sources that -- like any

16  source of religious books like all the foundation

17  religions, as long as they coincide with what the

18  torah is saying.  If there's something outside of the

19  torah, then we reject that part of other books.

20     Q.   All right.  Now, you say in your complaint

21  that there was some books that were delayed by the

22  mailroom...

23     A.   Right.

41

1      Q.   ...at Camp Hill?

2                         \*\*\*

3  MR. DORIAN:

4         I'm going to mark some stuff here.  Make

5         that Exhibit 3.

6                         \*\*\*

7  BY MR. DORIAN:

8      Q.   I'm going to show you what I've marked

9  Exhibit No. 3 and ask you are these copies of the

10  envelopes that you got in 1999 that were late?  The

11  first page shows an envelope from the House of Yahweh

12  in Abilene, Texas.  Do you see that?

13      A.   No, I can't see.  Okay, yeah, I see it.

14      Q.   Is that one of the envelopes from the mail

15  that came late?

16      A.   Close but not it.  It's missing the Waymart

17  sticker again off the front.

18      Q.   Okay.  Anything else different about that

19  envelope?

20      A.   I can't recall off the top of my head.  I'll

21  have to send you another copy of mine.

22      Q.   Now, the Waymart sticker is that something

23  that Waymart stamped on it?

42

1        A.    No.    That's something that Camp Hill put on

2    to send it to Waymart.

3        Q.    Okay.

4        A.    It has the Waymart address on it.  It says,

5    "Forward to Waymart."

6        Q.    Okay.

7        A.    And the address there.  And it was like

8    partially or mostly covering the address of the Camp

9    Hill.  It's the same objection I have with the other

10   piece you showed me.

11       Q.    All right.  Now -- okay, other than --

12   except for that stamp, does that look like one of the

13   pieces of mail that you got?

14       A.    Yes, it's close to it.

15       Q.    Okay.  What was in that envelope from the

16   House of Yahweh?

17       A.    Religious tracts and little booklets.

18       Q.    Okay.  When -- how many religious tracts did

19   you have while you were at SMU?

20       A.    I had some -- some that were my property

21   that they allowed me to have.

22       Q.    Okay.  Do you remember total how many you

23   had?

43

1      A.   Not a number, but approximately about a

2   quarter -- a quarter of a box to a half a box, you

3   know, of a legal size box.

4      Q.   All right.  Would that be 20, 30, 40?

5      A.   I don't know the size.  The size of the

6   property room boxes.

7      Q.   Well, I mean, how many -- these books you're

8   -- these tracts you're talking about, are they thin,

9   thick?

10      A.   Some of them are a little bit thick and some

11   of them are real thin only having a few pages, some of

12   them having several pages.

13      Q.   Well, altogether how many do you think you

14   had?  10, 20, 30, 40?

15      A.   You know, I don't want to -- I don't want to

16   venture out with a number.

17      Q.   Your best -- your best guess.

18      A.   Approximately?

19      Q.   Yes.

20      A.   In my cell at one time about 20, 25.

21      Q.   Okay.  And then you had more in storage?

22      A.   I had some in storage, yes.

23      Q.   All right.

44

1      A.    Probably about double that.

2      Q.    Okay.  All right, and would you read these

3  tracts on a regular basis?

4      A.    Yes, I would read them on a regular basis.

5  I would study some of them to retain something from

6  them.

7      Q.    And the tract that was in this envelope from

8  the House of Yahweh, what was that called?

9      A.    There was several tracts.

10      Q.    How many were there?

11      A.    I don't know, but I'll send them to you.  If

12  you want copies of them, I'll send you copies of the

13  materials.

14      Q.    Well, maybe the first page of it.

15      A.    Basically -- I'll give you an idea.  It's

16  something like -- I got one expounding on the name of

17  Yahweh that's written in the torah...

18      Q.    All right.

19      A.    ...as opposed to Jehovah in the King James

20  version how that's, you know,...

21      Q.    Okay.

22      A.    ...that's not the correct name of the

23  Creator, you know.

1      A.   No, I didn't.  No, because I kept -- I kept

2  it long for a while and then I seen that they wasn't

3  going to allow me to move anywhere so...

4      Q.   Well, after you cut your hair how soon did

5  you get transferred out of the SMU?

6      A.   I didn't.  What happened is all he did was

7  move me into a different cell.  He had me between guys

8  that like to argue and fight all the time knowing that

9  I'm kind of peaceful and then, you know,..

10      Q.   Well, I thought...

11      A.   ...as soon as I cut my hair he decided to

12  move me into a more peaceful section of the block and

13  then I started doing all right for a while and then...

14      Q.   Well, how long was it between when you gut

15  your hair until you got out of the SMU?

16      A.   I can't recall exactly the amount of months.

17      Q.   Did you cut your hair before the trial?

18      A.   No.

19      Q.   Okay.  All right, so now -- are you now

20  still with the Nazarite faith?

21      A.   Right, I am.

22      Q.   But you say you're not under the vow?

23      A.   I'm not under the vow.  I'm still of the

50

1   Hebrew faith.  See, Hebrew is the basis.

2       Q.   Do you still practice the Nazarite faith?

3       A.   I study the Nazarite because I plan on after

4   this, after -- basically I've made a vow to place

5   myself in shame for five years and that's what I'm

6   doing by shaving my head.  That's shaming me.

7       Q.   Now, were you still able to read the torah

8   without the tracts that you received late?

9       A.   Oh, yeah, you can always read the torah.

10      Q.   Were you still able to pray?

11      A.   Yes.

12      Q.   Were you still able to pray as often as you

13  could before...

14      A.   Yes.  I could pray anytime I wanted to.

15  There was no restrictions on that as far as I know.

16      Q.   And you could still read the other tracts

17  you already had?

18      A.   Yes.  I could read them.

19      Q.   Okay.  Now, the next page of this exhibit is

20  another envelope.  This is from something called

21  Yahweh's...

22      A.   New Covenant Assembly.

23      Q.   ...New Covenant Assembly, Kingdom City,

1  what's what...

2       A.   Missouri.

3       Q.   ...Missouri.

4       A.   Right.

5       Q.   Is that another piece of mail that you got

6  late?

7       A.   Yeah.  It's close but I've got the same

8  objections with that as...

9       Q.   Okay.  Except for that seal being missing

10  that you talked about, does it look like one of the

11  envelopes?

12       A.   Pretty much.

13       Q.   Okay.  All right, and what was in this

14  envelope?

15       A.   Small tracts on various subjects.

16       Q.   Okay.

17       A.   They're mostly mini-studies and stuff like

18  that.

19       Q.   And that also had to do with the Nazarite

20  faith?

21       A.   Right.  The Nazarite/Hebrew.

22       Q.   All right.  Did you need those tracts in

23  order to pray?

1    A.    Not to pray but, you know, to increase, you

2  know, to learn more.

3    Q.    Okay.  Do you still have those tracts today?

4    A.    Yes.

5    Q.    And could you give me a copy of the first

6  page of it?

7    A.    I can get you some of them.  See, they're

8  all different.  They're little fold over things like

9  this.  They open like this.

10    Q.    How many pages are these tracts each?

11    A.    All of them is one but they're like this.

12  They fold like this and they fold like this.

13    Q.    Well, how many pages are there altogether?

14    A.    Let's see, one, two, three, four, five.

15  Something like that.

16    Q.    They're not like thick books?

17    A.    No.  A lot of these are like this.  I've got

18  some that are thick books that I would have to do page

19  by page.  Some of them are...

20    Q.    But the ones you got in the mail they

21  were...

22    A.    Some of them were like.  The mini-studies --

23  what I'm talking about now is the mini-studies are

53

1   like that.  They're only one page but it's like five

2   columns.  They fold out like this.

3        Q.   So some are just one page long?

4        A.   Basically.

5        Q.   The one typewriter page?

6        A.   Yeah, they're called mini-studies.

7        Q.   All right.  And they told up.  They're not

8   like a real book?

9        A.   Yeah.  Some of them are, some of them ain't.

10  They were all in the same envelope.  I'll show you --

11  I'll send you what I have.

12       Q.   All right.  But you could still read your

13  other tracts even without these mini-studies.  Is that

14  right?

15       A.   Right.  But the mini-studies were for me,

16  you know, it's like what you'd call Bible study.

17       Q.   All right.

18       A.   You know what I mean?  It's like on the same

19  principle.

20       Q.   Okay.  And here's a third page on this

21  exhibit.  It looks like it's two different envelopes

22  Hizmet Religious Books, Inc. and Astounding Love

23  Ministry, Inc.  Are they two other envelopes that you

54

1   received late?

2        A.    No.   The one on the bottom ain't mine.   I've

3   never seen that before.   That's somebody else's.

4        Q.    That's addressed to a Catchmore (ph).   All

5   right.

6        A.    Yeah.   That's not even me.

7        Q.    All right.   I don't know why...

8        A.    The one on the top I recognize except for

9   the sticker that's missing and then I can't see the

10  words that's on there because it's copied real dark.

11       Q.    All right.   Do you remember what came in

12  that book from Hizmet?

13       A.    Yeah.   That was stuff that had to do with

14  Nazarite or Hebrew faith.   I thought it was when I

15  wrote to them and then I realized it wasn't.

16       Q.    Okay.

17       A.    I still have that, too.   That's some other

18  books.

19       Q.    So that has nothing to do with the Nazarite

20  faith?

21       A.    No, that don't.   It's religious books but

22  they don't have nothing to do with my faith in

23  particular.

55

1     Q.   All right.  What are they, Muslim books or

2  something?

3     A.   Yes, that's exactly what they are.

4     Q.   And you're not a Muslim?

5     A.   No.

6     Q.   Okay.  Just curious, why were you getting

7  Muslim books?

8     A.   I thought they was -- somebody told me that

9  they was Nazarite.

10    Q.   Oh, okay.

11    A.   It was under the Hebrew and it gave me the

12  address so I wrote to them.  And...

13    Q.   Okay.  How about today, how often do you

14  pray today as a Nazarite?

15    A.   As a Hebrew you mean.  Like I said, I'm not

16  under the Nazarite vow this day.

17    Q.   You're under what -- you're under a

18  different vow?

19    A.   I'm still -- I'm still under Hebrew.  No,

20  the vow from the Nazarite is part of the Hebrew faith.

21    Q.   Okay.  Do you consider yourself of the

22  Hebrew faith...

23    A.   Right.

56

1    Q.    ...today?

2    A.    Yeah.  Rastafori are under the Hebrew faith.

3    Q.    And what do you do as a Hebrew today?

4    A.    I pray.  I observe the Sabbath.

5    Q.    How often do you pray?

6    A.    I try to pray every day.  Sometimes several

7    days, sometimes I don't pray at all during a certain

8    day.

9    Q.    And you say you observe the Sabbath.  Did

10   you do that back when you were in Camp Hill?

11   A.    I had no choice in that matter.  I was

12   always in a cell.  All that is is not cooking nothing

13   and basically you don't come out after sundown, no

14   operating no machinery or use no tools.

15   Q.    When you were at Graterford were you in the

16   general population?

17   A.    Yes.

18   Q.    Did you observe the Sabbath...

19   A.    Yes.

20   Q.    ...when you were in Graterford?

21   A.    I would just confine myself to this on

22   Sunday and that's what I do these days.

23   Q.    Okay.  Do the Nazarites wear any special

1    clothes or anything?

2        A.    No.

3        Q.    Did you ever discuss with Superintendent

4    Kyler about the delay in receiving the mail in this

5    case, the letter from Culletin and the religious

6    tracts?

7        A.    You mean personally or what?

8        Q.    Face-to-face.

9        A.    No, I never met him personally.  I never met

10   him face-to-face.

11       Q.    All right.  Did you ever file a grievance

12   about that delay?

13       A.    I did file a grievance.

14       Q.    Do you remember what they told you?

15       A.    Yeah.  They told me that they -- something

16   about they understand that they held up my legal mail

17   and stuff, you know.  They apologized but that was it.

18       Q.    All right.  Do you know whose fault it was

19   that this mail wasn't delivered in a timely fashion?

20       A.    I assume it falls on the three Defendants

21   because they I reckon -- I mean, I couldn't say it was

22   a certain officer because, like I said, I didn't

23   receive it.  I didn't bring nobody in here to

1  substantiate it, you know, or didn't at least have a

2  supervisory role in this.

3      Q.   All right.  Do you know why...

4      A.   I don't...

5      Q.   Do you know if Superintendent Kyler had any

6  role in delaying your mail?

7      A.   I can't say he had his hand in it

8  personally, but he's in a supervisory position and I

9  believe that falls under his jurisdiction.

10     Q.   Okay.  How about Unit Manager Ward, do you

11 know if he had any role in delaying your religious and

12 legal mail?

13     A.   I can't say.

14     Q.   What about Mr. Imschweiler, do you have any

15 reason to believe he had a role in delaying your legal

16 mail and your religious mail?

17     A.   He's about the only one that I could believe

18 because he's in direct access and direct handling of

19 the mail in the mailroom.

20     Q.   Do you know if any -- did you hear from any

21 other inmates what his role was?

22     A.   I don't go on what other people tell me

23 usually like that.

1    Q.   Since you got those pieces of mail in

2   November of '99, did you talk to any of those three

3   gentlemen; Ward, Kyler or Imschweiler about the delay?

4    A.   I don't even know how to contact them even

5   to this day.

6    Q.   All right.  You were at Waymart when you

7   received them.  Right?

8    A.   Right.

9    Q.   Did anyone explain to you why it was

10   delayed?

11    A.   No.  They just handed it to me and they

12   didn't even realize it I guess until I pointed it out

13   to the guards that handed it to me.

14    Q.   Were you -- without the religious tracts

15   that you got in November of '99, were you still able

16   to practice your religious faith?

17    A.   Yeah, I could practice it.

18    Q.   Is there anything you want to add about any

19   of this -- any of your claims here today you think I

20   should know about about your claims?

21    A.   No, I believe it's pretty clear.

22    Q.   All right.  Is there any witnesses -- do you

23   know what witnesses you intend to call if this thing

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,     :

   Plaintiff,   :

        :  Civil Action No. 1:CV-00-2125

  v.      :

        :  (Judge Caldwell)

KENNETH KYLER, et al.,  :

        :

   Defendants  :

## CERTIFICATE OF SERVICE

I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of the foregoing Appendix to Defendants' Motion for Summary Judgment upon the person(s) and in the manner indicated below.

Service by first-class mail
addressed as follows:

John Cleary, DF-5779
SCI-Pittsburgh
P.O. Box 99901
Pittsburgh, PA  15233

Janelle C. Stapleton
Clerk Typist 2

PA Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:  March 14, 2001