(40)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA RB #/0

## ORIGINAL

John Cleary,

      Plaintiff

   v.

Kenneth Kyler, et al,

      Defendants

CIVIL ACTION

NO. 1:CV-00-2125

(Judge Caldwell)

FILED

MAR 2 9 2002

PER _____
HARRISBURG, PA, DEPUTY CLERK

Plaintiff's motion in opposition
the Defendant's motion for summary Judgement

    John Cleary, Pro se prisoner, here by move this
court to deny summary judgement to the
defendants, in favor of the plaintiff. A brief in
support of this motion, setting forth the reasons
to deny summary judgement, is being filed this
same date by the plaintiff.

    Wherefore, the the plaintiff requests that
the court deny the defendants summary judgement
and enter judgement in favor of the plaintiff.

              Respectfully submitted

Po Box 99901
Pittsburgh, Pa. 15233

      X _____

      John Cleary # DF5779

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

John Cleary,

      Plaintiff

    v.

Kenneth Kyler, et al,

      Defendants

CIVIL ACTION

NO. 1:CV-00-2125

(Judge Caldwell)

Plaintiff's Brief in Support of motion in
opposition to the defendant's motion for
<u>Summary Judgement.</u>

1 statement of the case

    This is a civil rights action initiated by John Cleary
(pro se plaintiff) a state prisoner at S.C.I. Pittsburgh, forma__
a state prisoner at S.C.I. Camphill, where the issues of
the complaint arose. Defendants include superintendent
Kenneth Kyler, Unit Manager William S. Ward, and mail ro__
supervisor Howard Imschweiler.

    In his complaint, the plaintiff was housed in the
S.M.U. at Camphill between October 10, 1997 until July 7, 199__
He was also at the P.O.C. cell in the Camphill hospital from
August 27, 1999, until August 30, 1999, then transferred to
the M.H.U. at S.C.I. Frackville from August 30, 1999 unti__
September 27, 1999, then transferred to F.T.C. Waymart from
September 27, 1999 until December 29, 1999.

The plaintiff stated in his complaint that the named defendants intentionally and maliciously withheld five pieces of mail addressed to the plaintiff at his address at Camphill while he was a state prisoner in that prison. The five pieces included a package of legal mail from the plaintiff's court appointed attorney in a previous civil action, which was postmarked December 5, 1997, and recieved by the plaintiff at F.T.C. Waymart on November 12, 1999. The plaintiff also recieved a personal letter from a friend postmarked August 12, 1999, ~~and recieved~~ and recieved by the plaintiff at F.T.C. Waymart on November 15, 1999. The plaintiff notes that the legal package was intentionally and maliciously withheld by the defendants for one year, eleven months, and seven days, and the personal letter was intentionally and maliciously withheld by the defendants for one year, three months, and ~~xxxx~~ three days.

The plaintiff then recieved two packages which contained religious books, and instructional tracts, while at F.T.C Waymart on November 16, 1999. They were postmarked June 4, 1998, and November 30, 1998 respectively, and were intentionally and maliciously withheld by the defendant for one year, five months and twelve days; and eleven months and seventeen days respectively.

Finally, the plaintiff recieved a package of religious books while at F.T.C. Waymart on November 23, 1999, postmarked November 20, 1998. This piece of mail was intentionally and maliciously withheld by the defendants for one year and two

2. Statement of issues presented

1. Are the defendants entitled to summary judgement on the plaintiff's access to courts claim, since the plaintiff believes that the delay of his legal mail, which contained essential information to the plaintiff's case, had caused him to be unprepared for trial, and ultimatly compromised the integrity of his case?

   suggested answer: NO.

2. Are the defendants entitled to summary judgement on the plaintiff's religious freedom claim, since the books and instructional tracts contained vital information that the plaintiff believed was necessary for him to correctly and accurately worship his Creator, and interpret the scripture which the plaintiff strives to live by and better himself in the practice of his strongly held religious beliefs?

   suggested answer: NO.

   3. Argument

1. Defendant's are not entitled to summary judgement on the plaintiff's access to courts claims, since the plaintiff believes the delay of his legal mail contained vital information, and caused him to be unprepared for trial, and compromised the integrity of his case.

The plaintiff has established that he suffered substantial injury, and would be able to demonstrate substantial injury to a jury at trial, and also be able to demonstrate malice in the the defendant's action by withholding the plaintiff's essential legal mail for almost two years.

Therefore, the defendants are <u>NOT</u> entitled to summary judgement in their favor.

Any obstruction to the meaningful access to the Courts by a prison official is actionable, <u>Bounds v. Smith</u>, 430 U.S. 81 (1977)

Further, defendant Imschweiler's deliberate and malicious mishandling of prisoner's incoming mail between 1996 and 1999 shows a long history of deliberate and malicious indifference in the handling of inmate legal mail. see: <u>Jackson v. Procunier</u> 789 F.2d 307 (5th cir 1986). Also see Imschweiler's disciplinary conference ¶¶

Also; "Incoming "legal" mail is to be delivered promptly and unopened. See: <u>Conklin v. Hancock</u>, 334 F. Supp. 1119 (D.N.H. 1971)

Finally; "Inmates may not be deprived of visits from attorneys, mail from courts and attorneys.." See: <u>Berch v. Stahl</u>, 373 F. Supp. 4 (W.D.N.C. 1974)

The weight of the evidence indicates that the two year delay of the plaintiff's legal mail caused the plaintiff to be unprepared for trial in his civil case, and was in violation of a clearly established constitutional right, and the mere volume of mail maliciously withheld shows that this is <u>NOT</u>

: see Intelligence Captain D.B. Orwig (of S.C.I. Camphill) letter to defendant Kyler, dated November 23, 1999, subject: "Unprocessed mail". ¶1.

It is also evident that the processing of mail was held to a different standard addressed to prisoners confined in the S.M.U. at Camphill, Imschweiler's disciplinary conference ¶11. The S.M.U at Camphill was operated by defendant Ward on a daily basis, who answered only to defendant Kyler. Defendants Kyler and Ward dictate policy and procedure for the S.M.U. as a self contained "prison within a prison", including, but not limited to incoming and out going mail.

Not only was the defendant's actions malicious and deliberate, but in violation of the employee's Code of Ethics and Conduct #7 and #14; see attached code of Ethics book ¶¶5, 7.

therefore the defendants are NOT entitled to summary judgement in their favor against the plaintiff.

2. the defendants are not entitled to summary judgement on the plaintiff's religious freedom claim, since the books and instructional tracts that were maliciously and intentionally withheld by the defendants contained vital information that the plaintiff believed was necessary for him to correctly and accurately worship his Creator and interpret the scripture which the plaintiff strives to live by and better himself in the practice of his strongly held religious beliefs.

The defendants are _NOT_ entitled to summary judgement on the plaintiff's religious freedom claim. The plaintiff has established that he suffered substantial injury, and would be able to demonstrate substantial injury to a jury at trial, and also to demonstrate malice in the defendant's action by withholding the plaintiff essential religious information and study materials. The plaintiff is a Nazarite=Ras tafor-I, which is based in the Israelite Hebrew faith. For clarification to this court, it is related to Judaism. Smarter men than the plaintiff contemplate the Torah (Old Testament, Hebrew version) for decade and their entire lives to interpret it's meaning. The plaintiff is a novice by comparison, by none the less devout in his practice of his strongly held belief in his Creator. Informat previously unknown to the plaintiff, but vital to the plainti correct worship, was contained in the packages maliciously and intentionally withheld by the defendants. The plaintiff believes that because he called on his Creator by in correct, erroneous, and blasphamous names, that his prayer went largely unanswered by his Creator. the information contained in packages of religious books and tracts that was maliciously withheld by the defendants for almost one year and a half, would have otherwise informed the plaintiff of his error. See the attached covers of said books and tracts; "why aren't your prayers answered today"?; "Who is lord god? who is baal?"; "Who do you worship?"; and "How Yeshua Became Jesus!"                     From package dated June 4, 19

Also see: covers of books and tracts; "Passover: A memorial for all time"; "the Mistaken J: True names of the Father and Son"; "and mini studies "Yahweh's name at the end of the age"; "Is the rapture biblical?"; "This is the Eliyah message"; "Is the Kingdom here now?"; Is Christmas a biblical observance?"; "Is His name Jehovah or Yahweh?"; "why grace leads to obedience"; "why the Savior spoke in parables" and, "Sunday Worship?" From package postmarked November 30, 1998.

Plaintiff does not argue that there are policies and practices found not to interfere with a prisoner's rights and practice of religion, but the arbitrary withholding of mail serves no legitimate penological purpose, in fact the plaintiff's desire to seek forgiveness and atone for his sins against his fellow man and his Creator should be commanded, not repressed and stifled. Penance is the objective of confinement in a penitentary. The plaintiff is NOT arguing "inmate movement", or "fellowship meals", but the unnecessary and arbitrary withholding of essential religious materials. Yes, the plaintiff could pray without the information contained in these packages, but not correctly or accuratly, nor could the plaintiff grow in his faith as he tried to better himself morally. Yes, the plaintiff could fast, but not correctly without the knowledge of the rules, which would maximized his atonement to his Creator, because the plaintiff did not have the materials maliciously and intentionally withheld by the defendants.

Therefore, the defendants are NOT entitled to summary judgement in their favor against the plaintiff

## 4. Conclusion

For all of the above reasons, it is respectfully requested that the Court deny the defendants motion for summary judgement and order the instant civil action to be heard by a jury in trial.

Respectfully Submitted

X ✗

John Cleary ✗ DF 5779
Pro Se Prisoner

P.o.Box 99901
Pittsburgh, Pa 15233

DATED: March 26, 2002

RECEIVED
SCI - CAMP HILL.

Nov 29   9 37 AM '02

DEPARTMENT OF
HUMAN RESOURCES

COMMONWEALTH OF PENNSYLVANIA
STATE CORRECTIONAL INSTITUTION
AT CAMP HILL, PA  17001-8837
November 23, 1999

**SUBJECT:**   Unprocessed Mail

**TO:**       K. D. Kyler
              Superintendent

                                                    IO #206/99

**FROM:**     D. B. Orwig
              Intelligence Captain

On 10/25/99, the Security Office received correspondence from your office dated 10/22/99 concerning unprocessed mail.  Your correspondence indicated that SCIC Business Manager Robert Gimble reported to you on 10/21/99 that he discovered approximately twenty (20) Records Center boxes containing various U. S. Mail and inter-institutional mail/request slips that had not been properly processed by SCIC Mail Supervisor Howard Imschweiler.  Your correspondence further indicates that these boxes were removed and stored in a locked closet in Jennine Rhome's office at the Manor House (Personnel Office). You also indicated that some of the U. S. Mail discovered was personal mail, legal mail and that some of the mail contained money orders.  Based upon the above information, you requested that this Captain conduct an investigation into this matter by interviewing all Mailroom Staff, Mr. Imschweiler and Mr. Gimble.

Before conducting interviews on this matter, this Captain went to the Manor House on 10/28/99 to determine the extent of the unprocessed mail found by Mr. Gimble.  I found a total of twenty-two (22) boxes, which contained a varied assortment of outgoing/incoming mail.  This mail included mail from inmates at other State Correctional Institutions addressed to the SCIC Mailroom, incoming mail to inmates with money orders, incoming legal mail to SCIC inmates, outgoing legal mail from SCIC Administrative Staff, incoming mail from Central Office Staff to inmates, inter-institutional mail (request slips/grievances, etc.), and publications (books/ magazines, etc.).  Due to the type of mail found and the volume, this Captain notified Major Carey and Deputy Superintendent Palakovich of this and the Security Office was instructed to attempt to process this mail as best as possible.  This processing was to include the logging of each piece of U. S. Mail as well as making a photocopy of the front of each envelope/package. Once logged and copied by Security Office Staff, the mail is being sent to Business Manager Gimble's office for appropriate handling/distribution by mailroom staff.  As of the date of this report, the Security Office has logged and copied over one thousand two hundred (1,200) pieces of mail and is currently involved in finishing the remaining mail/paperwork that is stored in the boxes at the Manor House.  At this time, approximately half of the boxes that were taken to the Manor House have been processed by the Security Office.  It must also be mentioned, that the postmarks on this mail range from 1996 through the 1999 year. Most of the mail addressed to inmates at this facility are currently housed in the SMU.

Unprocessed Mail
Page 2
November 23, 1999

However, a large percentage of mail belongs to inmates who have since transferred from SCIC and are no longer housed at this facility.

This Captain interviewed SCIC Business Manager Robert Gimble in the Security Office on 10/29/99 and again on 11/17/99. Mr. Gimble said that he found approximately fifteen (15) to twenty (20) boxes of unprocessed mail stacked along a wall in the mailroom on 10/21/99. He then said that he began to sort through this mail in his office and that he then notified your office of his findings and that he was directed by you to take the boxes of mail to the Department of Human Resources (Manor House) for storage. Mr. Gimble also stated that he is Mr. Imschweiler's immediate supervisor and that he has had no major problems with him concerning his work performance. He also said that he visits the mailroom on a daily basis and that he was not aware of what was stored in these boxes and that he had received no feedback from mailroom staff concerning these boxes once they were removed and taken to the Manor House. Mr. Gimble also indicated that he has spoken to Mr. Imschweiler on prior occasions concerning backlogs of mail and how to rectify these problems and that he (Mr. Gimble) has made every effort to assist mailroom staff in processing mail and ensuring that adequate staffing levels were requested/maintained. Mr. Gimble signed and dated his transcribed statements.

This Captain then interviewed all Corrections Mail Inspectors who are currently assigned to the mailroom. This included Holly Bookwalter, Terri Collins, Scott Harbold, Idris Smith, Brian Harris and Anthony Green. Union Representation was offered to all staff and was accepted by everyone with the exception of Brian Harris, who declined. Ruth McCracken, President of AFSCME Local 1981, was present for the interviews of those desiring Union Representation.

All Mail Inspectors interviewed said that they were not aware of the contents of the boxes and that they had not received specific instructions from Mr. Imschweiler to work on or process anything in these boxes. They also said that they were familiar with Administrative Directive 803 (Inmate Mail Privileges) and that inmate mail / money orders were to be processed in a timely manner, usually within a day or two after receipt of such mail. They further indicated that Mr. Imschweiler is normally the person responsible for handling / processing inmate mail to be delivered to inmates in the SMU. All staff interviewed signed and dated their transcribed statements.

Corrections Mail Inspector Supervisor Howard Imschweiler was interviewed by this Captain in the Superintendent's Office on 11/10/99 and again in the SCIC Business Office on 11/23/99. Union Representation was offered and was provided by Phyllis Smith of AFSCME Local 2495. SCIC Human Resources Department Director Ms. Janet Smith indicated to this Captain that Ms. Phyllis Smith could represent Mr. Imschweiler although they are not in the same union. Mr. Imschweiler said that as Mail Inspector Supervisor he is responsible for the overall operation of the mailroom including the supervision of the Mail Inspectors. He also said that he is familiar with Administrative Directive 803 (Inmate Mail Privileges) and that all inmate mail / money orders are to be processed in a timely manner, usually within twenty-four (24) hours. Mr. Imschweiler also said that he was familiar with what was in the boxes and that he accepted full responsibility for anything in these boxes and that his mail inspectors had nothing to do with items in these boxes. He also stated that the mailroom is very busy and short staffed and that he was going to attempt to get to this mail and process it. He further indicated that he had no reason not to forward inmate mail as he has avenues available through the Postal Service to not forward mail if that is what he wanted to do.

Unprocessed Mail
Page 3
November 23, 1999

During his second interview, Mr. Imschweiler discussed the concerns he had over people having access to the mailroom and things coming up missing. He said that there were times when the computers indicated that their log times were exceeded and that food products were taken out of the mailroom. He also indicated that these incidents were addressed with Mr. Gimble and Central Office staff. Mr. Imschweiler further stated that he had old mail for E-Block put in boxes and that this mail may not have been processed possibly from moving them around or the boxes were rotated.

Mr. Imschweiler also discussed his previous statement in which he indicated that Mr. Gimble could verify that he (Imschweiler) was going to process these boxes one at a time and Mr. Imschweiler also mentioned the operational concerns of the mailroom. He said that the mailroom staff has not increased for several years and that the workload is very heavy. He also indicated that numerous mailroom staff had become sick due to various problems with the mailroom environment and that this has impacted on their ability to get work done. He also said that Mr. Gimble was aware that the was attempting to process these boxes of mail after Mr. Gimble had found the boxes. Mr. Imschweiler signed and dated both of his transcribed statements.

**Conclusion:**   As a result of information obtained during this investigation, it is obvious to this Captain that deliverable mail both to and from inmates was not processed in a timely manner and in accordance with Administrative Directive 803 – Inmate Mail Privileges. As noted earlier in this report, some of this mail was postmarked as far back as 1996 and numerous pieces of mail contained money orders that for whatever reason, was not processed. Staff interviews indicate that Business Manager Gimble and Mail Inspectors were not aware of what was in these boxes and Mailroom Supervisor Imschweiler stated that he accepts full responsibility for the contents of these boxes. Although staff also indicated that the mailroom is extremely busy and short staffed on occasions, this does not appear to be an acceptable reason as to why mail postmarked a year or two ago was not processed in accordance with established guidelines. Mr. Imschweiler also mentioned that security issues and operation concerns had a possible impact on the processing of this mail. Once again, it does not seem reasonable that these issues are responsible for the volume of mail dated two and three years ago going unprocessed.

Another concern that needs to be discussed regarding this situation is the impact of delivering this mail to the inmates, particularly in the SMU. The delivery of this late mail will in all likelihood create numerous complaints/grievances being submitted by inmates and their families. Two to ten (2-10) Shift Lieutenant G. Funk had authored a Daily Incident Report dated 11/10/99 concerning SMU inmates complaining of receiving mail that was dated 1996 and 1997. This only emphasizes the importance of the need to have inmate mail processed and distributed in a timely manner.

**Recommendation:**   After discussing this investigation with your office, a recommendation is being made to have a Pre-Disciplinary Conference held with Mr. Imschweiler to give him an opportunity to explain why such a volume of inmate mail was not processed in a timely manner and in accordance with Administrative Directive 803. The Security Office will continue to inventory and log the remaining unprocessed mail and forward it to Business Manager Robert Gimble for appropriate disposition.

Unprocessed Mail
Page 4
November 23, 1999

 Mr. Imschweiler and mailroom staff will also need to be closely supervised to ensure that future inmate mail is being processed accordingly. Although there appears to be no criminal activity involving this matter, Administrative Staff can consider the involvement of the PA State Police or the U. S. Postal Inspection Service to possibly review this matter, if warranted.

If you have any questions / concerns regarding the above or desire further action by this office, please contact me in the Security Office.

I concur

_____
Deputy Palakovich

I concur

_____    11-23
Superintendent Kyler

DBO/ckr

Attachments

cc:    Deputy Secretary Love          Deputy Palakovich
       Deputy Petruccio               Major Carey
       Major Sunday                   Ms. J. Smith
       File (2)

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 5

MS. SMITH: Oh, the same one we had before.

MR. IMSCHWEILER: That form is used throughout all that, the one that has "other" on the bottom.

MS. SMITH: So when you tried to do the call line and the inmate didn't show up then you were to do this form and have it destroyed?

MR. IMSCHWEILER: Correct.

MS. SMITH: And you put it in the box instead.

MR. IMSCHWEILER: I put it in the box.

MS. SMITH: Now, did you put a cover, is this on a piece, a piece of mail that's in that box?

MR. IMSCHWEILER: Why would we take the time to fill one of those forms out.

MS. SMITH: Ok.

MR. IMSCHWEILER: What I did was in my computer, I had every time I had a call line and they didn't show up, in my computer, I had it all programmed into my computer. Unfortunately my hard drive went down, which can be verified, and my backup disk that I had also were bad. I lost three categories on my disks, one of which I had was called call line, and that's where I had all those listed.

MS. SMITH: Did you tell Mr. Gimble?

MR. IMSCHWEILER: That I lost the call line?

MS. SMITH: No, that you were not destroying the mail, that the inmates did not come for the call line?

MR. IMSCHWEILER: No.

MS. SMITH: Ok, why didn't you? Let me ask you that.

MR. IMSCHWEILER: What I was planning on doing was waiting till the end of the year to say ok look whenever

MS. SMITH: What year?

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 6

**MR. IMSCHWEILER:** Well whatever, I'm saying I was going to wait till I had a some time to go through them

**MS. SMITH:** But think about it, this has been happening since 1996.

**MR. IMSCHWEILER:** I realize that. I'm saying I was going to wait till I had time to sit down and go through the boxes, pull the stuff out and then say ok this is, this is what happened, going to get my cost factors in other words.

**MS. SMITH:** Ok, go ahead.

**MR. BLUGE:** So just let me ask this question. The boxes in question are mail that was going back and forth to people and couldn't be given to, I mean couldn't be distributed to these guys. Is that what you're saying?

**MR. IMSCHWEILER:** That's all stuff that I had in there. That's correct.

**MR. BLUGE:** Ok, so that's what that mail was from 1996, ok.

**MR. IMSCHWEILER:** That's correct. We attempted to one or the other one side of the institution or mail out the another institution come back.

**MR. BLUGE:** So an attempted guy's in the SMU they were no longer at Camp Hill SMU.

**MR. IMSCHWEILER:** Um, no the SMU's an entire

**MS. SMITH:** Is that different mail? Because didn't Captain Orwig say the inmates had complained that they were getting old mail?

**MR. IMSCHWEILER:** At the SMU? Well first of all let me tell you one thing right now. We have, it's only been the past month that we've been current in the Mailroom, and I have documentation to prove that also. It's not like you know all of a sudden, bingo, we're caught up. You know, this is happening, we would have a carry over and I have all the proof you want, carry over six thousand pieces of mail sitting on my table. Now six thousand pieces of mail is not a current situation. Ok. Mail is supposed to processed within 24 hours, and here again, I'm kind of jumping around.

**MS. SMITH:** Did you tell any of this to Captain Orwig when he did the fact finding? What you're telling us?

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 7

**MR. IMSCHWEILER:** He didn't give me the, he didn't ask the question.

**MS. SMITH:** Wait a minute, at the end of the fact finding don't you say, "is there anything else you want to add"?

**MR. IMSCHWEILER:** I didn't think

**MS. SMITH:** We're asking you now, and you're telling us all this, when Captain Orwig asked you that, why wouldn't you say yes, I have all this stuff I need to tell you?  Because that's why Captain Orwig asks that question.  Captain Orwig did ask you that question, do you have any thing else you want to add, right?

**CAPT. ORWIG:** I always ask that.

**MS. SMITH:** Yes.

**MR. IMSCHWEILER:** Yes, he did.

**CAPT. ORWIG:** Yeah, he knows that

**MR. IMSCHWEILER:** I said there were things I was going to bring up later.

**MS. SMITH:** Ok.

**MR. IMSCHWEILER:** But this is to verify, here's a flowchart that Superintendent and Mr. Gimble gets every week.

**MS. SMITH:** Is that in here?

**MR. IMSCHWEILER:** That's in there.  Also in the packet

**MS. SMITH:** Wait a minute you got to go slow because we're not Mr. Bluge and Mr. Hamberger are not

**MR. BLUGE:** Can I just go back before we get into another area here, just to clarify this, this form that says "other" on here, this wasn't on each individual piece of mail?

**MR. IMSCHWEILER:** No, right.

**MR. BLUGE:** Was it on the box?

**MR. IMSCHWEILER:** No, sir.

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 11

**MS. SMITH:**           Ok.  Go ahead.

**MR. IMSCHWEILER:**     It's, if they feel like, I want to work on a Saturday they'll sign up, if they decide they don't want to work, they'll just blow it off.

**MS. SMITH:**           Well if they would work in the evening, there wouldn't be a carry over Wednesday night to Thursday, correct?

**MR. IMSCHWEILER:**     Correct, I see what you're saying.

**MS. SMITH:**           So maybe there wouldn't have been as much on Friday going into Saturday, but go ahead.  Ok, so we've talked about mail you can't deliver, mail that's returned with wrong addresses, and inmates that don't show up.

**MR. IMSCHWEILER:**     Call line.

**MS. SMITH:**           Yes.

**MR. IMSCHWEILER:**     We talked about that, yes.

**MS. SMITH:**           Now what about inmates in the SMU that

**MR. IMSCHWEILER:**     Ok, the SMU is entirely, first of all we got stuck with this from the Attorney General's Office four years ago.  Every item that goes into the SMU, every item, has to be logged in.  Not just logged in, it has to be either, when you open up the letter, you have to write down six pages, one picture, one everything ok, it has to be a total log.  The SMU, if you look on that chart again, if we would receive, a couple years ago, if you would receive ten tubs of packages five of them were for the SMU.  The SMU gets penendated with packages and stuff.  Now, fortunately enough we got rid of couple of the guys like Bob Shirley, Johnson, the guys that were really were, these guys were, you know, and we'd have to sit there, and I have, not we, I would have to go through it and I would have to take each one of those little packages and open it up and it's very time consuming, plus the fact that being short handed I'm doing three or four hours a day out there inspecting mail, so I'm trying to get that done, do this, plus do the job of the supervisor.  And, people involved with, Phyllis would know, the phone calls we get are unbelievable from the parents, you know, what can I send Johnny.  And I'm the one who feels all those phone calls.  I'm on the

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 12

|  |  |
|---|---|
|  | phone constantly.  So, you know my job is not like sitting behind the desk and twiddling your thumb. |
| MS. SMITH: | You're a working supervisor. |
| MR. IMSCHWEILER: | Correct. |
| MS. SMITH: | Ok. |
| MR. IMSCHWEILER: | So, anyway, so we got so far behind there for a while what I did I said let's put them in boxes, and I had them set off to the side and as I would get caught up I would pull out a box and I'd open it up and put it in bags and I would send it in. |
| MS. SMITH: | So this is SMU mail that would come in that you had to log that you were behind so you put it in a box.  Now what's the rule, is there a time frame you're supposed to process that mail also? |
| MR. IMSCHWEILER: | Yes, yes maam.  The same as every one else's. |
| MS. SMITH: | Did you tell Mr. Gimble that? |
| MR. IMSCHWEILER: | No I did not. |
| MS. SMITH: | Why? |
| MR. IMSCHWEILER: | I don't know, I just |
| MS. SMITH: | Now, how old approximately was the SMU mail |
| MR. IMSCHWEILER: | I can't answer that, I don't know. |
| MS. SMITH: | So it could be anywhere from the 1996-1999 time frame also. |
| MR. IMSCHWEILER: | Correct, I had no idea, like I said I had them in boxes sitting off to the side, I would just take a box and I'd |
| MR. BLUGE: | Wouldn't that be justification for additional overtime for your staff, for you or your staff. |
| MR. IMSCHWEILER: | Sir, I work six days a week.  I'll tell you what, I've taken five Saturday's off since I've been here, seven years.  So I don't want to hear about overtime. |

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 14

printout I give them on a monthly basis, yearly basis and quarterly basis.

MS. SMITH:                  The postage report.

MR. IMSCHWEILER:            Yeah. That's, also the, underneath the postage report is also the flowchart broken down report for the year. Here again, that's my program. To answer the last question, is there another question, supervisor aware of the mail flow.

MS. SMITH:                  No, I said did you advise your supervisor, or any supervisory staff that this mail had not been processed in a timely manner or that you were aware of its' existence.

MR. IMSCHWEILER:            Ok, Mr. Gimble was aware of the fact of the call line mail being in those boxes. Ok, whether he wants to admit it or not because he made a statement to me in front of one of my employees, and that's what I wasn't going to get into, but it's in writing, he said to me, and I quote, he told me get rid of the boxes. I said I was going to put them in the dumpster.

MS. SMITH:                  Now when did he say this?

MR. IMSCHWEILER:            This goes, during Accreditation, before Accreditation.

MS. SMITH:                  Ok.

MR. IMSCHWEILER:            Ok. He said to me get rid of the boxes. I said, I'll put them in the dumpster. He said no, don't put them in the dumpsters, shred them because it could come back to bite you. And he was in reference to the call line boxes.

MS. SMITH:                  Now were these boxes, I know Terry, Mr. Bluge mentioned about the sheets being on the boxes. Could you tell which boxes were call line boxes?

MR. IMSCHWEILER:            No, it was just all the boxes I had, no, but he knew there was call line mail in there because we talked about that a long time ago, that there was stuff in there from the call lines. So what happened all those boxes were stacked it was not like I was hiding any boxes. When you walked in my Mailroom, right there were the boxes. It's not like you know I was trying to hide anything, they were sitting right there, and like I said what I would do with the new stuff is I just put them off to the one side and I just take them as I got around to it, but it wasn't like, and here he indicated as far as me wanting to

|  |  |
|---|---|
|  | destroy mail, I wouldn't have to destroy any mail. The U.S. Postal Service would have done that for me. Because all I have to do is take this envelope right here, all I do is line this out, line that out, put it in with my return mail that goes back to the Post Office and they would destroy it. |
| MS. SMITH: | Why didn't you do that? |
| MR. IMSCHWEILER: | Why should I? |
| MS. SMITH: | Oh |
| MR. IMSCHWEILER: | No, I'm not |
| MS. SMITH: | What do you mean why shouldn't you? |
| MR. IMSCHWEILER: | Why would I want to do that? My point was this, I wanted to show how much money is being involved in this. By using, you know, you know what happened with Cheryl. |
| MS. SMITH: | Yes. |
| MR. IMSCHWEILER: | I'm that type of person. Ok, even though I, I feel things basically done right, and even though I didn't do it right, I apologize because obviously, you know I should have, but I look at it this way I always look out for the taxpayer, I look out, for thirteen years I did at my last job, I did time studies, I did that type of stuff, that's just the way I am, I'm sorry. I want to say hey look this is it, this is what you can do, this is what has to be done or your going to loose x number of dollars. I did wrong, I understand that, but, you know |
| MS. SMITH: | Because I guess, if you think, we all do things that we maybe don't' agree with the policy, but we tell our supervisors why we don't agree with the policy and if the policy still says to do it, then we have to do it. |
| MR. IMSCHWEILER: | I understand that. |
| MS. SMITH: | Ok, and you knew that. |
| MR. IMSCHWEILER: | Correct. It wasn't, like I said, I had no I did wrong, I admit that, but it wasn't like I was trying to do anyone any harm, or anything, or, you know, you know, you say 1,300 pieces of mail which is a lot when you look at 99.96% of the mail we process on a timely basis the best we can, unfortunately |

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 17

**MR. IMSCHWEILER:** Plus if you really want to get technical about it, I had right after that, we had a light duty officer who was the messenger who was a permanent light duty officer. His name was John, ok. He retired. Then I got Sgt. Bailey, then I got, what was his name, Chadwick, and they were there for two years. So I had five full time employees, five full time employees, plus Chadwick and Sgt. Bailey. Plus any other guys you guys threw at me, ok.

**MS. SMITH:** I think that's been pretty constant, there's usually modified duty people in the Mailroom.

**MR. IMSCHWEILER:** Yeah. They give me some of these modified duty people and you have to play, where are they at, correct.

**MS. SMITH:** That's correct.

**MR. IMSCHWEILER:** Ok, so, call it bouncing, but anyway

**MR. BLUGE:** Maybe one thing hopefully positive will come out of this, why don't you write changes in policy that you think are required to do your job because what you're doing now is he's going to get inundated and that's just slowing the whole process down.

**MR. IMSCHWEILER:** It is changing now.

**MR. BLUGE:** But, you need, the only way is to do it properly is by policy. Unless Jan said, to tell your supervisor that you need to get it written in policy. I have another question, is anything, you've been doing this a long time, your stats, has anything come about that? Your stats brought any changes or does anybody look at that or do they just say

**MR. IMSCHWEILER:** I have no idea. Yeah the thing I, here again. I know when I leave here I know exactly what's in the Mailroom, I know exactly, and it's like you know they say why didn't you let people involved in the SMU, because what I was doing I knew it was wrong and I didn't want to hurt any body else. If I'm going to get burnt, I'm going to get burnt, I won't burn somebody else. That's just me. If I did something wrong fine, just like with Cheryl, you know, I did it, but uh, but uh, you would think things would change because you know during Accreditation they had to the problem, and if they

PRE-DISCIPLINARY CONFERENCE - MR. HOWARD IMSCHWEILER
PAGE 20

**MS. SMITH:**  Any other questions?  Is there anything else you'd like to add?  Do you have anything you'd like to add Ms. Smith?

**MS. P. SMITH:**  I made a few notes going over his paperwork last night.  I'd just want to, Mr. Imschweiler explained the 22 boxes also he provided charts along with the cost of the mail and sending it back, back and forth.  And in answer to Mr. Hamberger's question, yes the post marks do branch from 1996 to 1999.  He, Mr. Imschweiler was not hiding anything they were in full view of anybody that it entered the Mailroom, whether it was Mr. Gimble, Superintendent maybe once in a while would come in, or people from Accreditation.  As per Mr. Imschweiler's statement, Mr. Gimble knew about the call line, about the call sheets being in the boxes, he knew about that.  Mr. Gimble is in the Mailroom quite often, very often I'll say, so he should be aware of what is going on in the Mailroom.  As far as Mr. Imschweiler sending everything back to the Post Office to destroy, to hide things, be deceitful, he was not, he was being honest.  That's all I have to say.

**MS. SMITH:**  Ok.  The panel consists of Mr. Bluge, Mr. Hamberger and me.  What we have to do is we write to the Superintendent telling him whether we believe the charges have been substantiated.  Then he does a cover memo to Central Office, and Central Office gives him a range of discipline, if there is to be discipline, and you'll hear something in about a week week and a half.  Ok.

The conference concluded at 0944 hours.

_____                    _____
Phyllis Smith                                *H. Imschweiler*

/dls

cc:    Mr. Imschweiler
       Major Sunday
       Superintendent Kyler
       Union-Phyllis Smith
       *J. Smith*



MARTIN F. HORN
SECRETARY

KENNETH D. KYLER
SUPERINTENDENT

ADDRESS ALL REPLIES TO SUPERINTENDENT

JOHN A. PALAKOVICH
DEPUTY SUPERINTENDENT
FACILITY MANAGEMENT

ANTHONY L. PETRUCCIO
DEPUTY SUPERINTENDENT
CENTRALIZED SERVICES

ROBERT G. GIMBLE
BUSINESS MANAGER

JANET S. SMITH
PERSONNEL DIRECTOR

## PENNSYLVANIA DEPARTMENT OF CORRECTIONS
## STATE CORRECTIONAL INSTITUTION
## AT CAMP HILL
## P.O. BOX 8837, CAMP HILL, PA   17001-8837

### (717) 737-4531

December 16, 1999

Howard F. Imschweiler                    Corrections Mail Inspector Supervisor

Dear Mr. Imschweiler:

This is to advise you that effective at the close of business December 17, 1999, you are being terminated from your Corrections Mail Inspector Supervisor position.

A Pre-Disciplinary Conference was conducted on December 8, 1999 regarding allegations that you have violated the Department of Corrections Code of Ethics, Section B #7 and 14 and Administrative Directive 803, Inmate Mail Privileges.

At the Pre-Disciplinary Conference you admitted full responsibility for the 22 boxes of outgoing and incoming mail that were found stored in the SCI-Camp Hill Mailroom on October 21, 1999. This mail had postmarks from 1996 through 1999. This mail included incoming mail to inmates (some of which contained money orders), incoming legal mail, outgoing mail, inter-institutional mail and publications. It amounted to over 1200 pieces of mail.

You admitted to not following policy when the mail was not processed in accordance with Administrative Directive 803, Inmate Mail Privileges. You also stated that you had not kept your supervisor apprised of your actions and that he was not aware you were not following policy and not properly processing the mail.

Mr. Imschweiler, as Supervisor of the State Correctional Institution at Camp Hill Mailroom it is your responsibility to adhere to policy especially regarding the inmates' mail. Your negligence cannot be excused. I can no longer trust you to supervise mail operations at Camp Hill.

This action imposed is not based solely on the multiple offenses. Violation of any one of these could result in dismissal.

Please return all Commonwealth property to the Department of Human Resources located in the Manor House as soon as possible, including your picture I.D. Also, please return

6. There shall be no fraternization or private relationship of staff with inmates, parolees, or members of their families. This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from either the inmate or the inmate's friends, relatives, or representatives. Moreover, employes are not to deliver gifts or money to inmates' friends, relatives, or representatives.

7. The personal property of inmates will be handled with extreme care and disposed of only by properly designated authority in a manner designated by official Department of Corrections policy. Similiarly, no employe may assume the right of ownership of property owned by fellow employes, the state or by inmates; theft or abuse of property or equipment is prohibited.

8. No employe shall leave his assigned post or leave the institution or grounds without being properly relieved and receiving proper authorization from a supervisor. Proper relief involves communicating any special observations or orders to the relief personnel.

9. Lawful orders by a supervisor to a subordinate must be executed promptly and faithfully by the subordinate even though the employe may question the wisdom of such order.

14. Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the Department of Corrections by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

15. Alcoholic beverages and controlled substances shall not be carried, stored, or consumed on state property or in any state Facility or vehicle. When a controlled substance or nonpropriety drug is prescribed by a physician, the employe shall immediately notify his/her supervisor and obtain prior written approval to bring the medication onto facility grounds. Such medication must always be kept under the secure control of the employe. An employe shall not report for duty in an unfit condition.

16. Personal weapons shall not be brought onto state property without the advanced written approval of the Superintendent.

17. Employes shall not testify in any civil case in which the Department of Corrections may have an interest without informing the Commissioner, unless under court order.

18. An employe shall not use a Commonwealth vehicle for personal business or for any other reason except as authorized. When involved in in an accident while operating a state vehicle,

## Yahweh's New Covenant Assembly

*Thy Word is Truth* John 17:17

# Is the Rapture Biblical?

*"Then two shall be in the field; the one shall be taken, and the other left" —Matthew 24:40.*



◼ **MINISTUDY** ◼

# Yahweh's Name at the End of the Age

*His people will know His Name.*

Since the early 1930s the sacred Name of the Heavenly Father, Yahweh, has been proclaimed in earnest. The earliest Sacred Name pioneers realized that most readers of the Bible were ignorant of Yahweh's great Name. The omission of His Name and substitutes for it can be traced to early Bible translators who followed superstitious Jewish traditions against using the sacred Name Yahweh.

Few translators were conversant in Hebrew, and detested anything Hebrew or Jewish, just as many do today. They could neither read nor speak Hebrew fluently and resorted to the Greek translation of the Old Testament known as the Septuagint, bypassing the original Hebrew texts.

From the Greek Septuagint was made the Latin version of the Old Testament. From the Latin came our English Bibles.

## Septuagint Had Yahweh's Name

The original Greek Septuagint of the Old Testament had Yahweh's Name (known as the Tetragrammaton—meaning four letters) inscribed in gold letters in Hebrew: יהוה . Later copyists, being ignorant of Hebrew, substituted the Greek words Kyrios and Theos with the excuse that if the Tetragrammaton were sacred in the Hebrew, Kyrios and Theos were sacred in the Greek.

The translators of the 1611 English Bible, the highly revered King James "authorized" version, followed the custom of earlier Bible translators in supplanting the sacred Name Yahweh with the



## MINISTUDY

# Is the KINGDOM Here Now?

*A popular televangelist, as well as many others, proclaims that the "church" is the Kingdom. Is this true? Is the body of called-out ones the same as the Kingdom? Does Scripture tell us?*

In the study of end-time events, the rulership of Yahshua upon His return to this earth is often referred to as the *millennium*. Several forms of millennialism or millenarianism (also known as chiliasm) are widely believed. These are found in three major views of the future thousand-year reign of the Savior. Variations are also found within each view.

POSTMILLENNIALISM The teaching that the Second Advent of the Savior will occur after the thousand-year millennium. As a result of the preaching of the evangel by the "church," a period of righteousness would be established upon earth. Since World War II, many have become disillusioned with society's moral and spiritual decline. The day when the knowledge of Yahweh will fill the earth as water covers the sea has been but a dream.

PREMILLENNIALISM The most popular view held by many evangelicals wherein the Savior will literally rule over the earth. This concept dictates that Yahshua must appear before the millennial kingdom is set up. Premillennialists believe in the literal interpretation of Revelation and Old Testament related verses.

AMILLENNIALISM A symbolical interpretation of Revelation 20. It says Yahshua will return to set up His reign after the present earth is destroyed in judgment and a new heaven and earth is established. Rulership of Yahshua takes place upon His return.

1

# MINISTUDY

# Why Grace Leads to Obedience

**"Guilty" was the jury's verdict.** The judge's sentence: death by lethal injection. For Wey Ward, a convicted murderer, the nightmare of that December day seven years ago had played endlessly through his mind.

In a jealous rage he had taken a man's life. He realized that he deserved the death penalty for what he had done. No amount of agonizing could change that.

Regardless of how many times he pleaded for forgiveness from the victim's family, no matter how much he wished he could relive events, one persistent fact remained. Ward deserved to die. The law was the law. He was guilty of a capital crime and he had to pay the price for his sin.

With nowhere else to turn, he begged mercy from the governor.

## "You Have Been Pardoned"

Just 10 minutes before his scheduled execution, Wey Ward heard the most unbelievably wonderful words ever spoken to a condemned man:

"By the grace of the governor of this state, you have been pardoned."

"I can't believe it," he said to himself. "He forgave me!"

Humbly thankful for the gracious pardon, Ward vowed from that point on that he would be a model citizen. And he never was in trouble with the law again.

Although fictitious, the foregoing illustrates the concept of scriptural grace and how it works in the

1

# MINISTUDY

# Why the Savior Spoke in Parables

**Didn't the Messiah use parables to make the message clearer to the common people? That's what most think. But that is not necessarily so.**

THE SAVIOR OFTEN USED PARABLES in teaching His disciples. Many parables appear in the Evangels, but none in the Book of Acts, the ministry of the disciples.

Parable is *mashal* in Hebrew, meaning proverb, similitude, parable, in which ideas are presented in the robes of imagery. A parable might be said to be a very short story with a double meaning.

The Bible Encyclopedia defines a parable as a way of teaching spiritual truths by using a picture or short story. Grammarians explain a parable as a figure of speech, an "extended metaphor."

Parables were not new. Founded in antiquity, they are common in most cultures.

## Parables in the Old Testament

The Bible's first recorded parable in the form of a fable is that of trees choosing for themselves a king, as we read in Judges chapter 9. Jotham used this fable to convince the inhabitants of Shechem of the folly in having elected so vile a man as Abimelech for their king.

Interestingly, Nathan told King David a parable about a ewe lamb in order for David to get a perspective from Yahweh's viewpoint of his sin with Bathsheba, 2 Samuel 12:1-7. David was thus induced to name his own punishment, which Yahweh in His mercy delayed, but later inflicted through David's family.

1



## MINISTUDY

### Does Acts 20:7 Teach

# Sunday Worship?

*Was Paul really preaching on Sunday in Acts 20:7? A close look dispels this popular belief and discloses important days for observing today.*

A MOST CONTROVERSIAL AND DEBATED passage in the entire New Testament is found in Acts 20:7: *"And upon the first day of the week, when the disciples came together to break bread, Paul preached unto them, ready to depart on the morrow; and continued his speech until midnight."*

Often cited as proof that the early disciples had been instructed by the Savior to observe Sunday, this verse supposedly shows that they were indeed now keeping the first day of the week instead of observing the day we know as Saturday.

Certain translations of this passage render it the same as the King James Version, namely, "the first day of the week." However, other translations render it Saturday night (New English Bible, Good News for Modern Man). How are we to understand this enigmatic passage?

Churchianity's understanding of this passage is divided. Those who worship on Sunday insist this is a powerful passage in support of Sunday-keeping, and is a paramount verse used to show that the Apostle Paul was now keeping Sunday as a day of worship.

But Sabbath-keepers contend that it is indeed a Saturday evening message Paul preached that lasted into the night, into the first day of the week that begins at sunset (known to us as Sunday). They cite verses 8 and 9 to substantiate that it was evening and that there were many lights in the upper chamber. The evidence indicates that this latter understanding provides a clearer explanation. Biblical days end with sunset as well as start at sunset.

1



## MINISTUDY

# Is His Name Jehovah or Yahweh?

*The Christian translators of the Bible unknowingly followed the Jewish Scribes and disguised the Name of the Creator. Now learn the truth about the Heavenly Father's revealed, personal Name!*

---

ASK MOST BIBLE BELIEVERS what the name of the Heavenly Father is and they probably will say Jehovah. Ask them for some proof of this and they will either point to traditional usage or refer you to some Old Testament English Bible version.

Surprisingly, the name of the Heavenly Father is not Jehovah, and never was. The history of "Jehovah," which some encyclopedias call erroneous and which many Bible scholars agree is not accurate, is quite eye-opening.

In the oldest text of the Bible, the ancient Hebrew script, the sacred Name is represented by four Hebrew letters, יהוה . These four letters are called the *Tetragrammaton,* appearing in English as YHWH.

The ancient Hebrew alphabet had no vowels. To indicate vowels, scribes or copyists used diacritical marks or points above or below the letters. Jewish law experts decided to hide this Name to make certain it would not be taken in vain or blasphemed. Therefore, when the four letters of the Tetragrammaton appeared in the text, scribes "pointed" it with substitution vowels for the Hebrew word *adonai* (meaning "lord") which was then read "adonai" instead of the sacred Name "Yahweh."

One of the most widely known words in the world is "halleluYah," an imperative meaning "Praise you Yah." Notice that the short or poetic



# This Is the ELIYAH MESSAGE

*Ancient prophets along with the Messiah Himself foretold that an EliYah would come to restore all things before the Second Coming of the Savior. What that means directly affects you and your salvation!*

Bible students around the world are increasingly aware of the many events foretelling the end of the age and the imminent appearance of the Messiah. We are witnesses to growing lawlessness, shameless immorality, and a general spiritual decline at every level of society. All of which only confirms Bible prophecy. (See 2Tim. 3:1-5.)

At the same time, a continual diluting of the Bible's strong moral message has changed the reason many attend church. No longer a place for self-examination leading to a repentant change in one's life, church is now a place to learn about how to be prosperous and successful. Solid Bible teaching has given way to man-centered, "New Age" doctrines that promote self help.

## The Bible: an Ignored Book

Sins are condoned and overlooked under the guise of grace, love, and forgiveness. A lopsided emphasis is placed on the Savior's blood covering all sins when nothing is said about fruits worthy of repentance or making restitution for wrong.

Swept aside today is the Bible's clear message

## MINISTUDY

# Is Christmas A *Biblical* Observance?

**"Put the Savior back in Christmas," people cry. But was He ever there in the first place?**

By far the most important celebration in the Western world today is Christmas. Billions of dollars will be spent this year on gifts, gift wrapping, candy, decorations, and greeting cards in a gigantic, annual spending spree that starts in earnest right after Hallowe'en—and shifts into overdrive the day after Thanksgiving.

Merchants hinging their hopes for the entire sales year on Christmas profits keep the momentum at a fever pitch. A nonstop flood of advertisements and promotions entice an exploitable public to continue spending themselves into debt at this time each year.

The more religiously disposed object to the commercialization of the "Savior's birthday." They can see that this annual celebration has little in common with any Biblical observance. On the contrary, Christmas today is little more than a mandatory ritual of gift exchanging done under the guise of family togetherness and pleasing children.

But the Bible believer must stop to ask himself, am I pleasing my Heavenly Father by my Christmas observance? If this is what He wants me to do, then surely I can find in His very Word—the Bible—at least one passage telling me to keep this holiday.

Shocking as it may be, you cannot find even one command in the entire Bible to keep this supposed birthday of the Savior! Furthermore, nowhere in the New Testament is there a single instance where someone observed Christmas. Not one of the Apostles observed December 25, nor did any of them ever in the Savior's 33 years on this earth throw Him a birthday party. Nowhere do we find His disciples giving a gift to Him on December 25. Nor did anyone else. Not even to one another.

1



# PASSOVER

## *A Memorial for All Time*

# The MISTAKEN J

## True Names of the Father and Son

REPRINTED FROM THE CATHOLIC DIGEST
JANUARY 1991



By JOSEPH STALLINGS

# HOW YESHU'A BECAME JESUS

A history of
Our Lord's name

We usually don't think about it, but Our Lord's name was not always *Jesus*. It was, in fact, originally the popular Aramaic name *Yeshu'a*.

In first century Judea and Galilee, the name *Yeshu'a* was very common and shared fifth place with *Eleazar* (Lazarus) in popularity as a name for Jewish men. The most popular male names at that time were *Shime'on* (Simon), *Yosef* (Joseph), *Yehuda* (Judah or Judas), and *Yochanan* (John).

In the Holy Land at the time of Christ, Aramaic had replaced Hebrew in everyday conversation, but Hebrew remained the holy language and was used in worship and daily prayer. The rabbis also used Hebrew when instructing their disciples. The two languages were closely related, however, as close as Italian is to Spanish, and both used the same alphabet.

*Yeshu'a* was the Aramaic version of the Hebrew name *Yehoshu'a*, (Joshua), and means "Yahweh saves."

Throughout Christ's lifetime in Galilee, Samaria, and Judea, of course, the name *Yeshu'a* presented no problem for those who spoke Aramaic and read the Bible and prayed in Hebrew. But outside of the Holy Land, it became a different story as the Good News spread.

The Gentiles of the Roman Empire spoke Greek and Latin and simply could not pronounce *Yeshu'a*. It

45

# Who IS Lord God?

# Who IS Baal?





# Why Aren't Your Prayers Answered Today?



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN CLEARY,
      PLAINTIFF

    V.

KENNETH KYLER, ET. AL.,
      DEFENDANTS

CIVIL ACTION NO: 1-CV-00-2125
    (Judge Caldwell)

CERTIFICATE OF SERVICE

    I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of the foregoing Plaintiff's Motion in Opposition the Defendants Motion for Summary Judgement, upon the person(s) and manner indicated below.

    service by first class mail addressed as follows:

Office of Chief Counsel
Mr. Raymond W. Dorian
55 Utley Drive
Camphill, Pa 17011

John Cleary *DF5779
Box 99901
Pittsburgh, Pa 15233

DATED: March 26, 2002

X _____
John Cleary *DF5779
Pro Se Prisoner

burgh, Pa. 15233



FILED
MAR 2 9 2002
PER _____
HARRISBUR

U.S. District Court
228 Walnut St
P.O. Box
Harrisburg, Pa. 17108



MAR 27 02
PA.

PB METER
7059874

$1.72

U.S. POSTAGE